STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         Civil Action
                                                  Docket No. RE-11-0056


HELEN RIVAS ROSE and
NATHANIEL P. MERRILL,

        Plaintiffs,

    v.

WILLIAM PARSONS, JR., *et als.*,                  **ORDER ON SECOND**
                                                  **POST-JUDGMENT MOTION**
        Defendants,

    and

LLEWELLYN P. H. ALDEN, *et als.*,

        Parties-in-Interest.

Following issuance of the June 26, 2017 order on post-judgment motions granting

in part and denying in part relief requested by certain Defendants[1] to amend final

judgment in this matter, the same Defendants timely filed a second motion to alter or

amend.   The second motion is denied, and the court takes this opportunity to clarify its

ruling on the adverse possession issue in light of the Law Court's recent decision in

*Dupuis v. Ellingwood*, 2017 ME 132, \_\_\_\_ A.3d \_\_\_\_.

This second motion requests that the court reconsider and reverse its conclusion

in the June 26th order that Defendants failed to meet their burden of proof with respect

to the claim of abandonment of Road A by adverse possession.   The court cited then-

prevailing Law Court precedent, *Gravison v. Fisher*, 2016 ME 35, ¶ 52, 134 A.3d 857, in

support of its previous application of the higher, clear and convincing evidence

standard.   The day after the June 26th order issued, the Law Court decided *Dupuis*, 2017

---

[1] *See Order on Post-Judgment Motions,* at 1, n. 1.

1

ME 132, which clarified that the burden of proof applicable to a claim of abandonment by adverse possession is the preponderance standard, not clear and convincing evidence. *Id.* ¶ 9, n.4 ("Our notation in *Gravison*, 2016 ME 35, ¶ 52, 134 A.3d 857, that extinguishment by abandonment and by adverse possession are both subject to a clear and convincing standard of proof is a misstatement of our prior decisions.").

Even under the preponderance standard, Defendants have failed to establish adverse possession. In particular, and for the same reasons discussed in the June 26th order, the evidence does not establish it is more likely than not that their possession was "actual", "visible", and/or "exclusive." *See Order on Post-Judgment Motions,* at 6-7. Despite the similarities between the instant case and *D'Angelo v. McNutt,* 2005 ME 31, ¶ 13, 868 A.2d 239, there are also significant differences, including the facts that (i) none of the actions or improvements taken by the Liversidges over the years acted as a barrier to foot passage over Road A; and (ii) the 1916 deeds expressly allowed for relocation of the easement on the face of the earth over a servient estate.

The court hereby clarifies that it has applied the preponderance of evidence standard in evaluating the claim of abandonment by adverse possession consistent with *Dupuis,* and the application of that standard yields the conclusion that Defendants have not established said claim.

Accordingly, with that clarification, the motion to alter/amend is DENIED.[2]

SO ORDERED.

Date:    August 18, 2017

Wayne R. Douglas
Justice, Maine Superior Court

---

[2] Plaintiff's request for further consideration of other issues not raised by the instant motion is denied.

Date: 8/18/2017
At the direction of the Court, this
Order shall be incorporated into the
docket by reference. Rule 79 (a)

Justice, Superior Court

RE-11-56
<u>ATTORNEY FOR PLAINTIFF HELEN RIVAS ROSE:</u>
ALAN SHEPARD
ALAN SHEPARD & READ
93 MAIN STREET
KENNEBUNK ME  04043

PLAINTITT NATHANIEL P MERRILL PRO SE
CRESCENT SURF DRVE #1
KENNEBUNK ME  040431


<u>ATTORNEYS FOR DEFENDANTS:</u>
MICHAEL BOSSE
MEREDITH EILERS
BERNSTEIN SHUR SAWYER & NELSON
P O BOX 9729
PORTLAND ME  04104

PETER PLUMB
KELLY MCDONALD
MURRAY PLUMB & MURRAY
P O BOX 9785
PORTLAND ME  04104

<u>ATTORNEYS FOR PARTY-IN-INTEREST:</u>
JENS PETER W BERGEN
LAW OFFICE OF JENS-PETER W BERGEN
79 PORTLAND ROAD
KENNEBUNK ME  04043

REID HAYTON HULL
DRUMMOND WOODSUM
84 MARGINAL WAY SUITE 600
PORTLAND ME  04101

STATE OF MAINE
YORK, ss.

SUPERIOR COURT
Civil Action
Docket No. RE-2011-056

HELEN RIVAS ROSE and
NATHANIEL P. MERRILL,

        Plaintiffs,

    v.

WILLIAM PARSONS, JR., *et als.*,

        Defendants,

    and

LLEWELLYN P. H. ALDEN, *et als.*,

        Parties-in-Interest.

**ORDER ON POST-
JUDGMENT MOTIONS**

Following entry of final judgment, certain parties[1] timely filed post-judgment motions. Plaintiff's motion requests that the court reconsider its conclusion concerning the scope and purpose of the easements in Road A and Road H. Defendants' motion seeks reconsideration of the court's ruling that the Farm Lot easement in Road A was not abandoned through adverse possession, and also requests additional findings of fact related to that issue. Their motion further seeks correction of a misstated fact. In response to Plaintiff's motion, Defendants also asked the court to "explicitly address the

---

[1] Plaintiff Helen Rivas Rose; Defendants William Parsons, Jr., William C. Parsons, Charles B. Parsons, Louise P. Larry, Louise Parsons Pietsch (Louise Parsons Smith in complaint), David L. Weld, Jr., Christopher P. Weld, Ashley Taylor, Rudolph Hutz, Elizabeth Hutz, Thomas K. Liversidge, Jr., as Trustee of Beach Property Realty Trust, Kathryn A. Burns (Katherine A. Burns in complaint), Michael A. Greeley, Jackayla, LLC, Anne Ferguson (Ann Ferguson in complaint), Matthew Miller, Stacey Miller, Ben Miller, Ali Giacomin, Llewelyn Parsons Smith, Sarah S. Gerritz, Abigail A.S. Davis, G. Putnam Smith, Jr., Sarah P. Currie (Bonnie Curry in the complaint); and Party-in-Interest Horace P. Liversidge, II.

1

limits of the relief requested by Plaintiff in this action." (Def.s' Opp. to Pl.'s Mot. to Recons. at 1.)

## Plaintiff's Motion for Reconsideration

Plaintiff requests that the court reconsider its ruling on the scope of the Farm Lot's easements with regard to use of the beaches, and urges a conclusion that the easements include implied rights of general, recreational use of Crescent Surf Beach "within Road H" and Parsons Beach "within the confines of the areas between Lot C and CC on the 1915 Plan." (Pl.'s Mot. for Recons. at 10.)

The Law Court cases Plaintiff cites—*Sleeper v. Loring, Flaherty v. Muther,* and *Badger v. Hill*—do not hold or imply that a right-of-way easement to a body of water *per se* grants a dominant estate rights of use to the beach, land, or water. *See Sleeper v. Loring,* 2013 ME 112, ¶¶ 18-20, 83 A.3d 769; *Flaherty v. Muther,* 2011 ME 32, ¶¶ 56-57, 17 A.3d 640; *Badger,* 404 A.2d 222, 226 (Me. 1979). Rather, all three cases make clear the grantor's intent determines an easement's scope and purpose, and where deed language is ambiguous or incomplete, then resort to extrinsic evidence is appropriate to divine the intent. *Id.* The language of the 1916 deeds, the incorporated 1915 Plan, and pertinent extrinsic record evidence were the basis of the court's determinations of the scope of rights within the easements, the purposes of the easements, and the boundaries and location of the two roads. *See Rose v. Parsons,* No. RE-11-056, 2017 Me. Super. LEXIS 5, *45-48 (Jan. 12, 2017). For the reasons noted therein, the record evidence as a whole does not support Plaintiff's desired conclusions.

The cases Plaintiff cites from other jurisdictions are distinguishable or otherwise unpersuasive as a basis for establishing implied use rights in the face of existing Maine

2

precedent.[2]

Finally, Plaintiff states she is "seeking the ability to simply walk down the beach," and thus also requests that the court "conclude that the beach access in this case includes recreational rights . . . to walk the beaches in their entirety." (Pl.'s Mot. for Recons. at 5, 10.) Defendants' reply memorandum contends that Plaintiffs are estopped from seeking any rights outside the boundaries of Road A and Road H because other beachfront lot owners were not joined in the action,[3] and because earlier pleadings, rulings, and representations in the case[4] reflect that Plaintiffs were not seeking use rights beyond the confines of the easement boundaries. (Def.s' Opp. to Pl.'s Mot. to Recons.) Defendants seek clarification on this issue.

---

[2] In *Toms v. Settipane,* a Connecticut Superior Court case, one chain of title granted an express right to use the beach and a second title chain granted "a right of way over a footpath to the beach on Long Island Sound." 317 A.2d 467, 471-72 (Conn. 1973). The court held that the right of way in the latter deed included use of the entire beach, based on extrinsic evidence of use at the time the easement was created. *Compare id. with Flaherty v. Muther,* 2011 ME 32, ¶¶ 56-57, 17 A.3d 640. Moreover, even if Connecticut law implies such a right when an easement is ambiguous or silent without any supporting extrinsic evidence, Maine law does not; there must be sufficient evidence, extrinsic or otherwise, to establish that the grantor so intended. *Id.* The Massachusetts Appeals Court case of *Murphy v. Olsen* did not involve implied beach use rights but rather rights that were expressly set out in the deeds. 826 N.E.2d 249 (Mass. 2005). And, although the Massachusetts Supreme Judicial Court in *Anderson v. DeVries* held that back-lot owners' right-of-way to the beach implied recreational use rights in the beach, this conclusion was based both on extrinsic evidence of historical use particular to the case as well as upon a finding of "prior vested rights" because "[t]he chief inducement for the purchase of [the back lots] was the right to use the beach for swimming, bathing, and sun bathing." 93 N.E.2d 251, 253 (Mass. 1950).

[3] In response to Defendants' March 2011 motion to dismiss for failure to join necessary parties, Plaintiffs responded that they "are only asserting rights to get to the beach, and to utilize certain portions of the beach which are extensions of Roads 'A' and 'H'." (Pl.s' Opp. to Motion to Dismiss at 5.). The court (*Fritzsche, J.*) denied the motion stating, "[i]t is not necessary to join the remaining beachfront owners as the dispute is primarily about the use of 'Road H' and Road A.'" (Order signed June 8, 2011).

[4] Plaintiffs' second amended complaint claimed rights to use the roads and pathways depicted in the 1915 Plan, along with "access and *use of the beach within these pathways,*" and sought a declaration of rights to use said roads, including access and *use of the beach within the right of ways* . . . ." (2nd Am. Compl. Summary of the Claim, ¶¶ 19, 30, Demand for Judgment) (emphasis added)).

3

The judgment concludes that the rights-of-way in Road A and Road H extend to the low water mark of the Atlantic Ocean. This provides a right of access to the intertidal zone of the beach in question. It is not the intent of the judgment that exercise of the use rights articulated therein be confined within the physical boundaries of the easements themselves. Rather, once the intertidal zone of Parsons Beach or Crescent Surf Beach is reached via the right-of-way, the easement holder has the right to use the intertidal zone up and down each respective beach for any purpose so long as it is consistent with a fee owner's acquiescence, *see Flaherty v. Muther,* 2011 ME 32, ¶ 56, 17 A.3d 640, and also has any and all public use rights recognized under Maine law. *See McGarvey v. Whittredge,* 2011 ME 97, ¶ 28, 28 A.3d 620; *Bell v. Town of Wells,* 57 A.2d 168, 173 (Me. 1989); *Marshall v. Walker,* 93 Me. 532, 536-37, 45 A. 497, 498 (1900). These limited use rights in the intertidal zone of the beaches are not inconsistent with legal rights of beachfront lot owners, whether or not a party to this action. *Flaherty,* 2011 ME 32, ¶ 56, 17 A.3d 640.

## Defendants' Partial Motion to Alter or Amend Judgment

### 1. Adverse Possession

Defendants contend that the court did not adequately address their adverse possession claim with respect to Road A. They request the court make additional findings of fact on the basis of the existing record and conclude the Farm Lot's easement in Road A has been terminated by adverse possession.

The court did consider their adverse possession claim as an alternative ground for proving abandonment, and concluded that Defendants had not proven each and every required element of their claim. *Rose,* 2017 Me. Super. LEXIS 5, at *40-44. While there may have been sufficient evidence at trial to satisfy some of the adverse possession elements, Defendants did not meet their burden of proving all elements

4

required to establish their claim.

A claimant asserting fee ownership by adverse possession must prove actual, open, visible, notorious, hostile, continuous, and exclusive possession of the subject property under a claim of right to that property for a period of over 20 years. *Harvey v. Furrow*, 2014 ME 149, ¶ 11, 107 A.3d 604, *see also Rose*, 2017 Me. Super. LEXIS 5, at *44. These same nine elements comprise the substantive standard applicable to an adverse possession claim brought by a servient estate owner to extinguish a private easement over the servient estate. *D'Angelo v. McNutt*, 2005 ME 31, ¶ 13, 868 A.2d 239. In pressing their adverse possession claim, Defendants rely upon *D'Angelo* not only because it provides the applicable standard for establishing adverse possession but also because the "acts of dominion" found to be sufficient to extinguish a private easement right in that case are very similar to the actions taken by the Liversidges in this case. Despite its similarities, *D'Angelo* is not squarely on point and therefore does not compel the same result in this case.

*D'Angelo* did not involve a sole claim of extinguishment of a private easement by adverse possession. The plaintiffs, the D'Angelos, owned property abutting both sides a 30-foot wide strip of property known as "Maine Avenue." *Id.* ¶¶ 1, 3. The defendants, the McNutts, were fee owners of Maine Avenue. *Id.* ¶ 4. The plaintiffs asserted fee ownership in Maine Avenue by adverse possession and prevailed on that claim. *Id.* The Law Court rejected defendants' alternate contention that even if plaintiffs established ownership of Maine Avenue by adverse possession, defendants retained a private easement therein. *Id.* ¶ 12. Without further analysis and seemingly without applying a heightened burden of proof to the abandonment by adverse possession claim, the Court found the same "acts of dominion" that were sufficient to establish a fee interest by adverse possession under the preponderance standard were

5

also sufficient to extinguish a private easement.   *Id.* ¶ 13.

In the instant case, however, the Liversidges are the rightful owners and possessors of the servient estate.   In light of this distinction,[5] and the heightened clear and convincing burden of proof associated with abandonment claims, *see Gravison v. Fisher,* 2016 ME 35, ¶ 52, 134 A.3d 857; *Canadian Nat'l Ry. v. Sprague,* 609 A.2d 1175, 1179 (Me. 1992), Defendants have not met their burden of proving the Liversidges' possession and use was actual, visible, and/or exclusive.

Possession is "actual" when the property is in the "immediate occupancy and physical control" of the party claiming adverse possession.   *Striefel,* 1999 ME 111, ¶ 9, 733 A.2d 984.   The purpose of this requirement is to give the owner against whom adverse possession is being claimed "notice of the *extent* of the trespass."   *Id.* (emphasis in original).   Whether possession is "actual" depends upon "the nature and location of the property, the potential uses of the property, and the kind and degree of use and enjoyment to be expected of the average owner of such property."   *Id.*

---

[5]   Neither party cited a Maine Law Court decision addressing this precise issue.   Courts in other jurisdictions employ a sharp focus in evaluating the elements of adverse possession in cases involving the servient estate owner's attempt to extinguish a private easement; and they require that the acts of dominion be sufficiently inconsistent and irreconcilable with the exercise of the easement rights.   *See, e.g., Matoush v. Lovingood,* 177 P.3d 1262, 1270 (Colo. 2008) (only "incompatible or irreconcilable use" with easement holder's authorized rights sufficient to extinguish easement by adverse possession); *Smith v. Muellner,* 283 Conn. 510, 518, 932 A.2d 382, 390 (2007) (dominion over servient estate insufficient; acts of a servient owner must be "distinctly adverse" to easement rights); *Mueller v. Hoblyn,* 887 P.2d 500, 507 (Wyo. 1994) ("use of the servient estate made during the period of adverse possession [must be] sufficiently hostile and inconsistent with the use permitted by the easement"); *Titcomb v. Anthony,* 126 N.H. 434, 437-38, 492 A.2d 1373, 1375-76 (1985) (use of land by servient tenant must be "incompatible or irreconcilable with" easement rights); *New England Home for Deaf Mutes v. Leader Filling Stations Corp.,* 276 Mass. 153, 158-59, 177 N.E. 97, 99 (1931) (occupation of land by servient tenant must be "irreconcilable with the rights of the dominant tenant" to extinguish easement). This view is consistent with Maine's elevated burden of proof required in claims of abandonment of an easement, one basis for which can be adverse possession.   *See Gravison,* 2016 ME 35, ¶ 52, 134 A.3d 857 (claim must be proven "by clear and convincing evidence, establishing each fact to a high degree of probability.").

Possession is "visible" when the possession and use of the property is "capable of being seen by persons who may view the premises." *Id.* ¶ 11. The purpose of this requirement is to provide the party whose rights are being challenged "with adequate notice that a trespass is occurring, and that the owner's property rights are in jeopardy." *Id.*

Possession is "exclusive" when the adverse possessor is "not sharing the disputed property with the true owner or public at large." *Id.* ¶ 17. To establish exclusivity, the adverse possessor must show "'an exclusive domination over the land and an appropriation of it for his own use and benefit, and not for another.'" *Id.* ¶ 17 n.10 (quoting BLACK'S LAW DICTIONARY 565 (6th ed. 1990)).

The record is clear that the Liversidges have possessed and used their property continuously since the early 1980s. Over the years they have made numerous changes and improvements to the land, some of which directly or indirectly affect the pathway across their property where Road A is depicted in the 1915 Plan.[6] With respect to the question of whether their possession and use is sufficient to satisfy the foregoing elements, however, the test in these circumstances is not merely whether they used the property as average owners would or even whether they have made changes to the property that would impact the pathway of Road A as delineated in the 1915 Plan.

---

[6] For example, the Liversidges replaced the old white gate at the intersection of Road A and Road B on the 1915 Plan with a new gate, and then later with a chain. *Rose*, 2017 Me. Super. LEXIS 5, at *26. The court also made the following findings: the original gate was intended to prevent vehicle traffic, not the foot traffic of family members; the new gate and chain likewise would not have kept one from walking down that way; the Liversidges did "considerable landscaping and other work on their property on the land underlying Road A;" "[t]hey planted trees on the eastern boundary of the segment of Road A between Lots 12 and CC on the 1951 Plan;" they built a new driveway; they "planted a rose garden on or near a section of Road A between Lots CC and 21 on the Plan;" they "placed granite blocks on their property;" "[t]hey planted an arbor in [the same] location;" "[t]hey built a shed near, but not on, Road A;" and they "built an addition to their house, the corner of which . . . just barely" encroached upon a portion of Road A. *Id.* at 26-27.

7

Rather, it is whether their use and possession as lawful owners of the property was, in fact, inconsistent and irreconcilable with use of the easement. For several reasons, Defendants did not carry their burden.

First, despite the changes and improvements over the years, after considering all the evidence the court found "[n]one of the improvements would act as a physical barrier preventing foot passage over where Road A is depicted; although to follow that course today puts one squarely on the Liversidge property." *Id.*

Second, the 1916 deeds establishing the dominant and servient estates granted the servient estate owners the right to relocate easements across their properties. The original grantors did not intend for the actual locations of the rights-of-way on the face of the earth as depicted in the 1915 Plan to be fixed or immutable. This affords considerable flexibility to the servient estate owners to make changes in their properties without jeopardizing the rights-of-way guaranteed by the easements. These deed provisions, in the court's view, require an even clearer showing that the Liversidges' possession and use of their property was inconsistent and irreconcilable with continued use of an easement over Road A or a reasonable alternative pathway over the servient estate. From the court's viewing of the property and from the trial evidence, it is clear that Plaintiffs could traverse Road A, and other alternative pathways, across the Liversidges' property by foot to reach the beach.

2. **Correction of Date**

The judgment found: "In *1984*, [the Plaintiffs] sent written notice to Kin and Sandra Liversidge as well as owners of servient lots on the 1915 Plan, to give notice of their intent to 'contest the extinguishment of all easements and rights of way.'" *Rose*, 2017 Me. Super. LEXIS 5, at *28 (emphasis added). It also recites: "*Beginning shortly after Kin and Sandra Liversidge took up permanent residence at Parsons Beach around*

8

1980, Plaintiffs gave express, written notice on more than one occasion of their intent not to abandon Road A." *Id.* at *43 (emphasis added). Defendants are correct that the evidence at trial established that, although the notice bore a date of 1984, it was not mailed until 1990. (Joint Ex. 27 at 2, 30 at 1). Defendants' motion will be granted to correct the date, and the court will issue an amended judgment to so reflect.

### Order

In accordance with the foregoing, the court hereby orders:

1. Plaintiff's Motion for Reconsideration is DENIED.

2. Defendants' Partial Motion to Alter or Amend Judgment is GRANTED IN PART and the Memorandum of Decision and Final Judgment dated January 12, 2017, is amended as follows: (a) the year "1984" on page 20, line 6 of the judgment is amended to "1990," and (b) the sentence on page 31, line 11-13 is amended as follows: "~~Beginning shortly~~ After Kin and Sandra Liversidge took up permanent residence at Parsons Beach around 1980, Plaintiffs gave express, written notice on more than one occasion of their intent not to abandon Road A." An amended final judgment shall issue reflecting the foregoing amendments.

3. In all other respects, Defendants' motion is DENIED.

The clerk may incorporate this Order on Post-Judgment Motions by reference on the docket by reference under M.R. Civ. P. 79(a).

SO ORDERED.

Date: June 26, 2017

Wayne R. Douglas
Justice, Maine Superior Court

9

RE-11-056

ATTORNEY FOR PLAINTIFF:
ALAN SHEPARD
ALAN E SHEPARD & READ
93 MAIN STREET
KENNEBUNK ME  04043

ATTORNEY FOR DEFENDANTS:
KELLY MCDONALD
MURRAY PLUMB & MURRAY
75 PEARL ST
P O BOX 9785
PORTLAND ME  04104-5085

STATE OF MAINE
YORK, SS.

SUPERIOR COURT
Civil Action
Docket No. RE-2011-056

HELEN RIVAS ROSE and
NATHANIEL P. MERRILL,

        Plaintiffs,

v.

WILLIAM PARSONS, JR., *et als.*,

        Defendants,

and

LLEWELLYN P. H. ALDEN, *et als.*,

        Parties-in-Interest.

AMENDED*
MEMORANDUM OF DECISION
AND FINAL JUDGMENT
(TITLE TO REAL ESTATE INVOLVED)

## I. Background

### A. Introduction

This case involves a dispute over private rights of access to and use of two beaches—the western end of Parsons Beach and Crescent Surf Beach—both in Kennebunk, Maine. The parties are descendants of a man named Charles Parsons, who owned land along the Atlantic Ocean that included these beaches. After his death in 1904, an elaborate plan to subdivide the property among his heirs was established in accordance with his will. His descendants have owned and enjoyed use of the property since that time.

Two of his descendants, Helen Rivas Rose and her brother, Nathaniel P. Merrill, jointly own a parcel of land in the subdivision. The parcel is known as the Farm Lot and does not have ocean frontage. They claim the Farm Lot benefits from deeded easements over the properties of other family members in the subdivision. They further claim the easements provide an ongoing right to use certain private roads to

1

access and use the beaches. The dispute was brought to a head when Nathaniel P. Merrill attempted to sell part of the Farm Lot and represented to prospective buyers that the land for sale included a right of access to the beaches. Other family members and property owners oppose the claims.

## B. Procedural History

This action was commenced in March 2011 when Plaintiffs filed a three-count complaint. Count I sought a declaratory judgment to confirm that, as owners of the Farm Lot, they have full rights to utilize the roadways depicted in the subdivision plan, including for access to and use of the beaches. Count II sought similar relief under a theory of adverse possession or prescription. Count III alleged slander of title.

The original complaint named a smaller subset of defendants.[1] However, in response to a motion to dismiss, the court ordered joinder of any additional parties owning properties that this decision could affect. Plaintiffs then filed two amended complaints adding additional parties.[2] In March 2012, another amended complaint added a new party-in-interest.[3] Defendants filed a counterclaim seeking a declaratory judgment that Plaintiffs, as owners of the farm lot, have no rights to two of the roads depicted in the plan or any right to use the beaches. Party-in-Interest Mary Elizabeth

---

[1] The original complaint named the following Defendants: William Parsons, Jr.; Rudolph and Elizabeth Hutz; Thomas K. Liversidge; Katherine (Kathryn) A. Burns and Michael A. Greely; Matthew J. Burns and Debbie P. Burns; Ann Ferguson; Matthew Miller; Bonnie (Sarah P.) Curry; Llewellyn Parsons Smith; and Louise Parsons Pietsch.

[2] The complaint as amended named the following additional Defendants: William C. Parsons, Charles B. Parsons, Louise P. Parry, and Louise Parsons Smith; David L. Weld, Christopher P. Weld, and Ashley Taylor; Thomas K. Liversidge as Trustee of Beach Realty Property Trust; Stacey Miller, Ben Miller, and Ali Giacomin; and Sarah Gerritz, Abigail Davis, and G. Putnam Smith, Jr. It also added as Parties-in-Interest: Llewellyn P.H. Alden; United States of America; Elizabeth McMaster and Philip R.B. McMaster; Charles Bach McMaster and Joseph McMaster; Abigail M. Alling; Julia Read Burns; and Mary Elizabeth Fluke.

[3] The third amended complaint added Horace P. Liversidge II.

Fluke filed a cross-claim seeking a declaration that she and owners of other property depicted in the plan have rights to utilize the roadways, and in particular a road known as "Road H" to access and use the beach.

After mediation proved unsuccessful, Plaintiffs moved for partial summary judgment on Count I of their complaint. Defendants along with Party-in-Interest Horace P. Liversidge II filed a cross-motion for summary judgment on all counts. In September 2012 the court denied Plaintiffs' motion and granted the cross-motion for summary judgment, concluding that Roads A and H were terminated by merger except for the easement across Lot 12 and "[n]o later deeds revived the easements for the plaintiffs."[4] *Rose v. Parsons*, No. RE-2011-056, 2012 Me. Super. LEXIS 139, at *11 (Sept. 27, 2012). Plaintiffs appealed.

In August 2013 the Law Court vacated summary judgment in part and remanded the case to the trial court. *Rose v. Parsons*, 2013 ME 77, ¶¶ 1, 6, 76 A.3d 343. The Law Court held that even if the doctrine of merger had operated to extinguish the easements, a subsequent conveyance through a codicil to the will of one of Plaintiffs' predecessors in title revived the easements in the roads appurtenant to the Farm Lot. *Id.* ¶ 6. On remand, the trial court was instructed to determine whether the easements were thereafter abandoned or continue to exist. *Id.* ¶ 11. Summary judgment for Defendants was upheld with respect to the adverse possession and slander of title claims. *Id.* ¶¶ 12-13.

In the wake of the Law Court's remand, the parties filed another round of

---

[4] The court also found Plaintiffs "failed to establish that there was a false statement made with malice or with reckless disregard of its falsity [and] their claim for slander of title in Count III of the third amended complaint fails" and they "failed to establish that any rights . . . were re-created through adverse possession." *Rose v. Parsons*, No. RE-2011-056, 2012 Me. Super. LEXIS 139, at *12-13 (Sept. 27, 2012).

3

motions and cross-motions for summary judgment. In May 2014, the trial court granted Plaintiffs' renewed motion for summary judgment, denied Defendants' cross-motion, and dismissed as moot Party-in-Interest Fluke's motion. Defendants' motion to alter or amend the judgment was denied. Another appeal followed. The Law Court vacated the second summary judgment and remanded the matter for trial. *Rose v. Parsons*, 2015 ME 73, 118 A.3d 220.

The court conducted a view of the property with counsel on September 27, 2016. A bench trial was held on September 27, 28, and 29, 2016. Final argument was held on October 27, 2016.

## II. Facts

### A. The 1915 Division Plan

Around the turn of the twentieth century, Charles Parsons owned a significant amount of land along the Atlantic Ocean in Kennebunk, Maine. He and his family built and used seasonal homes and other buildings on the land. The property, which is the subject of the present dispute, includes two beaches separated by a rock outcropping—Parsons Beach to the east of the rocks and Crescent Surf Beach to the west—as well as substantial acreage inland.

Charles Parsons died in October 1904. Pursuant to his will, the property was initially placed in trust with instructions to the trustees, Edwin Parsons and Jefferson Hogan, that it was to be divided among his heirs after the death of his wife, Sarah J. Parsons. (Joint Ex. 21.) The trustees, with the assistance of Roland W. Libby an Engineer based in Saco, Maine, created a detailed plan to divide the lots in accordance with the will of Charles Parsons. The final plan is entitled, "Plan of Division of a part of the Estate of Cha's. Parsons, Kennebunk, Maine," dated August 10, 1915 ("1915 Plan" or "Plan"). (Joint Ex. 47.) The Plan was recorded in the York County Registry of

4

Deeds along with its implementing deeds in May 1916.    (Joint Exs. 2-8, 47.)

The 1915 Plan divides the property into approximately 46 lots, 27 of which have direct ocean frontage on one of the two beaches.    (Joint Ex. 47.)    The Plan states the square footage, ascribes the length in feet and directional courses of boundaries, depicts the footprint of any structure(s) then extant on a lot, and provides other details relevant to the division of the property for each lot.    (Joint Ex. 47.)    The Plan depicts eight "roads," labeled "Road A" through "Road H," passing over and through the lots.    (Joint Ex. 47.)    According to the Plan's scale—1 inch equals 200 feet—the roads were generally drawn to be between 12 ½ to 25 feet wide.    Below is an enlarged subsection of the Plan[5] highlighting the two roads in dispute in this case, Road A and Road H.    It also shows part of the Farm Lot, the dominant estate, and the relevant servient estates.



---

[5]  This enlargement, which is reprinted from *Rose v. Parsons*, 2013 ME 77, ¶ 2, 76 A.3d 343, is provided for the reader to illustrate the roads and lots in issue only as a convenience.  This diagram itself is not in evidence, and the court does not rely on it for any other purpose.  Joint Exhibit 47 is the full-scale Plan.

Despite the meticulous detail of the 1915 Plan and its implementing deeds, there remain several ambiguities that go to the heart of the dispute in this case, specifically, the purpose and scope of the easements in Road A and Road H and the intended location of Road A.

## B. The Dane Letter

The record contains a copy of a letter dated March 27, 1915 addressed to Walter L. Dane, Esq. ("Dane Letter" or "Letter") regarding "Charles Parsons' Estate." (Joint Ex. 25.) The Letter addresses issues that needed to be considered in order to finalize the plan for dividing the Parsons' property. (*Id.*) The author of the Letter does not identify himself but represents that he was asked by the trustees under the will of Charles Parsons "to take up with you [Walter L. Dane, Esq.][6] the matter of making a division of land owned by the estate in Kennebunk." (*Id.*) The author also quotes George C. Parsons, a son of Charles Parsons and one of the subsequently named co-executors of the will, with respect to some of the issues that needed to be addressed in dividing the property. (*Id.* at 10-12.) The Letter further authorizes Mr. Dane to "prepare descriptions of the several parcels of land to be conveyed to the different members of the family, . . . make whatever investigations of the titles is necessary, and have Mr. Libby make such surveys and maps as are necessary." (*Id.* at 2.)

Enclosed with the Letter was a map or draft of a division plan for the property that Mr. Libby previously prepared showing "the proposed division in a rough way." (*Id.* at 3.) The enclosure is not in the record, but it is apparent from the Letter's

---

[6] The letter does not indicate Walter L. Dane Esq.'s position or relationship to the family. The court infers he was a local attorney assisting with the transaction. It is also noted that Mr. Dane was subsequently named as a co-trustee/co-grantee (along with George Clarence Parsons and Henry Humphrey Parsons) of a 15-year trust established to oversee the property before all heirs assumed full ownership rights. (Joint Ex. 1.)

6

descriptions and references that the draft depicted the same configuration of many lots shown in the final 1915 Plan. (*Id.*) The Letter requests a new map be drawn up depicting the land in Kennebunk as well as the proposed division of the land into lots with "sufficient particularity to enable us to prepare proper deeds." (*Id.* at 3.) Further, it states, "The map should also show all existing roads and other rights of way," (*Id.*), and "[s]pecial attention should be paid to the question of public and private roads and other rights of way, as there seems to be a great deal of confusion in regard to this matter." (*Id.* at 9.)

The roads in issue in this case—Road H and Road A—are specifically referenced in the Letter, though not by name. For example, in referring to access to Crescent Surf Beach, the Letter quotes George C. Parsons as follows:

> In 1887 father built the house on lot A and turned the road about where the present circle on lot A is (on your map) westerly to the extreme easterly point of lot B, thence along lot B to *the road leading to the beach between lot B and lot one.* As far as I know from the circle on lot A to the beach was the way the road always ran.[7]

(*Id.* at 11.) (emphasis added). The italicized language is a reference to what became Road H on the Plan. The Letter also references the third segment of Road A shown in the 1915 Plan, again quoting George C. Parsons: *"The road to the beach between lot 12 and lot F.N.P. from E.P.*[8] formerly ran through F.N.P. from E.P. and has been moved twice." (*Id.*) (emphasis added).

---

[7] The Letter also quotes George C. Parsons referencing Road H as follows: "Last fall we stopped the Kennebunk road at the northwest corner of F.N.P. from E.P. People now to get on the western beach [Crescent Surf Beach] have to turn at the only triangle on the map and go along the road shown on the map running between the farm lot, *lot one* and lots F, E, G, *and B.*" (Joint Ex. 25 at 11.) (emphasis added).

[8] The reference to "lot F.N.P. from E.P.", (Joint Ex. 25 at 11.), is clearly a reference to Lot CC in the 1915 Plan. Joint Ex. 47. Lot CC on the Plan contains the name "Edwin Parsons." (*Id.*) Lot CC was conveyed to Frances N. Parsons and her 1916 deed confirmed that conveyance. (Joint Ex. 3 at 6.) Lot CC abuts Lot 12, and the third segment of Road A runs over both lots. (Joint Ex. 25 at 11; Joint Ex. 47.)

7

Other references in the Letter to the roads and easements are germane to the issues in this case. For example, the author makes clear that "George C. Parsons thinks that it would be a mistake to give any party the right to maintain pipes or wires over another party's land." (*Id.* at 6.) The author requests further investigation as to whether it is feasible to run pipes and wires along the roads. (*Id.*)

The Letter poses "two questions of law" for Mr. Dane to answer. It first asks whether a "private owner in Maine" is entitled to the fee of a public road passing over his land? (*Id.* at 10.) It then asks, "Has the public a right of way to the beach?" (*Id.*) With regard to the latter question, the author notes George C. Parsons' observation that "Father always claimed that the town *had only a right of way to the western beach* from the two posts as when he bought the place it was a pasture and a gate had to be opened at the two posts." (*Id.*) (emphasis added). And, the Letter notes that the "family seem to have an idea that the public has such a right of way, but that its position may be changed in any way the family desires." (*Id.*)

## C. The 1916 Deeds

In 1916 the trustees of the Charles Parsons estate executed eight deeds to carry out the planned distribution of his property. The deeds, which were recorded along with the Plan in the York County Registry of Deeds in May 1916, conveyed the property in accordance with and by explicit reference to the 1915 Plan. The heirs/grantees were the children of Charles Parsons—Robert W. Parsons, George Clarence Parsons, Frances N. Parsons, Mary Parsons Hogan, Llewellyn Swayne Parsons, and Henry H. Parsons— and one grandson—Charles ("Carl") Parsons. (Joint Exs. 2-8.)

The eighth deed conveyed the same properties in trust to George Clarence Parsons, Walter L. Dane, and Henry H. Parsons as trustees for the benefit of each of the foregoing heirs/grantees for a period of 15 years. (Joint Ex. 1.) The trustees jointly

8

held the property during this period, with enumerated rights and responsibilities. Each beneficiary held a fractional interest in the whole for that time, and any further conveyance of a property required consent of the trustees and a specified percentage of the other beneficiaries. (*Id.*)

Like the Plan, the deeds effectuating the transfer of property were carefully, professionally, and meticulously drafted. The deeds, together with the Plan, reflect a fully considered scheme for distributing the property among the heirs of Charles Parsons as well as a mechanism for assuring the property, and its use, was protected and initially maintained within the family. Each heir received at least one lot with direct frontage onto a beach. Every oceanfront lot was expressly bounded by the Atlantic Ocean in the deeds. (Stipulations ¶ 19.) Thus, each oceanfront lot owner was granted a fee interest in the beach, from the sea wall to the ocean, directly seaward of the upland portion of his or her lot(s). (Joint Ex. 2 at 2; Joint Ex. 3 at 2; Joint Ex. 4 at 2; Joint Ex. 5 at 2; Joint Ex. 6 at 2; Joint Ex. 7 at 2; Joint Ex. 8 at 2.)

In addition to describing the lots conveyed, the deeds specified a number of common provisions regarding easements, including sewer easements, utility easements, rights of way, and roads. The following provisions are common to all eight of the 1916 deeds and have particular relevance to the issues in this case.

Each 1916 deed granted[9] "as appurtenant to the . . . land and every part thereof, a right of way over all roads shown on said map and a right to maintain along all roads shown on said map water pipes, electric light wires, and telephone wires." (Joint Ex. 2

---

[9] Joint Exhibit 4 consists of Pages 303-308 of Book 641, as recorded in the registry of deeds. Page 304 of this deed, however, is missing from the court's record of the exhibits. Because all of the other deeds are consistent in content and description and because Exhibit 4 is consistent with the other deeds as far as is shown, the court has no reason to believe the missing page contains a different provision with respect to the roads.

at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.)

Each deed provided that an owner of a servient lot shall own in fee the land to the center of the road. (Joint Ex. 2 at 4; Joint Ex. 3 at 7; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 6.)

Each deed permitted servient lot owners to redirect a road crossing their property as long as "a reasonably convenient route [was] maintained for the use of the other parties entitled to a right-of-way over such road." (Joint Ex. 2 at 4; Joint Ex. 3 at 7; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 5.)

Each deed conveyed the lots "subject to the restriction that such real estate and every part thereof shall be used only for private residential purposes." (Joint Ex. 2 at 4-5; Joint Ex. 3 at 6; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 5.)

None of the 1916 deeds expressly conveyed to any inland lots a right to use or recreate on the beaches. (Joint Ex. 2 at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.)

## D. The Farm Lot

The Farm Lot is the second largest single parcel in the Plan (1,014,000 square feet). (*See* Joint Ex. 47.) In 1916, it was originally conveyed to Frances N. Parsons and George Clarence Parsons as tenants in common. (Joint Ex. 3 at 4; Joint Ex. 8 at 4.) All of the common provisions discussed above are found in these two original deeds. (Joint Exs. 3, 8.) The deeds that conveyed Frances N. Parsons and George Clarence Parsons an interest in the Farm Lot did not expressly grant any right to use the beaches. (Joint Ex. 3 at 6; Joint Ex. 8 at 5.)

Llewellyn Swayne Parsons, also one of the original heirs of Charles Parsons, later came to own the Farm Lot outright. Upon her death in 1956, the Farm Lot was devised

10

under her will to her niece, Helen Parsons Merrill. (Stipulations ¶ 18.) Helen Parsons Merrill is the mother of Plaintiffs Helen Rivas Rose and Nathaniel P. Merrill. (Stipulations ¶ 16.)

Upon Helen Parsons Merrill's death, the Farm Lot was devised to Plaintiffs' father, Frederic Arnold Merrill. *Rose v. Parsons*, 2013 ME 77, ¶ 4, 76 A.3d 343. He conveyed the Farm Lot and other lots he inherited from Helen Parsons Merrill to his children, Plaintiffs, "together with all my right, title and interest, in common with others, in and to the roads shown on the 1915 division plan; and subject to and with the benefit of all other rights, privileges, easements, obligations, conditions, covenants, restrictions and reservations set forth in deeds and devises in record title to said properties insofar as such benefits and burdens may be in force and effect and insofar as applicable to said properties." *Id.*

Until 1977, the Farm Lot was occupied only by caretakers, who lived there year-round and were responsible for maintaining all buildings and properties. The caretakers were not members of the Parsons family nor did they have any ownership rights in the Farm Lot. There was no evidence presented that the then owners of the Farm Lot, Llewellyn Swayne Parsons and Helen Parsons Merrill, ever used either Road H or Road A to access the beaches between 1931 and 1978.

### E. Road H

Road H extends from a fork in Road F and initially runs between Lot 1 and a small, unnamed lot situated between it and Road G. (Joint Ex. 47.) Road H then runs southwesterly, burdening Lot 1, Lot B-1, and Lot B. (*Id.*) Based on the Plan's scale, Road H is depicted as having a width of approximately 25 feet (2/16"). (*Id.*) There is an opening in the "line of sea wall" on the Plan where Road H reaches the beach. (*Id.*) From that intersection, two parallel, dotted lines extend south across the beach to the

11

ocean. *(Id.)* The parties stipulated that Road H extends beyond the sea wall, across the beach, and terminates at the low water mark of the Atlantic Ocean. (Stipulations ¶ 20.)

By virtue of the 1916 deeds, the lots burdened by Road H—Lot 1, Lot B, and Lot B-1—were held in fee by Charles Parsons' grandson, Carl Parsons. (Joint Ex. 2 at 2-3.) The fee in Lot 1[10] and Lot B-1 were conveyed outright. (Joint Ex. 2 at 2.) It was purported that Lot B was previously conveyed to Carl Parsons,[11] and the 1916 deed expressly confirmed his ownership of Lot B.[12] (Joint Ex. 2 at 3.) The deeds contained all of the common deed provisions mentioned above. (Joint Ex. 2.)

---

[10] The deed describes Lot 1 is as follows:

> Beginning at the northeasterly corner of Lot 2, running thence along the southerly boundary line of Road E north 84 degrees 55 minutes east 173 feet to the intersection of the southerly boundary line of Road E with westerly boundary line of Road F, thence along Road F along the westerly boundary of Road F and the westerly boundary line of Road H the following courses and distances, south 15 degrees west 129.5 feet, south 11 degrees 15 minutes east 217 ft, south 69 degrees 25 minutes east 66 feet, south 11 degrees west 274.2 feet to a point (which is south 71 degrees 20 minutes west 169.9 feet from the westerly corner of the house now owned by Charles Parsons on Lot B in the Sea Wall), thence in the same course to the Sea, thence westerly by the sea to a point in the easterly boundary line of Lot 2; thence north 5 degrees 5 minutes west along the easterly boundary line of Lot 2 to a point in the Sea Wall; thence in the same course 660 feet still along the easterly boundary line of Lot 2 to the point of beginning; containing about 40,590 square feet to the Sea Wall.
> (Joint Ex. 2 at 2.)

[11] There was no deed offered or admitted at trial with regard to the prior conveyance of Lot B to Carl Parsons. The parties did not challenge or question the capacity of the trustee/grantors to encumber Lot B with easements in the 1916 deeds.

[12] The deed's language with regard to conveying Lot B:

> [A]ll rights, titles, interest, easements and restrictions which the grantors, or any of them, have or have power to convey or release in respect to Lot B, together with the beach and other land between said Lot B and the Sea included by extending to the Sea the southeasterly and westerly boundary lines of Lot B. It is believed that title in fee simple to Lot B is already in Charles Parsons, and the foregoing provision is for the purpose of confirming his title and of releasing to him any all easements and restrictions which the parties of the first part [the grantors] may have in respect of Lot B.
> (Joint Ex. 2 at 3.)

12

By the time of her death in 1956, Llewellyn Swayne Parsons owned Lot 1, Lot B, and the Farm Lot. (Joint Ex. 23 at 2.) Upon her death, Lot 1 was devised to Helen Parsons Merrill as one of five tenants in common. (Stipulations ¶ 18.) Under a codicil to the will, Lot B was conveyed to Helen Parsons Merrill.[13] (Stipulations ¶ 17.) As noted above, the Farm Lot was also conveyed under the codicil to Helen Parsons Merrill. (Joint Ex. 22 at 11.)

Helen Parsons Merrill retained her ownership interest in these lots until 1964. (Joint Ex. 11; Joint Ex. 13.) In 1964, she conveyed her interest in Lot 1 to Robert Parsons. (Joint Ex. 11.) In 1973, she conveyed her interest in Lot B to William Parsons. (Joint Ex. 13.) The conveyances were both made subject to any burdens "in force and effect" at the time. (Joint Ex. 11 at 3; Joint Ex. 13 at 4.) Neither the 1964 nor 1973 conveyance made any reference to the easement in Road H appurtenant to the Farm Lot, while the 1973 conveyance of Lot B to William Parsons did expressly reserve an easement across Road G for the benefit of the Farm Lot. (Joint Ex. 13 at 4.)

F. **Road A**

Road A is depicted on the 1915 Plan running from the north down the east side of the Farm Lot to an intersection with Road B and Road C.[14] (Joint Ex. 47.) From that intersection, Road A continues south and east in three discrete segments. (*Id.*) The first segment runs in a southerly direction between Lot F and Lot 21, until it reaches

---

[13] In the 1915 Plan, two small lots, Lot B-1 and Lot B-2, were carved out of Lot B. (Joint Ex. 47.) Lot B-1 was situated on the north side of Lot B between Lot B and the junction of Road H and Road G. (*Id.*) Lot B-2 was situated to the east of Lot B, between Lots B, K and A. (*Id.*) At one point in time prior to 1973, Helen Parsons Merrill owned Lot B-2 in fee and owned a 1/3 interest in Lot B-1, both of which she conveyed in 1973 to William Parsons, Sr. (Joint Ex 13.)

[14] In the early years Road A appears to have been the primary means of access to the family's main home on Lot A. It may have been considered a public road for a time, and ran directly to the northeast corner of Lot A—where the Big House is located—over land that was converted in the 1915 Plan to Lots W, H, and I. (*See* Joint Exs. 25, 44, 47.)

13

the northeastern boundary of Lot W. (*Id.*) The second segment then turns 90 degrees easterly and runs between Lot 21 and Lot CC, until it reaches the western boundary of Lot L. (*Id.*) The third segment then turns 90 degrees southerly and runs between Lot CC and Lot 12. (*Id.*)

The two solid, parallel lines depicting the third segment of Road A just described intersect the "line of sea wall" pictured on the Plan at the southeast corner of Lot CC and the southwest corner of Lot 12. (*Id.*) As is the case with the Plan's depiction of Road H, there is an opening in the "line of sea wall" where it meets Road A. (*Id.*) Unlike Road H, however, from the intersection of Road A and the sea wall only one dotted line continues to the water, extending from the southwestern corner of Lot 12 across the beach to the ocean. (*Id.*)

The first and second segments of Road A are approximately double the width of the third segment of Road A. (*Id.*) Based on the Plan's scale, the first two segments are approximately 25 feet wide (2/16") and the third segment is approximately 12 1/2 feet wide (1/16"). (*Id.*)

Road A burdens multiple lots in the 1915 Plan, including, as relevant to this matter, Lot F, Lot CC, and Lot 12. Under the 1916 deeds, three heirs—Henry H. Parsons, Llewellyn Swayne Parsons, and George Clarence Parsons—were each granted a one-third interest in Lot F. (Joint Ex. 4; Joint Ex. 5; Joint Ex. 8.) Frances N. Parsons was granted a fee interest in Lot 12.[15] (Joint Ex. 3.) Lot CC was allegedly[16] conveyed

---

[15] The deed describes Lot 12 as follows:

> Beginning at the northwesterly corner of Lot AA, running thence south 13 degrees 45 minutes east 165.3 feet along the westerly boundary line of Lot AA to the Sea Wall, thence in the same course to the Sea; thence westerly about 299 feet by the Sea to a point in a line which is 249 feet westerly from and parallel with the westerly boundary line of said Lot AA, thence north 13 degrees 45 minutes

14

to Frances N. Parsons prior to 1916. (*Id.*) Thus, the deed purports to be a confirmatory grant with respect to Lot CC,[17] just as the deed to Carl Parsons had been a confirmatory deed to him with respect to Lot B. (*Id.* at 6.) These deeds contained all of the common provisions with respect to the roads and easements referenced above.

As noted below, on the 1915 Plan the name "Edwin Parsons" is written below the reference to "Lot CC." Edwin Parsons was one of the executors and trustees of the Charles Parsons estate. (Joint Ex. 1 at 1.) He previously owned some of lots in this subdivision but confirmed the transfer of them to other family members as part of the division of lands in the 1915 Plan.

Llewellyn Swayne Parsons held fee title to Lot F, Lot 21, and Lot CC by 1943. (Joint Ex. 23 at 3, 5.) In 1948 she conveyed Lot F as well as part of Lot CC and Lot W to Mary Parsons Liversidge. (Joint Ex. 9 at 1.) In 1950, she also conveyed the part of Lot 21 adjoining Road A and the remainder of Lot CC to Mary Parsons Liversidge. (Joint Ex. 10 at 1.) Neither deed expressly reserved an easement across said lots for the benefit of the Farm Lot, nor, however, did they expressly release those easements.

---

west by said line to the Sea Wall, thence in the same course 167.2 feet along the easterly boundary line of Road A to the southwesterly corner of Lot L thence north 75 degrees 20 minutes east 299 feet along the southerly boundary line of Lot L to the point of beginning, containing about 49,644 feet to the Sea Wall. (Joint Ex. 3)

[16] There was no deed offered or admitted at trial to reflect any prior conveyance to Frances N. Parsons. The parties did not challenge or question the capacity of the trustee/grantors to encumber Lot CC with easements in the 1916 deeds.

[17] The deed's language with regard to conveying Lot CC:

[A]ll rights, titles, interest, easements and restrictions which the parties of the first-part, or any of them, have or have power to convey or release . . . in Lot CC, as shown on said map, together with the beach and all other land between said Lot CC and the Sea included by extending the easterly and southwesterly boundary lines of Lot CC to the Sea. (It is believed that title in fee simple to . . . Lot CC is already in Frances N. Parsons, and the foregoing provisions is for the purpose of continuing her title and of releasing to her any and all easements and restrictions which the parties of the first-part may have in respect of . . . Lot CC.) (Joint Ex. 3.)

15

(Joint Exs. 9-10.) However, both deeds make express references to Road A in the lot descriptions, and the 1950 deed conveying the eastern portion of Lot CC and part of Lot 21 states that a "conveyance to the boundary line of a road shall convey the fee to the middle of the road subject to any easements now existing." (Joint Ex. 10 at 2.)

## G. Use of the Property from 1915 to 1977

From 1915 through the mid-1960s, the heirs and descendants of Charles Parsons used the property primarily during the summers. They stayed in one of four houses: The "Big House," located on the point and shown on Lot A of the Plan; "Seven Gables," located and shown on Lot E; the "Play House," located and shown on Lot F; and "Pine Knot," located on Lot 12 but not shown on the Plan.[18] (Stipulation ¶ 10; *see also* Joint Exs. 35, 47.) All four houses had access to the ocean. (Stipulations ¶ 11.) Typically the family that owned or stayed in each of the four houses would use the beach area in front of that house. (Stipulation at Tr. Trans., Day 2 at 60.)

In the early years there was another building on the property known as the "Pool House," an L-shaped structure located on Lot CC. Its footprint is depicted on the 1915 Plan. (Joint. Ex. 47.) The structure housed an in-ground, salt-water pool (fed by a windmill-powered pump) and a bowling alley. The pool was in the vertical (north/south) part of the "L"-shaped figure shown on Lot CC on the Plan. According to the Plan scale, the top of the "L" was approximately 100 feet (8/16") from the second segment of Road A; and the horizontal or bottom (east/west) part of the "L" shape appears to have been approximately 40 feet (3/16") from the third segment of Road A as depicted on the Plan. (*Id.*) Thomas K. ("Kin") Liversidge testified that the horizontal part of the Pool House may have been expanded at some point, bringing it

---

[18] Although not depicted in the Plan, testimony at trial indicated that "Pine Knot" was the house on Lot 12 east of the Pool House as pictured on page 1 of Joint Exhibit 35.

16

even closer to Road A where it approaches the sea wall.

The Pool House was torn down in the 1930s. At some point after it was torn down, a white fence or gate was erected across Road A, in the vicinity of its intersection with Road B. The hole where the pool had been remained open and unfilled for many years. Road A was not used for vehicular access to the area where the Pool House previously stood after that point. Over time, Road A from the gate south and east became overgrown with vegetation.

Helen Rivas Rose was born in 1942. As a child, she visited the Parsons Beach property with her family every summer for two to three weeks during the month of June and sometimes again during September. As a child, she and her immediate family would stay at Seven Gables, located on Lot E. Her family was part of a group that owned Seven Gables on Lot E. They would use the beach in front of on Lots C and D, which were directly south of Lot E.

She testified that during her childhood visits to Parsons Beach she often spent time with the caretaker's twin daughters, who lived on the Farm Lot. They would traverse the land and sometimes idle away the hours at a white gate across Road A southeast of the triangle at the intersection of Roads A, B, and C. She also testified that they would walk along Road A behind and to the south of the white gate and would spend time at the two pillars at the southwest and southeast corners of Lot W.

Helen Rivas Rose did not visit the Parsons Beach area from 1964 to 1971. It was only after her father conveyed the property to her and her brother in 1978 that she moved to Maine permanently.

Plaintiff Nathaniel P. Merrill's use of the property is unclear. He resides in Colombia, South America and did not appear at trial.

17

## H. Use of the Property and Road A Since 1977

Upon moving to Maine in 1978, Helen Rivas Rose took up permanent residence in the house on the Farm Lot. She testified that she went to Parsons Beach via a route she believed to be Road A across Lot CC up to four or five times during that first summer. At the time, her cousin, Kin Liversidge, was also living at the property. According to her testimony, Kin Liversidge asked her to take a different route to the beach to afford him privacy while he was recovering from a long-term illness. She obliged and used a different path—further to the east across Lot 21 and Lot 12—to access Parsons Beach. (*See* Joint Ex. 42 (enlarged map with push-pins).)

Kin Liversidge and his wife, Sandra, currently own most of the land underlying the southern three segments of Road A. (Joint Ex. 50.) His mother, Mary C. Parsons Liversidge, deeded him the land in 1980. (Joint Ex. 16.) The deed granted him in relevant part the "[w]esterly portion of Lot 21, [e]asterly portion of Lot CC, portion of Road A (not open), all used in common, and adjoining beach of the Atlantic Ocean, 1915 Parsons division plan . . . ." (Joint Ex. 16 at 1.)

According to his testimony, Kin Liversidge began clearing vegetation to open a road in this area as early as 1976. He testified that it took him three days to clear the growth to re-create a road extending from behind the white gate at the intersection of Roads A and B on the 1915 Plan to the western end of the segment of Road A located between Lots F and 21, and to the point where Road A takes a 90 degree turn to the east between Lots 21 and CC. When the new road was installed there was no trace of an old gravel road, and the only indication of Road A's prior existence was elevated ground between Lots CC and 21 and Lots CC and 12. He replaced the old white gate with a new gate, but eventually replaced it with a chain. The gates and chain were intended to keep out vehicles, not family members on foot. Kin Liversidge testified he

18

and his family, including two of his siblings, Horace Liversidge and Mary Elizabeth Fluke, and their families, are the only ones who have used the road that he opened.

Over the years, Kin and Sandra Liversidge have done considerable landscaping and other work to their property on the land underlying parts of Road A. They planted trees on the eastern boundary of the segment of Road A between Lots 12 and CC on the 1915 Plan. They planted a rose garden on or near a section of Road A, and planted a vegetable garden near or on the southwestern portion of Lot 21. They placed granite blocks on their property, one of which was placed in the location just below the letters "OA" in the word "Road" labeling the segment of Road A between Lots CC and 21 on the Plan. (Joint Ex. 47.) They planted an arbor in a location that appears on the Plan just above the same word. They built a shed near, but not on, Road A. Kin and Sandra Liversidge also built an addition to their house, the corner of which extended up to and perhaps just barely over the southern boundary of the second segment of Road A. (Joint Ex. 51.) They did not see evidence of a path or evidence of use of that area as a pathway. None of the improvements would act as physical barrier preventing foot passage over where Road A is depicted; although, to follow that course today puts one squarely on the Liversidge property.

Plaintiff Rose was aware of these improvements as they were being made, including the addition. In November 2009 she sent an email Kin Liversidge, her cousin, to ensure that the addition would not impede or block Road A. The next day he responded, "[T]he addition will not effect Road A." (Joint Ex. 31.) She also visited Kin Liversidge's property as the foundation for the addition was being laid to see where it was located.

Plaintiff Nathaniel Merrill emailed Kin Liversidge in May 2010 regarding Road A: "I have used Road A very little over the years to get to the beach. However must

19

now think about my six children and six grandchildren! Helen and I will be surveying this Road sometime during the summer." (Joint Ex. 32.) Kin Liversidge responded a few days later expressing his concerns regarding Plaintiffs' desire "to pursue the use of a road that has not existed for many, many years." (Joint Ex. 32.)

This was not the first time Plaintiffs, as owners of the Farm Lot, had asserted a right of way over Road A. In 1990, they sent written notice to Kin and Sandra Liversidge as well as owners of other servient lots on the 1915 Plan, to give notice of their intent to "contest the extinguishment of all easements and rights of way." (Joint Ex. 27.) Plaintiffs did not receive a response from any of the recipients of the notice. Plaintiff Rose also wrote to Kin Liversidge in 1989 to inform him that she might have people staying at her house that summer who would use Road A to access Parsons' Beach. (Joint Ex. 28.) He responded that it was his belief that Road A was his and his siblings' exclusive property, but offered to allow Plaintiff Rose to walk down his driveway to the beach. (Def.'s Ex. 3.) That offer was later rescinded upon learning that his sister and neighbor, Ms. Fluke, was planning to have renters at her house for the summer. (Joint Ex. 29.)

### III. Conclusions

Prior to trial the parties agreed that the legal issues in dispute were as follows: (A) Whether the easement rights in Road H appurtenant to the Farm Lot[19] have been extinguished by operation of the doctrine of merger? (B) Whether the easement rights in Road A appurtenant to the Farm Lot have been extinguished by abandonment? (C) If easement rights in Road H and Road A have not been extinguished, then (1) What is the scope of the easements? (2) Where is Road A's intended and actual location, and in

---

[19] Defendants are not claiming that the doctrine of merger terminated any easement in Road H appurtenant to Party-in-Interest Fluke's property. (*See* Stipulation ¶ 26.)

particular, does Road A extend beyond the sea wall and if so to what extent? (3) What is the scope of the easements in the roads and does this include a general right of recreation on the beaches? By the conclusion of trial, another disputed issue had arisen: Whether the easement rights in Road A as appurtenant to the Farm Lot have also been extinguished by operation of the doctrine of merger?[20]

For the reasons set out below, the court concludes: (A) The easements in Road H and Road A appurtenant to the Farm Lot have not been extinguished by the doctrine of merger; (B) The easement in Road A appurtenant to the Farm Lot has not been extinguished by abandonment; and (C)(1) The scope of said easement rights in the roads consists only of a right-of-way over the roads and a right to maintain certain utilities along the roads; (C)(2) One purpose of the rights-of-way in the roads is to provide access to the beaches; (C)(3) Both roads extend from the sea wall to the Atlantic Ocean and thus to the intertidal zone of the beach; and (C)(4) By virtue of these rights-of-way, the easements imply general use rights, including recreational rights, within the intertidal zone of said Crescent Surf Beach and Parsons Beach, but only as acquiesced in or permitted by the title owner of the intertidal land(s) as well as any and all public use rights in the intertidal zone of said beaches recognized under Maine law, including the so-called Colonial Ordinance of rights of fishing, fowling and navigation.

---

[20] In the first appeal of this matter to the Law Court, Plaintiffs challenged this court's grant of summary judgment to Defendants based upon an initial conclusion that merger had extinguished the easements in both roads appurtenant to the Farm Lot. See *Rose v. Parsons*, 2013 ME 77, ¶¶ 1, 6, 76 A.3d 343. The Law Court's reversal of that ruling was predicated, in part, on facts that trial revealed to be erroneous. Neither the parties nor the Law Court were aware at the time of this gap in the record. Thus, the question of merger as it pertains to Road A appears to now be revived. The court addresses the issue of merger with regard to Road A and the doctrine of law of the case below in Section III (A)(2).

## A.  Easements in Road H and Road A Not Extinguished by Merger

### 1. Road H

The doctrine of merger operates to extinguish an easement when there is "unity of title and possession of the dominant and servient estates in the same person by the same right." *Dority v. Dunning*, 78 Me. 381, 387, 6 A. 6, 9 (Me. 1886). Defendants contend that the easements appurtenant to the Farm Lot comprising part of Road H were extinguished in 1956 by operation of law under the doctrine of merger when Helen Parsons Merrill acquired the dominant estate, the Farm Lot, and the two servient estates, Lot 1 and Lot B.

The Law Court made clear, however, that the rule it was enunciating in *Dority v. Dunning* "is subject to qualifications." *Id.* Thus, for merger to operate, "unity of title" requires ownership of the estates to be "coextensive, equal in validity, quality, and all other circumstances of right."[21] *Id.* If one estate is "held in severalty and the other only as to a fractional part thereof by the same person, there will be no extinguishment of such easement." *Id.; see* Restatement (First) of Property § 497 cmt. b (1944) ("'unity of ownership of estates' as used in this Section applies to the unity in one person of estates in a dominant and servient tenement . . . . [and] does not extend to estates held in co-ownership, but only to estates held in severalty."); 28A C.J.S. *Easements* § 123 (1996) ("[A]n easement is not extinguished under the doctrine of merger by the

---

[21] *Dority v. Dunning* still appears to be sound precedent. It followed Massachusetts case authority dating back to *Ritger v. Parker*, 62 Mass. (8 Cush.) 145 (1851) ("[I]n order to extinguish an easement, by the unity of title and possession, both of the dominant and servient tenements, in the same person, he should have a permanent and enduring estate, an estate in fee in both."). *Ritger v. Parker* is still prevailing law in Massachusetts, *see Busalacchi v. McCabe*, 71 Mass. App. Ct. 493 (Mass. App.Ct. 2008); *Mills v. Mason*, 120 Mass. 244, 251 (1876), and has been cited with approval on other grounds by the Maine Law Court. *See Lemay v. Anderson*, 397 A. 2d 984, 988 n.3 (Me. 1979); *see generally* Knud E. Hermansen & Donald R. Richards, *Maine Roads and Easements*, 48 Me. L. Rev. 197, 268 (1996) ("ownership of dominant estate and a half interest in the servient estate will not result in unity of title.").

22

acquisition by the owner of the dominant or servient estate of title to only a fractional part of the other estate.").

Helen Parsons Merrill did not have the requisite unity of title in the lots in question in order for the doctrine of merger to operate to extinguish the easements in Road H. She owned one of the servient estates—Lot 1—as a tenant in common with four others. Since her ownership in all estates was not "coextensive, equal in validity, quality, and all other circumstances of right," she did not have unity of title to support extinguishment of her easement in Road H by merger. *Dority*, 78 Me. at 387, 6 A. at 9.

Defendants urge, in the alternative, that the court should bring the merger issue into sharper focus and determine that partial extinguishment of the easement in Road H has occurred as to particular burdened lots. For example, since the boundary of both servient estates extends to the middle of Road H and since Helen Parsons Merrill held both the Farm Lot and one of the two servient lots—Lot B—in severalty, Defendants argue that easement rights in the half of Road H that falls on Lot B should be extinguished.

The court is not inclined to accept this argument. Partial extinguishment here would only apply to one segment of Road H—the lower portion of Road H between Lot 1 and Lot B—and not the full length or width of the road. In these circumstances, such a ruling would have little practical effect or value. The upper portion of Road H, which runs along the eastern boundary of Lot 1 between Lot 1 and the small, unidentified island of land on the Plan between Road H and Road G, would not be affected because Helen Parsons Merrill held only a fractional interest in Lot 1. And with respect to the portion of Road H running between Lot 1 and Lot B, only the eastern half of the easement would be extinguished; the western half would be unaffected. The Farm Lot's owner(s) would still have an intact easement and a right of way over the

23

Lot 1-side of the road. This outcome would be both confusing and difficult to enforce. Moreover, the principal case Defendants cite in support of partial extinguishment is distinguishable. *See Chase v. Eastman,* 563 A.2d 1099 (Me. 1989) (affirming there was an easement over defendant's property allowing plaintiff, in common with others, to access the waterfront, even though part of the easement was abandoned by plaintiff's failure to object to defendant's construction of cottage).

There is another basis for concluding that the easements in Road H have not been, or should not be, extinguished by merger in these circumstances. The doctrine of merger is given more limited application with respect to easements that are part of a recorded subdivision plan or common plan of development. In that instance, complete unity of title to all dominant and servient estates in the plan is required to extinguish the easements by merger. The Restatement (Third) of Property: Servitudes § 7.5 (2000)[22] states a "servitude is terminated when all the benefits and burdens come into a single ownership." Comment c to section 7.5, titled "Application to property subject to general plan of development," provides as follows:

> Because merger takes place only when all the benefits and burdens of the servitude come into a single ownership, subdivision covenants and servitudes in other developments with reciprocal servitudes are rarely terminated by merger. Since each lot, unit, or parcel enjoys the benefit of the servitudes imposed on every other property in the development, see § 2.14(a), the occasion for merger can arise only when the entire development is acquired by a single owner.

Restatement (Third) of Property, § 7.5 cmt. c (2000); *see also id.* § 2.14(a) (conveyance of land pursuant to a general plan of development implies creation of servitudes

---

[22] The Law Court cited with approval other language in section 7.5 of Restatement (Third) of Property when holding that the easements in this case had been re-established. *See Rose v. Parsons,* 2013 ME 77, ¶ 10, 76 A.3d 343 ("Transfer of a previously benefited or burdened parcel into separate ownership does not revive a servitude terminated under the rule of this section. Revival requires re-creation under the rules stated in Chapter 2.")

24

benefitting and burdening all lots).

The 1915 Plan is a common development plan or subdivision and merits different treatment with respect to applying the merger doctrine. "Existence of a general plan is a question of fact to be determined from the circumstances." Restatement (Third) of Property: Servitudes § 2.14 cmt. f (2000); *see, e.g., Murch v. Nash*, 2004 ME 139, ¶¶ 5-8, 861 A.2d 645 (discussing the creation and details of a subdivision plan and the conveyance of the lots to the wife and heirs of the decedent landowner). Pursuant to and at the direction of the will of Charles Parsons, his property was subdivided for distribution among heirs according to a detailed, intricate plan and implementing deeds. The Plan was drawn with due consideration not only for the property distribution itself, but also the configuration and purposes of roads, and easements therein. Each deed granted "as appurtenant to the . . . land and every part thereof, a right of way over all roads shown on said map" and the right was granted "in common with others in and to the roads shown on the 1915 Plan." (Joint Ex. 2 at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) This is consistent with the intent of the trustee/grantors to assure each lot owner had not only rights of way over the roads, but also the right to use the roads as utility corridors. This latter concern was explicitly raised in connection with the creation of the roads so as to avoid the need to run pipes or wires over any of the lots. Extinguishing these rights-of-way on a piecemeal basis is contrary to the overall intent and design of the common plan of development.

The Law Court has not addressed whether the rule articulated in comment c to section 7.5 of the Restatement (Third) Property applies in Maine. However, the Court has held private easement rights in roads are created by implication based on estoppel when grantees acquire property by reference to a plan providing for such roads. *See*

25

*Murch*, 2004 ME 139, ¶¶ 12-17, 861 A.2d 645 (grantee who acquired property by reference to a plan received a private right-of-way in proposed streets delineated in the plan); *Callahan v. Ganneston Park Dev. Corp.*, 245 A.2d 274, 278 (Me. 1968) (grantee who purchased land by reference to plan had easement in the roads "by implication based on estoppel"); *Arnold v. Boulay*, 147 Me. 116, 120, 83 A.2d 574, 576 (1951) (person who received a deed with a description of land recited as a lot number according to a recorded plan received all rights contained within the plan, including use of roads on the plan.); *Bartlett v. Bangor*, 67 Me. 460 (1878) (rights-of-way in streets annexed to subdivision lots cannot be afterwards interrupted or destroyed).[23]

In the unique context of this case, and in light of the principles stated in the Restatement (Third) Property and consistent with the principles articulated in the Law Court's decisions cited above, the court finds that something more than mere inaction or silence is required for merger to extinguish easements passively through operation of law and on a piecemeal basis with respect to properties that are, and have been, transferred only among family members and are part of a subdivision/common development plan. All of the parties to this action are descendants of Charles Parsons, whose appointed trustees acted to create a thoughtful, integrated plan of development for his descendants and heirs in which the roads, and the easements therein, were considered with much care and attention. The original 1916 deeds effectuating the

---

[23] Two cases cited by Defendants for a contrary position, the Maine case of *Warren v. Blake*, 54 Me. 276 (1866) and the Massachusetts case of *Cheever v. Graves*, 592 N.E.2d 758 (Mass App. 1992) appear distinguishable and/or not controlling. The Law Court expressly noted in *Warren v. Blake* that it was "not called upon to discuss or decide the question [of] how far individuals holding deeds of lots on other streets, laid down on this plan of 12 acres, can claim a right to have this distant street always kept open." *Blake*, 54 Me. at 281. Although *Cheever v. Graves* held that merger could extinguish individual easements in a subdivision, not all of the deeds contained the express easement grants. *Cheever*, 592 N.E.2d 758. All of the 1916 deeds contain such grants. Moreover, *Cheever v. Graves* was a decision by a Massachusetts intermediate appellate court.

26

1915 Plan granted as appurtenant to each lot a "right of way over all roads shown on the map [the Plan]." (Joint Ex. 2 at 3; Joint Ex. 3 at 6; Joint Ex. 4 (Page 304 missing) Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) Plaintiffs acquired the Farm Lot in 1978 together with all right, title and interest "in common with others, in and to the roads shown on the 1915 division plan." *Rose*, 2013 ME 77, ¶ 4, 76 A.3d 343.

The court concludes that the easements in Road H appurtenant to the Farm Lot have not been extinguished by operation of law through the doctrine of merger.

## 2. Road A

The issue of merger with respect to Road A was resurrected on the last day of trial when it became clear from the evidence that the factual predicate for the Law Court's holding in *Rose v. Parsons I* no longer proved accurate.[24] During her lifetime, Llewellyn Swayne Parsons acquired a number of lots that were initially granted to her siblings or nephew pursuant to the 1915 Plan. By 1948 she acquired the Farm Lot, a dominant estate with respect to the easements in Road A, and Lots F, 21 and CC, the servient estates burdened by two of Road A's three segments at issue. (*See* Joint Exs. 9, 10; Def. Exs. 2(a)-3(d).) Defendants contend that the doctrine of merger extinguished the easements in Road A that benefitted the Farm Lot because there was unity of title and possession in Llewellyn Swayne Parsons at that time.

The Law Court's 2013 decision in *Rose v. Parsons I* held that, as with Road H, the easements in Road A were recreated when Llewellyn Swayne Parsons' properties were devised or conveyed out under her will and codicils upon her death in 1956. *Rose*, 2013 ME 77, ¶ 6, 76 A.3d 343. However, unlike the lots that constitute the servient estates with respect to Road H, Llewellyn Swayne Parsons did not own the servient

---

[24] *See supra* note 20.

estates with respect to Road A at the time of her death. In 1949 she conveyed Lot F and in 1950 she conveyed parts of Lots 21 and CC, all to Mary Parsons Liversidge. The deeds that conveyed the lots to Mary Parsons Liversidge did not reserve or grant a new easement. (Joint Exs. 9, 10.) One cannot convey—or as in this case devise or convey by codicil—that which one does not own. And an easement can only be created if the grantor owns in fee the land under the road. *See Warchalowski v. Brown*, 417 A.2d 425, 428 (Me. 1980).

Plaintiffs object to the court entertaining this issue. They contend it is settled law of the case and even if the Law Court was operating on an record that was subsequently discovered to be inaccurate, this court cannot revisit the merger issue with respect to Road A. The law of the case doctrine does not preclude, as is the case here, reconsideration of an issue that was decided on "essentially different facts." *Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979) (holding "absent a showing of essentially different facts, the decision by an appellate court on a given issue is to be followed in the trial court once the case is remanded."); *Raymond v. Raymond*, 480 A.2d 718, 720 (Me. 1984).

Even though Llewellyn Swayne Parsons had unity of title and possession in these estates, the court concludes that that the easements in Road A appurtenant to the Farm Lot were not extinguished by merger because, as concluded above, the 1915 Plan constituted a common development plan and in order for merger to extinguish the easements there would need to be unity of title in all lots of the subdivision.[25]

---

[25] This conclusion also may be consistent with what Llewellyn Swayne Parsons might have intended, as inferred from the record evidence. It is true, as Defendants have noted, that she did not expressly recreate or reserve the easements in Road A in the deeds of conveyance to Mary Parsons Liversidge with respect to Lots F, 21, and CC. At the same time, however, the property descriptions in these deeds made a number of references to Road A on the Plan in delineating the boundaries of the properties conveyed. Nowhere in the deeds did it appear she intended to extinguish the easements in Road A. In any event, the third segment of Road

The court concludes that merger did not extinguish the easements in Road A appurtenant to the Farm Lot.

## B.    Abandonment of Road A Not Proven by Clear and Convincing Evidence

Nonuse alone cannot extinguish an easement.   *Rutland v. Mullen*, 2002 ME 98, ¶ 10, 798 A.2d 1104.   "To prove abandonment a party must show 1) a history of nonuse coupled with an act or omission evincing a clear intent to abandon, or 2) adverse possession by the servient estate."   *Canadian N. Ry. v. Sprague*, 609 A.2d 1175, 1179 (Me. 1992); *Stickney v. City of Saco*, 2001 ME 69, ¶ 51, 770 A.2d 592.   The party seeking to demonstrate abandonment must prove the above "elements by clear and convincing evidence, establishing each fact to a high degree of probability."   *Gravison v. Fisher*, 2016 ME 35, ¶ 52, 134 A.3d 857.   An intent to abandon requires evidence of "unequivocal acts inconsistent with the further assertion of rights associated with the existence of the easement."   *Chase v.* Eastman, 563 A.2d 1099, 1102-03 (Me. 1989)).   Such unequivocal acts must be "decisive and conclusive."   *Canadian N. Ry.*, 609 A.2d at 1179.

The three segments of Road A at issue in this case were unused for a long period of time.   Llewellyn Swayne Parsons and Helen Parsons Merrill, previous owners of the Farm Lot, were never seen using these portions of Road A.   There was no evidence that the original devisees of the Farm Lot used these parts of Road A.   In the 1930s, after the Pool House was razed, a fence or a gate was erected across Road A near its intersection with Road B.[26]

---

A would have been unaffected—or at least the portion of Road A that was on Lot 12, the lot abutting Lot CC to the east.

[26]   Read together, the Plan and the Dane Letter suggest that Road A previously continued southwest over what became Lots W, H and I and thus was the primary means of access to the Big House.   It appears that the trustees and drafters of the Plan may have intended to close off

29

As noted above, Llewellyn Swayne Parsons conveyed Lot F, Lot 21, and Lot CC, the Road A servient estates, to Mary Parsons Liversidge in 1949 and 1950. Road A was referenced as part of the property descriptions, even though there was not an express reservation of the easements. (Joint Exs. 9, 10.) Several later deeds also referenced the fact that Road A "was not open." None of these deeds involved the Farm Lot.

In later years, after Kin and Sandra Liversidge acquired their property on Lot CC, they cleared some of the land, built a driveway, and put in some gardens in the vicinity of where part of Road A appears on the Plan. As time went on, parts of Road A became overgrown with vegetation. Kin Liversidge testified that the vegetation he cleared to build his driveway was thick and consistent with years of growth. The driveway is in close proximity to, but not coextensive with, the first segment of Road A. Kin and Sandra Liversidge have created gardens and arbors on or near portions of Road A. They planted a hedge of bushes along the third segment of Road A. The built an addition to their home which approaches, but does not infringe upon or obstruct the third segment of Road A.

For an extended period of time, this road was not used. During some of this time the servient estate owner undertook actions that appeared inconsistent with its continued use. However, in order to establish abandonment there must be clear and convincing evidence of "decisive and conclusive" intent *on the part of the dominant estate owners* to abandon the easement. *Chase*, 563 A.2d at 1102. Defendants have not made this showing. *See Stickney*, 2001 ME 69, ¶ 52, 770 A.2d 592 ("Although the . . .

---

this portion of Road A, use the smaller lots established in the footprint of the former Road A as buffer lots, and redirect "traffic" around onto Road B as the primary means of access to the Big House, Seven Gables, and other houses on the lots fronting Crescent Surf Beach. When the Pool House was torn down, there would have been no reason to keep this portion of Road A open to vehicles. The fact that the road was no longer used for vehicles, however, does not establish intent to abandon it altogether.

driveway is arguably a permanent structure, it is not a decisive act that *permanently* obstructs the right-of-way, compelling an objection for the purposes of abandonment." (emphasis in original)); *Rutland*, 2002 ME 98, ¶ 10, 798 A.2d. 1104 ("Neither the building of a fence across an easement and using it for pasturage, nor a right-of-way overgrown with trees, blocked by rocks, and inaccessible by car for many years is sufficiently adverse to constitute abandonment." (internal citations omitted)).

The evidence regarding intent, if any, of the former owners of the Farm Lot, Llewellyn Swayne Parsons and Helen Parsons Merrill, to abandon the easement in Road A is indirect, circumstantial, and far from clear and decisive. The testimony of the current owner of the Farm Lot, Helen Rivas Rose, established the contrary—that she had no intention of abandoning this easement. After Kin and Sandra Liversidge took up permanent residence at Parsons Beach around 1980, Plaintiffs gave express, written notice on more than one occasion of their intent not to abandon Road A.

Further, for the same reasons the evidence does not clearly establish adverse possession. To prove adverse possession, Defendants must demonstrate that their use of the property was actual, open, visible, notorious, hostile, under claim of right, continuous and exclusive for a period of over 20 years. *Harvey v. Furrow*, 2014 ME 149, ¶ 11, 107 A.3d 604. Defendants have not so proven.

**C. Scope, Purpose, and Location of Easements in the Roads**

**1. Scope of Easements**

The scope of rights granted in an easement is to be determined from the language of the deed. *Sleeper v. Loring*, 2013 ME 112, ¶ 18, 83 A.3d 769; *Matteson v. Batchelder*, 2011 ME 134, ¶ 16, 32 A.3d 1059. In construing a deed, the court must "give words their general and ordinary meaning to determine if they create any ambiguity." *Sleeper*, 2013 ME 112, ¶ 12, 83 A.3d at 773. The language of the 1916 deeds was clear

31

and unambiguous as to the scope of easement rights.

Each of the 1916 deeds granted "as appurtenant to the . . . land and every part thereof, *a right of way over all roads shown on said map and a right to maintain along all roads shown on said map water pipes, electric light wires, and telephone wires.*" (Joint Ex. 2 at 3; Joint Ex. 3 at 6; Joint Ex. 4 (Page 304 missing) Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) (emphasis added). A "right-of-way" is a "legal right to pass through property owned by another." *Sleeper*, 2013 ME 112, ¶ 13 n.5, 83 A.3d 769 (*quoting* BLACK'S LAW DICTIONARY 1326 (7th ed. 1999)). Thus, the "right of way over all roads" means the right to pass and re-pass over the roads as they cross another's property, nothing more. Similarly, the "right to maintain along all roads" pipes for water and wires for electricity and telephone is plain and unambiguous.

Based upon the unambiguous language of the deeds, the court concludes that the scope of the easements is limited to the right to pass over the roads shown on the map; and the right to maintain water pipes, electric lines, and telephone wires along the roads depicted on the map. The court rejects the argument Plaintiffs and Party-in-Interest Fluke put forward that any additional easement rights, specifically the right of use for general recreational purposes, exist within the boundaries of the roads themselves. Any rights or activities beyond those expressly specified would exceed and conflict with the plain, unambiguous language of the deeds.

## 2. Purpose of Easements

Even though the scope of rights within an easement is clearly set forth in the deeds, the question of the easements' purpose is not fully answered. *See Flaherty v. Muther*, 2011 ME 32, ¶ 55, 17 A.3d 640; *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979). One of the purposes of the easements in the roads can be determined from the express language of the deeds—that is, to delineate specific corridors for laying certain utilities

32

to avoid crossing over individual lots. However, the purpose of the easement's second component—the "right of way over all roads"—is not clear from the deeds alone. A right of way over all roads to where? And, for what purpose(s)? When the "purposes of an express easement are not specifically stated," the court may turn to extrinsic evidence to "ascertain the objectively manifested intention of the parties [to the original conveyance]," including facts and circumstances in existence prior to conveyance. *Flaherty*, 2011 ME 32, ¶ 55, 17 A.3d 640; *Fine Line v. Blake*, 677 A.2d 1061, 1064 (Me. 1996); *Badger*, 404 A. 2d at 225; *Englishmans Bay Co. v. Jackson*, 340 A.2d 198, 200 (Me. 1975).

The Dane Letter is persuasive extrinsic evidence from which the court infers that one of the intended purposes of the rights of way in the roads was to access the beaches. It is clear from the Letter, and in particular from the statements of George C. Parsons quoted therein, that Roads A and H had historically been used to access the beach. Road H is referred to as "the road leading to the beach between lot B and lot one." (Joint Ex. 23 at 11.) Further, it stated "People now to get on the western beach . . . go along the road shown on the map running between . . . lot one and . . . [lot] B." (Joint Ex. 23 at 11.) The Letter also makes explicit reference to the road "between lot 12 and lot F.N.P. from E.P.," the third segment of Road A running between Lot CC and Lot 12 on the 1915 Plan, as "the road to the beach." (Joint Ex. 23 at 11.) There is nothing in the deeds or the Plan evincing an intent to alter this historic usage of the roads, at least insofar as private access for family lot owners was concerned. Moreover, the Plan itself, which depicts openings in the sea wall at the intersection with Road H and Road A, suggests the roads were not intended to terminate abruptly at the sea wall (see below).

The court therefore finds that one purpose of the right-of-way easements in Road

H and Road A was for access to the beaches.

With respect to Road A, the court has considered, but ultimately finds unpersuasive, Defendants' contention that Road A was not intended to go to the beach but rather only to the Pool House. Their argument cites a 1908 letter from Henry Parsons to Edwin Parsons discussing the property and referring to "the road from the swimming pool to Kennebunk." (Joint Ex. 24 at 2.) Defendants also point to the fact that the Pool House may have been later extended to be closer to the third segment of Road A and that once the Pool House was torn down a gate was erected across a section of Road A and Road A was little used thereafter.[27]

The reference to the "road from the swimming pool to Kennebunk" was most likely a reference to Road A. Even if Road A went to the swimming pool, it does not preclude the fact that the road also was used to access the beach. The Dane Letter has a clearer, more direct identification of both the particular segment of Road A being referenced as well as one of its established purposes. Moreover, Road A appears to have been the major access road to the entire property at that time. The Pool House was also proximately located to other parts of Road A, to which Henry Parsons could just as likely have been referring.

Further the fact that Road A fell into disuse after the Pool House was torn down likewise does not persuade the court that the intent of the drafters of the deeds and the Plan was to limit the purpose of Road A's third segment to accessing the Pool House, especially given its historic use as referenced in the Dane Letter and the manner in which it is depicted in the Plan.

---

[27] Defendants' argument that the physical existence of sea wall indicated that Road A was intended to terminate at the wall is addressed below in Section III(C)(3)(b).

34

### 3. Location of Road H and Road A

Determining the intended location of an easement is a question of law to be based upon the language of the deed and any recorded plan referenced therein if clear and unambiguous on their face; and if not, then the court looks to ascertain the intent of the parties. *See French v. Estate of Gutzan,* 2015 ME 152, ¶ 7, 128 A.3d 657; *Anchors v. Manter,* 1998 ME 152, ¶ 16, 714 A.2d 134. When the precise location of a right of way is ambiguous on the face of the deeds then location becomes a question of fact. *Anchors,* 1998 ME 152, ¶ 16, 714 A.2d 134. Moreover, "where a boundary is on the face of the earth is a question of fact." *Hennessy v. Fairley,* 2002 ME 76, ¶ 21, 796 A.2d 41. The party asserting easement rights has the burden of proving its precise location when there is a dispute as to its location. *See French,* 2015 ME 152, ¶ 19, 128 A.3d 657.

#### a. Road H

The parties have stipulated to the intended location of Road H. They stipulated that Road H runs between Lot 1 and Lot B as shown, and continues beyond the "line of sea wall" as shown on the Plan and across the beach to the Atlantic Ocean, terminating at the low water mark. (Stipulations ¶ 20.) In other words, the stipulation effectively provides that Plaintiffs and Party-in-Interest Fluke have access to the intertidal zone of Crescent Surf Beach via Road H.

Likewise, there seems to be no disagreement as to Road H's location on the face of the earth. During the September 27th view, parties, counsel, and the court traversed the relevant part of Road H, which runs between Lot 1 and Lot B as depicted in the Plan. The road began at a sign erected a number of years ago, ran along a pathway that was somewhat overgrown but passable and that was distinctly raised in elevation. The pathway terminated at the sea wall where a set of wooden stairs had been recently erected. The court so finds that this is the location of Road H on the face of the earth.

35

### b. Road A

The location of Road A, in particular its southernmost point of termination and the location on the face of the earth of its third segment between Lot CC and Lot 12 as shown on the Plan, remains in dispute.

As to the former issue, Defendants contend that Road A terminates at, and goes no further than, the "line of sea wall" as depicted on the Plan. Plaintiffs take the general position that if Road A was intended to provide access to the beach then it must pass beyond the sea wall. The parties also contest—or did at one point—the dimensions of Road A south of the line of the sea wall.

The court finds that Road A was intended to extend beyond the sea wall to the water, thus providing access to the intertidal zone of Parsons Beach.

The 1916 deeds alone are not determinative, one way or the other, of this question. As discussed above, the deeds expressly provide a right-of-way easement in the roads, but beyond that do not make reference to the beaches. The court concluded above, in light of relevant extrinsic evidence, that one intended purpose of the rights-of-way was to provide access to the beaches. The deeds do not support the conclusion that that Road A was intended to terminate at the sea wall. Contrary to Defendants' reading of the deed conveying Lot 12, the servient estate underlying the southeastern most portion of Road A, the description of its western boundary does not support the conclusion that Road A terminates at the sea wall. It is true that the relevant deed describes the western boundary of Lot 12 by reference to Road A only from the sea wall north, and does not refer to Road A in the description of the boundary line extending from the ocean to the sea wall.[28] However, the deed's description of the eastern

---

[28] *See supra* note 15.

boundary of Lot 12 also makes the same distinction in describing the portion of the boundary north of the sea wall, which expressly references the adjoining Lot AA, and the portion from the sea wall south to the ocean, which does not include such a reference. The boundary south of the sea wall is similarly depicted on the Plan as a dotted line extending from the sea wall to the ocean.

On the other hand, the deeds may support an inference that Road A was intended to extend to the ocean. Lot 12's deed description vis-à-vis Road A is nearly identical to the description of Lot 1's western boundary that borders Road H.[29] The deed descriptions of the other two lots adjacent to both of these roads—Lot CC to the west of the third segment of Road A and Lot B to the east of Road H—are also identical. In other words, the manner in which the relevant deeds describe the properties adjacent to Road A and to Road H is strikingly similar.[30] Thus, based on the language of the deeds, there is little difference between the two roads in terms of where their seaward terminus is located.[31]

The 1915 Plan indicates an intention that Road A extend beyond the sea wall to the beach. The Plan depicts both Road H and Road A at the "line of sea wall" with an opening in the line, as if to indicate that the roads continue on and do not terminate there. This stands in contrast with the Plan's depiction of road termination points in other locations. For example, where Road A meets Lot W there is a solid black line indicating that Road A terminates its southerly course and turns east. Where Road A meets Lot L there is a solid black line, indicating that Road A terminates its easterly

---

[29] *See supra* note 10.

[30] The deeds differ in the limited respect that the description of the eastern boundary of Lot 1 is from north to south and the description of the western boundary of lot 12 is from south to north.

[31] *Compare* Joint Ex. 2 at 2 *with* Joint Ex. 3 at 2.

course and turns south.   There is a solid black line across the Road G where it meets and terminates at Lot K.   (*See* Joint Ex. 47.)

However, despite those details, the Plan is not unambiguous with regard to the southern terminus of Road A.   The omission of a second, parallel dotted line extending across the beach to the water from the intersection of Road A and the "line of sea wall" at the southeast corner of Lot CC does not provide a clear, visual impression of a road crossing the beach (as is the case with Road H) and thus raises at least a question as to whether Road A was intended to extend past the sea wall.   The court considers relevant extrinsic evidence to answer this question.

In support of their position that Road A terminates at the sea wall, Defendants rely primarily on extrinsic evidence concerning the physical feature of the sea wall at the time as well as evidence suggesting that the third segment of Road A was only used and intended to be used for access to the Pool House.[32]   While photographs in evidence show an "unbroken" sea wall along the oceanfront lots in the area, the wall was not so high or formidable so as to prevent one from easily stepping down from the upland onto the sand.   (*See* Joint Ex. 35.)   The court has considered, and for the reasons noted previously, rejected the proposition that the third segment of Road A existed only to access the Pool House.

The Dane Letter offers more persuasive evidence of an intent to extend Road A beyond the sea wall.   It provides a clear indication that the family at the time

---

[32]   Defendants cite the following evidence in support of their position that Road A was only intended to access the Pool House, not the beach: (i) the proximity of the former Pool House to the third segment of Road A, as evidenced by the Plan's depiction of the Pool House footprint on Lot CC, the view taken on September 27th which demonstrated the approximate location of the in-ground pool, and testimony of Kin Liversidge regarding the addition to the Pool House that brought its eastern side closer to Road A; and (ii) the 1908 letter from Henry Parsons discussed above.   For the reasons discussed, the court does not find this evidence as persuasive as other record evidence with regard to the intended purpose of Road A.

considered Road A as a means of access to Parsons Beach, as the court has previously concluded. The provision in the deeds for "a right of way over all roads," the Plan's depiction of the opening in the "line of sea wall" at the intersection with Road A, and Road H, and the absence of any contrary provisions in either the deeds or the Plan, read in the light of the historic uses of the roads as made clear in the Dane Letter, lead the court to find the intent of the trustee/grantors was to continue the historic use of these rights of way to the beaches requiring the conclusion that the right of way in Road A extends beyond the sea wall to the low water mark.

As noted above, the Plan's omission of a second, parallel, dotted line running from the southeastern corner of Lot CC not only created an ambiguity as to Road A's southern terminus but also as to its dimension once it extended past the sea wall. Plaintiffs initially took the position in this litigation that this feature of the Plan indicated an intent that Road A, as it extended past the sea wall, widened out to the south and west, encompassing the entire beach area seaward of Lots CC, D and C.

Plaintiffs seemed to abandon this position at trial. If the position was not fully abandoned, Plaintiffs failed to carry their burden of proof on this point.

The Plan does not depict dotted lines extending from each boundary of the three lots to the west of Road A—Lots CC, Lot D, and Lot C. This stands in marked contrast with the fact that in every other instance the Plan depicts the boundaries of oceanfront lots as extending via dotted lines from the sea wall to the water. While this is a curious omission in an otherwise meticulously drawn plan, it does not evidence an intention to widen the dimension of Road A as it extends from the sea wall to the water.

First, the Plan itself does not label this area as "Road A." All other segments of Road A are expressly labeled as such. It would seem particularly important to include that label here because it would have been an unusual and counterintuitive notion to

39

consider a wide stretch of beach to be the extension of a 12 ½ foot road.

Second, the deeds conveying Lots C, D, and CC clearly and unequivocally conveyed title to the beach seaward of these lots, down to the ocean. None of the relevant deeds mention any reservation of a right of way or other encumbrance specific to this situation. Moreover, the 1916 deeds provide that the servient estates extend to the mid-point of any road. This construct would be difficult to apply in this instance if the beach in front of these three lots was considered a "road."

Third, other record evidence does not support the notion that the beach on Lots C, D, and CC was an extension of Road A. Plaintiffs point to evidence that this particular stretch of the Parsons Beach was the part of the beach historically used by the families. They contend this demonstrates the trustee/grantors' intent to designate an area of the beach for general use as part of the right-of-way in Road A. However, the parties stipulated at trial that all of the families used the beach in front of their own houses. (Stipulation at Tr. Trans. Day 2 at 60.) Moreover, as concluded above, the roads served limited purposes as rights of way for passing over land and as utility corridors. Neither of those purposes provides support to find this stretch of beach as an extension of Road A.

The court concludes that Plaintiffs have not shown it more likely than not that Road A encompassed the entire beach area in front of Lots C, D, and CC.

Even if Plaintiffs had met their burden of showing that Road A was intended to encompass this entire beach area, such a ruling by the court would have little practical effect or value. The 1916 deeds expressly granted servient estate owners the right to alter the precise location of a road across his or her property so long as a "reasonably convenient route is maintained for the use of the other parties entitled to a right-of-way over such road." (Joint Ex. 3 at 7.) Even if Road A widened out to encompass the

40

entire beach, Plaintiffs' sole rights therein, as owners of the Farm Lot, would be to cross over the beach for access to the intertidal zone. Pursuant to the controlling deeds, the servient estate owners, presently the Liversidges, are entitled to alter the path of the right-of-way. Thus, the Liversidges could, consistent with their deeds, relocate, redirect, or limit the right-of-way easement in Road A to a particular route or location.[33]

Therefore, the court concludes that the Road A easement appurtenant to the Farm Lot assures a right to pass from the sea wall to the water, and hence to access the intertidal zone, and that this is a 12 ½ foot wide extension of the third segment of the road. And, use of this easement is subject to the right of the servient oceanfront lot owners to dictate another, specific path that constitutes a "reasonably convenient route" to the intertidal zone of the beach.

Finally, with regard to the location of the upland portion of the third segment of Road A between Lot CC and Lot 12 on the face of the earth, the court finds and concludes that it runs along the raised ground where the Liversidges have planted shrubbery along their eastward boundary with Lot 12. The 2002 revised site plan of Kin and Sandra Liversidge's property provides an accurate depiction of the road as it lays on the face of the earth relevant to his driveway and property boundaries. (Joint Ex. 50.) This part of the road is approximately 12 ½ feet wide according to the scale of the Plan. Of course, as noted, the precise location of the easement right-of-way in the road can be altered consistent with the deeds so long as a "reasonably convenient route" is maintained.

### 4. Extent of Use Rights in the Beaches

By virtue of the easements in the roads appurtenant to the Farm Lot, Plaintiffs

---

[33] The servient estate may not alter the route in such a way that makes it less convenient than the 12 ½ foot right of way that was depicted in the 1915 plan.

claim an unfettered right to use the beaches, including a right of general recreational use. In asserting this claim, Plaintiffs rely primarily on language found in certain deeds and Law Court cases discussed below. For the following reasons, the court rejects their claim.

The 1916 deeds themselves do not convey any general rights of use in the beaches as part of the easement rights or otherwise. As noted, the 1916 deeds expressly limit the scope of easement rights to rights-of-way over the roads and for certain utilities. The rights-of-way in Road H and Road A to the water thus assure the right to pass over the land to reach the water and hence the intertidal land. Beyond that, the 1916 deeds are silent with respect to any further use rights, recreational or otherwise.

Significantly, the oceanfront lots conveyed by the 1916 deeds expressly extended to the Atlantic Ocean. The lots, therefore, included all land from the sea wall to the water, encompassing any dry sand portion of the beach (from the upland portion of the lot to the mean high water line) and the intertidal zone (from the mean high water line to the mean low water line). The clear intent and result was that each beachfront lot owner holds title in fee to the beach seaward of the upland portion of the lot conveyed and down to the water.

Plaintiffs point to more recent deeds in the chain of title of the current servient owners as a basis for their claim of rights to use the beaches. In 1973, several deeds conveying some of the properties in question began using the phrase, "adjoining beach of Atlantic Ocean, all used in common." (Joint Ex. 12 at 2; Joint Ex. 13 at 2; Joint Ex. 14 at 2; Joint Ex. 15 at 2; Joint Ex. 16 at 1; Joint Ex. 17 at 1; Joint Ex. 18 at 2; Joint Ex. 19 at 1; Joint Ex. 20 at 3.) For multiple reasons these deeds are not relevant to this issue.

First, the above-quoted language did not appear in any Parsons Beach deeds

42

until 1973 when Helen Parsons Merrill, Plaintiffs' mother and predecessor in title to the Farm Lot, conveyed her fee interests in Lots B and B-2 and her one-third interest in Lot B-1 to William Parsons. (Ex. 13 at 2.) The deed grants: "all our respective rights, titles and interests in and to the following properties . . . <u>Entire int [sic] (title in HPM) of combined area of Lots B, B-2, *and adjoining beach of Atlantic Ocean, all used in common, 1915 division plan*.</u>" (Ex. 13 at 1-2.) (underscore in original; italics added).

Second, when read in context this language appears to have a different meaning from that suggested by Plaintiffs. Lot B-2 is a very small carve-out from Lot B. It does not have ocean frontage, and likely was never used as a stand-alone lot due to its small size. The same may be said of Lot B-1, also is a very small carve-out from the larger Lot B that lacks ocean frontage. It is far more likely that the phrase, "all used in common, 1915 division plan," was intended to mean that both lots were conveyed to be "used in common" with one another as well as with the "adjoining beach of Atlantic Ocean," which previously would have been only part of Lot B and not part of Lot B-2 or Lot B-1.

All but one[34] of the later deeds using this same phrase involved transactions that (i) were conveying two or more lots, at least one of which did not have ocean frontage, and (ii) were transferring and/or consolidating the lots among the children of Mary C. Parsons Liversidge. (Joint Exs. 15, 16, 17, 19, 20.) Again, in this specific context it

---

[34] The 1973 deed from Llewellyn Parsons Hogan Hall to Matthew and Deborah Head Burns conveying "<u>Lot 2 and adjoining beach of Atlantic Ocean, used in common, 1915 plan[,]</u>" (Ex. 14 at 2.), is the only one of the seven deeds using this phrase that did not convey multiple lots, including a lot that did not have ocean frontage. However, even in this instance, given the absence of any express authority in the prior deeds, it would make more sense to construe this phrase to mean that Lot 2 and its adjoining beach were all one parcel, as is made clear from the 1916 deeds. Moreover, this deed, dated July 14, 1973, appears to have been prepared by the same attorney who drafted the May 4, 1973 deed conveying Lots B, B-1 and B-2, in which this phrase was used, likely for the reasons noted above.

would make sense that the intent of the grantor(s) was to provide that all lots conveyed be "used in common" and that the beach adjoining any ocean front lot be "used in common" for all of the lots, as the 1915 Plan had intended for the ocean front lot.

Third, none of the deeds using this phrase involve the dominant estate in this case, the Farm Lot. Even if the court were to construe the phrase to have broader intent and purpose with respect to conveying general rights to use the beach, these conveyances do not benefit Plaintiffs as owners of the Farm Lot. Therefore, when considered in context this language does not establish general recreational rights in the beach through the easements in the roads, or otherwise. The later deeds using this phrase have gone beyond the plain language of the 1916 deeds and, therefore, do not reflect the intent of the grantors of the original deeds.

Plaintiffs rely on several Law Court decisions to support their claim of a right to use the beaches. *See Badger*, 404 A.2d 222; *Flaherty*, 2011 ME 32, 17 A.3d 640; *Sleeper*, 2013 ME 112, 83 A.3d 769. These cases do not hold that a right of way via an easement to the water overrides the private property rights of ownership in the beach.

*Badger v. Hill* and *Sleeper v. Loring* both addressed the question of whether a deeded right-of-way to an inland body of water included a right for the owners of the dominant lot to construct a dock at the end of the easement. *Badger*, 404 A.2d 222; *Sleeper*, 2013 ME 112, 83 A.3d 769. The Court held that the easements in both cases provided access to the water and that the right to construct a dock at the easements' water-ward terminus fell within the scope of the easements' purpose. However, those cases are distinguishable in an important respect. The area over which the plaintiffs sought to construct a dock—the river in *Badger* and the lake in *Sleeper*--was not owned by the defendants in either case. Thus, the imputation of the right to construct a dock based on the easements' implied purpose and the exercise of that right by the easement

44

holders would not infringe upon any rights of others nor overburden the servient estates. *See Sleeper*, 2013 ME 112, ¶ 21, 83 A.3d 769. That is not the case here. The servient estates include the beach. An unfettered right to use Crescent Surf Beach or Parsons Beach would directly impact the rights of the fee owners of the land.

Likewise, the Law Court in *Flaherty v. Muther* did not hold that an easement right-of-way to access a beach established a general right to recreate inconsistent with private ownership rights. *Flaherty*, 2011 ME 32, ¶¶ 57-58, 17 A.3d 640. *Flaherty* involved a "20 foot drainage and walkway easement" over an oceanfront lot in a subdivision. *Id.* ¶ 5. The easement extended to the high water mark, thus providing the holder of the easement with access to the intertidal zone. *Id.* ¶¶ 57-58. Because the easement, though unambiguous on its face, was "silent as to [its] purpose," the Law Court affirmed the trial court's reliance upon extrinsic evidence of recent use to conclude that the "the purpose of the easement was to allow access to Secret Beach for general recreational purposes." *Id.* ¶ 56. Even then, because the grantor of the servient estate and easement did not own the intertidal land, the Court expressly recognized that the general recreational rights created could only be "properly used . . . if the title owner of the intertidal land, who is neither a party to this litigation nor identified by the record, permits or acquiesces to those uses." *Id.* ¶ 58.

In *Flaherty*, there was sufficient evidence in the record to establish that at the time the subdivision and easement were created there was regular use of the beach for general recreational purposes. *Id.* ¶ 57. Here, that is not the case. At the time of the original conveyances, each heir inherited at least one ocean front lot. Over the years the families tended to gather on and use the beach in front of their own houses and lots. While there was also evidence that the portion of Parsons Beach in front of Lot C and Lot D was commonly and regularly used, it is also true that the families using that part

45

of the beach owned houses and lots landward of that part of the beach.

Moreover, as noted the 1916 deeds made unequivocal grants in fee to the beaches down to the Atlantic Ocean. Although those grants were subject to easements created, there is little evidence that around the time the Plan was devised and deeds were executed to suggest that families regularly used the beaches outside of their own property. All of the lot owners were family members.

The court finds and concludes that it is more likely than not, given the record evidence as a whole read in light of the language of the 1916 deeds and the incorporated 1915 Plan, that the intent of the trustee/grantors was for each heir to have separate, private ownership of the beach area immediately seaward of their upland lot(s), and that the roads could provide a means of access for family members to go to and use each other's beach area; however, each owner would nonetheless have the ultimate right to exclude anyone, including other family members or others, from using his or her privately owned part of the beach.

This conclusion is buttressed by the silence of the deeds and Plan with respect to the public's use of the beaches. The Dane Letter posed direct questions to be addressed regarding the public right of access to the beaches. The Letter suggested, at least, that the family believed it might have some latitude in determining whether to change or restrict the public's historic access. The final 1916 deeds are silent in this regard, and do not recognize any rights in the public, either to use the roads or the beaches. While the public's use rights are distinct from the family's private use rights, it is reasonable to infer from this silence and from the structure of the ultimate plan of distribution, that the trustee/grantors intended, and the deeds reflected an intent, to limit access to and use of the beaches from what it had been prior to that time, and to give greater weight to the rights of private property ownership in and to the beaches.

46

That is not to say that the rights-of-way to the beaches via Road H and Road A are without purpose or meaning. Consistent with *Flaherty* and with this judgment, there are implied rights of use within the intertidal lands of these beaches, and those rights include general recreational rights if acquiesced in or permitted by the fee owner(s) of the land. Over and above these rights, there are the limited, common law rights in Maine to use the intertidal zones of the beaches, including rights of fishing, fowling, and navigation. *See McGarvey v. Whittredge,* 2011 ME 97, ¶ 28, 28 A.3d 620; *Bell v. Town of Wells,* 557 A.2d 168, 173 (Me. 1989); *Marshall v. Walker,* 93 Me. 532, 536-37, 45 A. 497, 498 (1900). The court concludes that the 1915 Plan as implemented by the 1916 deeds reflected an intent on the part of the trustee/grantors to strike a balance between access to and use of the beaches and the private property interests granted to the heirs and descendants of Charles Parsons.

Therefore, the court concludes as follows with respect to Plaintiffs' and Party-in-Interest Mary Elizabeth Fluke's rights of use of the beaches. As owners of the dominant estates benefited by easements appurtenant to those estates, they have (i) the right to pass over the roads on the 1915 Plan, including the right to pass over Road H to reach the intertidal lands of Crescent Surf Beach and the right to pass over Road A to reach the intertidal lands of Parsons Beach; (ii) rights of use including general recreational rights within the intertidal zone of the beaches so long as the fee owner(s) of said intertidal lands acquiesce or permit the use; and (iii) any and all public use rights in the intertidal zone of said beaches recognized under Maine law, including the so-called Colonial Ordinance rights of fishing, fowling and navigation.

### IV.  Order and Judgment

In accordance with the foregoing, it is hereby ordered and the entry will be:

1. Partial judgment for Plaintiffs on Count I of their Complaint, to the extent

that the easements in the roads depicted in the 1915 Plan which are appurtenant to the Farm Lot, including without limitation the easements in Road A and Road H, are not extinguished; and that said easements include the right to utilize said roads, and in particular and without limitation the right to access the intertidal zones of Parsons Beach via Road A and Crescent Surf Beach via Road H, and the right to use the intertidal zones of said beaches subject to and consistent with the terms of this Final Judgment.

2.   Partial judgment for Party-in-Interest Mary Elizabeth Fluke on her Cross-Claim, to the extent that the easements in the roads depicted in the 1915 Plan which are appurtenant to her property as identified in her Cross-Claim, including without limitation the easements in Road H, include the right to utilize said roads, and in particular and without limitation the right to access the intertidal zone of Crescent Surf Beach via Road H, and the right to use the intertidal zone of said beach subject to and consistent with the terms of this Final Judgment.

3.   Partial judgment for Defendants on Count I of Plaintiffs' Complaint and Party-in-Interest Mary Elizabeth Fluke's Cross-Claim to the extent that the right to use the intertidal zones of said beaches by virtue of the easements appurtenant to said respective dominant estates as set forth in paragraphs 1 and 2, above, are subject to a servient estate fee titleholder's acquiescence or permission unless otherwise provided by Maine law.

4.   Partial judgment for Plaintiffs on Count I of the Counterclaim of Defendants William Parsons, Jr., et als. to the extent set forth in and consistent with paragraph 1 above.

5.   Partial judgment for Defendants on Count I of the Counterclaim of Defendants William Parsons, Jr., et als. to the extent that the right to use the intertidal zones of said beaches by virtue of the easements appurtenant to the Farm Lot is subject to a servient estate fee titleholder's acquiescence or permission unless otherwise provided by Maine law.

The clerk may incorporate this Memorandum of Decision and Final Judgment on the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated:   June 26, 2017*

Wayne R. Douglas
Justice, Maine Superior Court

* As amended in accordance with Order on Post-Judgment Motions dated June 26, 2017.

STATE OF MAINE
YORK, SS.

SUPERIOR COURT
Civil Action
Docket No. RE-2011-056

HELEN RIVAS ROSE and
NATHANIEL P. MERRILL,

   Plaintiffs,

v.

WILLIAM PARSONS, JR., *et als.,*

   Defendants,

 and

LLEWELLYN P. H. ALDEN, *et als.,*

   Parties-in-Interest.

MEMORANDUM OF DECISION
AND FINAL JUDGMENT
(TITLE TO REAL ESATE INVOLVED)

## I. Background

### A. Introduction

This case involves a dispute over private rights of access to and use of two beaches—the western end of Parsons Beach and Crescent Surf Beach—both in Kennebunk, Maine. The parties are descendants of a man named Charles Parsons, who owned land along the Atlantic Ocean that included these beaches. After his death in 1904, an elaborate plan to subdivide the property among his heirs was established in accordance with his will. His descendants have owned and enjoyed use of the property since that time.

Two of his descendants, Helen Rivas Rose and her brother, Nathaniel P. Merrill, jointly own a parcel of land in the subdivision. The parcel is known as the Farm Lot and does not have ocean frontage. They claim the Farm Lot benefits from deeded easements over the properties of other family members in the subdivision. They further claim the easements provide an ongoing right to use certain private roads to

1

access and use the beaches. The dispute was brought to a head when Nathaniel P. Merrill attempted to sell part of the Farm Lot and represented to prospective buyers that the land for sale included a right of access to the beaches. Other family members and property owners oppose the claims.

## B. Procedural History

This action was commenced in March 2011 when Plaintiffs filed a three-count complaint. Count I sought a declaratory judgment to confirm that, as owners of the Farm Lot, they have full rights to utilize the roadways depicted in the subdivision plan, including for access to and use of the beaches. Count II sought similar relief under a theory of adverse possession or prescription. Count III alleged slander of title.

The original complaint named a smaller subset of defendants.[1] However, in response to a motion to dismiss, the court ordered joinder of any additional parties owning properties that this decision could affect. Plaintiffs then filed two amended complaints adding additional parties.[2] In March 2012, another amended complaint added a new party-in-interest.[3] Defendants filed a counterclaim seeking a declaratory judgment that Plaintiffs, as owners of the farm lot, have no rights to two of the roads depicted in the plan or any right to use the beaches. Party-in-Interest Mary Elizabeth

---

[1] The original complaint named the following Defendants: William Parsons, Jr.; Rudolph and Elizabeth Hutz; Thomas K. Liversidge; Katherine (Kathryn) A. Burns and Michael A. Greely; Matthew J. Burns and Debbie P. Burns; Ann Ferguson; Matthew Miller; Bonnie (Sarah P.) Curry; Llewellyn Parsons Smith; and Louise Parsons Pietsch.

[2] The complaint as amended named the following additional Defendants: William C. Parsons, Charles B. Parsons, Louise P. Parry, and Louise Parsons Smith; David L. Weld, Christopher P. Weld, and Ashley Taylor; Thomas K. Liversidge as Trustee of Beach Realty Property Trust; Stacey Miller, Ben Miller, and Ali Giacomin; and Sarah Gerritz, Abigail Davis, and G. Putnam Smith, Jr. It also added as Parties-in-Interest: Llewellyn P.H. Alden; United States of America; Elizabeth McMaster and Philip R.B. McMaster; Charles Bach McMaster and Joseph McMaster; Abigail M. Alling; Julia Read Burns; and Mary Elizabeth Fluke.

[3] The third amended complaint added Horace P. Liversidge II.

Fluke filed a cross-claim seeking a declaration that she and owners of other property depicted in the plan have rights to utilize the roadways, and in particular a road known as "Road H" to access and use the beach.

After mediation proved unsuccessful, Plaintiffs moved for partial summary judgment on Count I of their complaint. Defendants along with Party-in-Interest Horace P. Liversidge II filed a cross-motion for summary judgment on all counts. In September 2012 the court denied Plaintiffs' motion and granted the cross-motion for summary judgment, concluding that Roads A and H were terminated by merger except for the easement across Lot 12 and "[n]o later deeds revived the easements for the plaintiffs."[4] *Rose v. Parsons*, No. RE-2011-056, 2012 Me. Super. LEXIS 139, at *11 (Sept. 27, 2012). Plaintiffs appealed.

In August 2013 the Law Court vacated summary judgment in part and remanded the case to the trial court. *Rose v. Parsons*, 2013 ME 77, ¶¶ 1, 6, 76 A.3d 343. The Law Court held that even if the doctrine of merger had operated to extinguish the easements, a subsequent conveyance through a codicil to the will of one of Plaintiffs' predecessors in title revived the easements in the roads appurtenant to the Farm Lot. *Id.* ¶ 6. On remand, the trial court was instructed to determine whether the easements were thereafter abandoned or continue to exist. *Id.* ¶ 11. Summary judgment for Defendants was upheld with respect to the adverse possession and slander of title claims. *Id.* ¶¶ 12-13.

In the wake of the Law Court's remand, the parties filed another round of

---

[4] The court also found Plaintiffs "failed to establish that there was a false statement made with malice or with reckless disregard of its falsity [and] their claim for slander of title in Count III of the third amended complaint fails" and they "failed to establish that any rights . . . were re-created through adverse possession." *Rose v. Parsons*, No. RE-2011-056, 2012 Me. Super. LEXIS 139, at *12-13 (Sept. 27, 2012).

3

motions and cross-motions for summary judgment. In May 2014, the trial court granted Plaintiffs' renewed motion for summary judgment, denied Defendants' cross-motion, and dismissed as moot Party-in-Interest Fluke's motion. Defendants' motion to alter or amend the judgment was denied. Another appeal followed. The Law Court vacated the second summary judgment and remanded the matter for trial. *Rose v. Parsons*, 2015 ME 73, 118 A.3d 220.

The court conducted a view of the property with counsel on September 27, 2016. A bench trial was held on September 27, 28, and 29, 2016. Final argument was held on October 27, 2016.

## II. Facts

### A. The 1915 Division Plan

Around the turn of the twentieth century, Charles Parsons owned a significant amount of land along the Atlantic Ocean in Kennebunk, Maine. He and his family built and used seasonal homes and other buildings on the land. The property, which is the subject of the present dispute, includes two beaches separated by a rock outcropping—Parsons Beach to the east of the rocks and Crescent Surf Beach to the west—as well as substantial acreage inland.

Charles Parsons died in October 1904. Pursuant to his will, the property was initially placed in trust with instructions to the trustees, Edwin Parsons and Jefferson Hogan, that it was to be divided among his heirs after the death of his wife, Sarah J. Parsons. (Joint Ex. 21.) The trustees, with the assistance of Roland W. Libby an Engineer based in Saco, Maine, created a detailed plan to divide the lots in accordance with the will of Charles Parsons. The final plan is entitled, "Plan of Division of a part of the Estate of Cha's. Parsons, Kennebunk, Maine," dated August 10, 1915 ("1915 Plan" or "Plan"). (Joint Ex. 47.) The Plan was recorded in the York County Registry of

4

Deeds along with its implementing deeds in May 1916.  (Joint Exs. 2-8, 47.)

The 1915 Plan divides the property into approximately 46 lots, 27 of which have direct ocean frontage on one of the two beaches.  (Joint Ex. 47.)  The Plan states the square footage, ascribes the length in feet and directional courses of boundaries, depicts the footprint of any structure(s) then extant on a lot, and provides other details relevant to the division of the property for each lot.  (Joint Ex. 47.)  The Plan depicts eight "roads," labeled "Road A" through "Road H," passing over and through the lots.  (Joint Ex. 47.)  According to the Plan's scale—1 inch equals 200 feet—the roads were generally drawn to be between 12 ½ to 25 feet wide.  Below is an enlarged subsection of the Plan[5] highlighting the two roads in dispute in this case, Road A and Road H.  It also shows part of the Farm Lot, the dominant estate, and the relevant servient estates.



---

[5] This enlargement, which is reprinted from *Rose v. Parsons*, 2013 ME 77, ¶ 2, 76 A.3d 343, is provided for the reader to illustrate the roads and lots in issue only as a convenience.  This diagram itself is not in evidence, and the court does not rely on it for any other purpose.  Joint Exhibit 47 is the full-scale Plan.

Despite the meticulous detail of the 1915 Plan and its implementing deeds, there remain several ambiguities that go to the heart of the dispute in this case, specifically, the purpose and scope of the easements in Road A and Road H and the intended location of Road A.

## B. The Dane Letter

The record contains a copy of a letter dated March 27, 1915 addressed to Walter L. Dane, Esq. ("Dane Letter" or "Letter") regarding "Charles Parsons' Estate." (Joint Ex. 25.) The Letter addresses issues that needed to be considered in order to finalize the plan for dividing the Parsons' property. (*Id.*) The author of the Letter does not identify himself but represents that he was asked by the trustees under the will of Charles Parsons "to take up with you [Walter L. Dane, Esq.][6] the matter of making a division of land owned by the estate in Kennebunk." (*Id.*) The author also quotes George C. Parsons, a son of Charles Parsons and one of the subsequently named co-executors of the will, with respect to some of the issues that needed to be addressed in dividing the property. (*Id.* at 10-12.) The Letter further authorizes Mr. Dane to "prepare descriptions of the several parcels of land to be conveyed to the different members of the family, . . . make whatever investigations of the titles is necessary, and have Mr. Libby make such surveys and maps as are necessary." (*Id.* at 2.)

Enclosed with the Letter was a map or draft of a division plan for the property that Mr. Libby previously prepared showing "the proposed division in a rough way." (*Id.* at 3.) The enclosure is not in the record, but it is apparent from the Letter's

---

[6] The letter does not indicate Walter L. Dane Esq.'s position or relationship to the family. The court infers he was a local attorney assisting with the transaction. It is also noted that Mr. Dane was subsequently named as a co-trustee/co-grantee (along with George Clarence Parsons and Henry Humphrey Parsons) of a 15-year trust established to oversee the property before all heirs assumed full ownership rights. (Joint Ex. 1.)

6

descriptions and references that the draft depicted the same configuration of many lots shown in the final 1915 Plan. (*Id.*) The Letter requests a new map be drawn up depicting the land in Kennebunk as well as the proposed division of the land into lots with "sufficient particularity to enable us to prepare proper deeds." (*Id.* at 3.) Further, it states, "The map should also show all existing roads and other rights of way," (*Id.*), and "[s]pecial attention should be paid to the question of public and private roads and other rights of way, as there seems to be a great deal of confusion in regard to this matter." (*Id.* at 9.)

The roads in issue in this case—Road H and Road A—are specifically referenced in the Letter, though not by name. For example, in referring to access to Crescent Surf Beach, the Letter quotes George C. Parsons as follows:

> In 1887 father built the house on lot A and turned the road about where the present circle on lot A is (on your map) westerly to the extreme easterly point of lot B, thence along lot B to *the road leading to the beach between lot B and lot one.* As far as I know from the circle on lot A to the beach was the way the road always ran.[7]

(*Id.* at 11.) (emphasis added). The italicized language is a reference to what became Road H on the Plan. The Letter also references the third segment of Road A shown in the 1915 Plan, again quoting George C. Parsons: *"The road to the beach between lot 12 and lot F.N.P. from E.P.*[8] formerly ran through F.N.P. from E.P. and has been moved twice." (*Id.*) (emphasis added).

---

[7] The Letter also quotes George C. Parsons referencing Road H as follows: "Last fall we stopped the Kennebunk road at the northwest corner of F.N.P. from E.P. People now to get on the western beach [Crescent Surf Beach] have to turn at the only triangle on the map and go along the road shown on the map running between the farm lot, *lot one* and lots F, E, G, *and B.*" (Joint Ex. 25 at 11.) (emphasis added).

[8] The reference to "lot F.N.P. from E.P.", (Joint Ex. 25 at 11.), is clearly a reference to Lot CC in the 1915 Plan. Joint Ex. 47. Lot CC on the Plan contains the name "Edwin Parsons." (*Id.*) Lot CC was conveyed to Frances N. Parsons and her 1916 deed confirmed that conveyance. (Joint Ex. 3 at 6.) Lot CC abuts Lot 12, and the third segment of Road A runs over both lots. (Joint Ex. 25 at 11; Joint Ex. 47.)

Other references in the Letter to the roads and easements are germane to the issues in this case. For example, the author makes clear that "George C. Parsons thinks that it would be a mistake to give any party the right to maintain pipes or wires over another party's land." (*Id.* at 6.) The author requests further investigation as to whether it is feasible to run pipes and wires along the roads. (*Id.*)

The Letter poses "two questions of law" for Mr. Dane to answer. It first asks whether a "private owner in Maine" is entitled to the fee of a public road passing over his land? (*Id.* at 10.) It then asks, "Has the public a right of way to the beach?" (*Id.*) With regard to the latter question, the author notes George C. Parsons' observation that "Father always claimed that the town *had only a right of way to the western beach* from the two posts as when he bought the place it was a pasture and a gate had to be opened at the two posts." (*Id.*) (emphasis added). And, the Letter notes that the "family seem to have an idea that the public has such a right of way, but that its position may be changed in any way the family desires." (*Id.*)

## C. The 1916 Deeds

In 1916 the trustees of the Charles Parsons estate executed eight deeds to carry out the planned distribution of his property. The deeds, which were recorded along with the Plan in the York County Registry of Deeds in May 1916, conveyed the property in accordance with and by explicit reference to the 1915 Plan. The heirs/grantees were the children of Charles Parsons—Robert W. Parsons, George Clarence Parsons, Frances N. Parsons, Mary Parsons Hogan, Llewellyn Swayne Parsons, and Henry H. Parsons—and one grandson—Charles ("Carl") Parsons. (Joint Exs. 2-8.)

The eighth deed conveyed the same properties in trust to George Clarence Parsons, Walter L. Dane, and Henry H. Parsons as trustees for the benefit of each of the foregoing heirs/grantees for a period of 15 years. (Joint Ex. 1.) The trustees jointly

held the property during this period, with enumerated rights and responsibilities. Each beneficiary held a fractional interest in the whole for that time, and any further conveyance of a property required consent of the trustees and a specified percentage of the other beneficiaries. (*Id.*)

Like the Plan, the deeds effectuating the transfer of property were carefully, professionally, and meticulously drafted. The deeds, together with the Plan, reflect a fully considered scheme for distributing the property among the heirs of Charles Parsons as well as a mechanism for assuring the property, and its use, was protected and initially maintained within the family. Each heir received at least one lot with direct frontage onto a beach. Every oceanfront lot was expressly bounded by the Atlantic Ocean in the deeds. (Stipulations ¶ 19.) Thus, each oceanfront lot owner was granted a fee interest in the beach, from the sea wall to the ocean, directly seaward of the upland portion of his or her lot(s). (Joint Ex. 2 at 2; Joint Ex. 3 at 2; Joint Ex. 4 at 2; Joint Ex. 5 at 2; Joint Ex. 6 at 2; Joint Ex. 7 at 2; Joint Ex. 8 at 2.)

In addition to describing the lots conveyed, the deeds specified a number of common provisions regarding easements, including sewer easements, utility easements, rights of way, and roads. The following provisions are common to all eight of the 1916 deeds and have particular relevance to the issues in this case.

Each 1916 deed granted[9] "as appurtenant to the . . . land and every part thereof, a right of way over all roads shown on said map and a right to maintain along all roads shown on said map water pipes, electric light wires, and telephone wires." (Joint Ex. 2

---

[9] Joint Exhibit 4 consists of Pages 303-308 of Book 641, as recorded in the registry of deeds. Page 304 of this deed, however, is missing from the court's record of the exhibits. Because all of the other deeds are consistent in content and description and because Exhibit 4 is consistent with the other deeds as far as is shown, the court has no reason to believe the missing page contains a different provision with respect to the roads.

at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.)

Each deed provided that an owner of a servient lot shall own in fee the land to the center of the road. (Joint Ex. 2 at 4; Joint Ex. 3 at 7; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 6.)

Each deed permitted servient lot owners to redirect a road crossing their property as long as "a reasonably convenient route [was] maintained for the use of the other parties entitled to a right-of-way over such road." (Joint Ex. 2 at 4; Joint Ex. 3 at 7; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 5.)

Each deed conveyed the lots "subject to the restriction that such real estate and every part thereof shall be used only for private residential purposes." (Joint Ex. 2 at 4-5; Joint Ex. 3 at 6; Joint Ex. 4 at 4; Joint Ex. 5 at 5; Joint Ex. 6 at 4; Joint Ex. 7 at 3; Joint Ex. 8 at 5.)

None of the 1916 deeds expressly conveyed to any inland lots a right to use or recreate on the beaches. (Joint Ex. 2 at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.)

**D.  The Farm Lot**

The Farm Lot is the second largest single parcel in the Plan (1,014,000 square feet). (*See* Joint Ex. 47.) In 1916, it was originally conveyed to Frances N. Parsons and George Clarence Parsons as tenants in common. (Joint Ex. 3 at 4; Joint Ex. 8 at 4.) All of the common provisions discussed above are found in these two original deeds. (Joint Exs. 3, 8.) The deeds that conveyed Frances N. Parsons and George Clarence Parsons an interest in the Farm Lot did not expressly grant any right to use the beaches. (Joint Ex. 3 at 6; Joint Ex. 8 at 5.)

Llewellyn Swayne Parsons, also one of the original heirs of Charles Parsons, later came to own the Farm Lot outright. Upon her death in 1956, the Farm Lot was devised

10

under her will to her niece, Helen Parsons Merrill. (Stipulations ¶ 18.) Helen Parsons Merrill is the mother of Plaintiffs Helen Rivas Rose and Nathaniel P. Merrill. (Stipulations ¶ 16.)

Upon Helen Parsons Merrill's death, the Farm Lot was devised to Plaintiffs' father, Frederic Arnold Merrill. *Rose v. Parsons*, 2013 ME 77, ¶ 4, 76 A.3d 343. He conveyed the Farm Lot and other lots he inherited from Helen Parsons Merrill to his children, Plaintiffs, "together with all my right, title and interest, in common with others, in and to the roads shown on the 1915 division plan; and subject to and with the benefit of all other rights, privileges, easements, obligations, conditions, covenants, restrictions and reservations set forth in deeds and devises in record title to said properties insofar as such benefits and burdens may be in force and effect and insofar as applicable to said properties." *Id.*

Until 1977, the Farm Lot was occupied only by caretakers, who lived there year-round and were responsible for maintaining all buildings and properties. The caretakers were not members of the Parsons family nor did they have any ownership rights in the Farm Lot. There was no evidence presented that the then owners of the Farm Lot, Llewellyn Swayne Parsons and Helen Parsons Merrill, ever used either Road H or Road A to access the beaches between 1931 and 1978.

## E. Road H

Road H extends from a fork in Road F and initially runs between Lot 1 and a small, unnamed lot situated between it and Road G. (Joint Ex. 47.) Road H then runs southwesterly, burdening Lot 1, Lot B-1, and Lot B. (*Id.*) Based on the Plan's scale, Road H is depicted as having a width of approximately 25 feet (2/16"). (*Id.*) There is an opening in the "line of sea wall" on the Plan where Road H reaches the beach. (*Id.*) From that intersection, two parallel, dotted lines extend south across the beach to the

11

ocean. *(Id.)* The parties stipulated that Road H extends beyond the sea wall, across the beach, and terminates at the low water mark of the Atlantic Ocean. (Stipulations ¶ 20.)

By virtue of the 1916 deeds, the lots burdened by Road H—Lot 1, Lot B, and Lot B-1—were held in fee by Charles Parsons' grandson, Carl Parsons. (Joint Ex. 2 at 2-3.) The fee in Lot 1[10] and Lot B-1 were conveyed outright. (Joint Ex. 2 at 2.) It was purported that Lot B was previously conveyed to Carl Parsons,[11] and the 1916 deed expressly confirmed his ownership of Lot B.[12] (Joint Ex. 2 at 3.) The deeds contained all of the common deed provisions mentioned above. (Joint Ex. 2.)

---

[10] The deed describes Lot 1 is as follows:

> Beginning at the northeasterly corner of Lot 2, running thence along the southerly boundary line of Road E north 84 degrees 55 minutes east 173 feet to the intersection of the southerly boundary line of Road E with westerly boundary line of Road F, thence along Road F along the westerly boundary of Road F and the westerly boundary line of Road H the following courses and distances, south 15 degrees west 129.5 feet, south 11 degrees 15 minutes east 217 ft, south 69 degrees 25 minutes east 66 feet, south 11 degrees west 274.2 feet to a point (which is south 71 degrees 20 minutes west 169.9 feet from the westerly corner of the house now owned by Charles Parsons on Lot B in the Sea Wall), thence in the same course to the Sea, thence westerly by the sea to a point in the easterly boundary line of Lot 2; thence north 5 degrees 5 minutes west along the easterly boundary line of Lot 2 to a point in the Sea Wall; thence in the same course 660 feet still along the easterly boundary line of Lot 2 to the point of beginning; containing about 40,590 square feet to the Sea Wall.
> (Joint Ex. 2 at 2.)

[11] There was no deed offered or admitted at trial with regard to the prior conveyance of Lot B to Carl Parsons. The parties did not challenge or question the capacity of the trustee/grantors to encumber Lot B with easements in the 1916 deeds.

[12] The deed's language with regard to conveying Lot B:

> [A]ll rights, titles, interest, easements and restrictions which the grantors, or any of them, have or have power to convey or release in respect to Lot B, together with the beach and other land between said Lot B and the Sea included by extending to the Sea the southeasterly and westerly boundary lines of Lot B. It is believed that title in fee simple to Lot B is already in Charles Parsons, and the foregoing provision is for the purpose of confirming his title and of releasing to him any all easements and restrictions which the parties of the first part [the grantors] may have in respect of Lot B.
> (Joint Ex. 2 at 3.)

By the time of her death in 1956, Llewellyn Swayne Parsons owned Lot 1, Lot B, and the Farm Lot. (Joint Ex. 23 at 2.) Upon her death, Lot 1 was devised to Helen Parsons Merrill as one of five tenants in common. (Stipulations ¶ 18.) Under a codicil to the will, Lot B was conveyed to Helen Parsons Merrill.[13] (Stipulations ¶ 17.) As noted above, the Farm Lot was also conveyed under the codicil to Helen Parsons Merrill. (Joint Ex. 22 at 11.)

Helen Parsons Merrill retained her ownership interest in these lots until 1964. (Joint Ex. 11; Joint Ex. 13.) In 1964, she conveyed her interest in Lot 1 to Robert Parsons. (Joint Ex. 11.) In 1973, she conveyed her interest in Lot B to William Parsons. (Joint Ex. 13.) The conveyances were both made subject to any burdens "in force and effect" at the time. (Joint Ex. 11 at 3; Joint Ex. 13 at 4.) Neither the 1964 nor 1973 conveyance made any reference to the easement in Road H appurtenant to the Farm Lot, while the 1973 conveyance of Lot B to William Parsons did expressly reserve an easement across Road G for the benefit of the Farm Lot. (Joint Ex. 13 at 4.)

F. Road A

Road A is depicted on the 1915 Plan running from the north down the east side of the Farm Lot to an intersection with Road B and Road C.[14] (Joint Ex. 47.) From that intersection, Road A continues south and east in three discrete segments. (Id.) The first segment runs in a southerly direction between Lot F and Lot 21, until it reaches

---

[13] In the 1915 Plan, two small lots, Lot B-1 and Lot B-2, were carved out of Lot B. (Joint Ex. 47.) Lot B-1 was situated on the north side of Lot B between Lot B and the junction of Road H and Road G. (Id.) Lot B-2 was situated to the east of Lot B, between Lots B, K and A. (Id.) At one point in time prior to 1973, Helen Parsons Merrill owned Lot B-2 in fee and owned a 1/3 interest in Lot B-1, both of which she conveyed in 1973 to William Parsons, Sr. (Joint Ex 13.)

[14] In the early years Road A appears to have been the primary means of access to the family's main home on Lot A. It may have been considered a public road for a time, and ran directly to the northeast corner of Lot A—where the Big House is located—over land that was converted in the 1915 Plan to Lots W, H, and I. (See Joint Exs. 25, 44, 47.)

the northeastern boundary of Lot W. (*Id.*) The second segment then turns 90 degrees easterly and runs between Lot 21 and Lot CC, until it reaches the western boundary of Lot L. (*Id.*) The third segment then turns 90 degrees southerly and runs between Lot CC and Lot 12. (*Id.*)

The two solid, parallel lines depicting the third segment of Road A just described intersect the "line of sea wall" pictured on the Plan at the southeast corner of Lot CC and the southwest corner of Lot 12. (*Id.*) As is the case with the Plan's depiction of Road H, there is an opening in the "line of sea wall" where it meets Road A. (*Id.*) Unlike Road H, however, from the intersection of Road A and the sea wall only one dotted line continues to the water, extending from the southwestern corner of Lot 12 across the beach to the ocean. (*Id.*)

The first and second segments of Road A are approximately double the width of the third segment of Road A. (*Id.*) Based on the Plan's scale, the first two segments are approximately 25 feet wide (2/16") and the third segment is approximately 12 1/2 feet wide (1/16"). (*Id.*)

Road A burdens multiple lots in the 1915 Plan, including, as relevant to this matter, Lot F, Lot CC, and Lot 12. Under the 1916 deeds, three heirs—Henry H. Parsons, Llewellyn Swayne Parsons, and George Clarence Parsons—were each granted a one-third interest in Lot F. (Joint Ex. 4; Joint Ex. 5; Joint Ex. 8.) Frances N. Parsons was granted a fee interest in Lot 12.[15] (Joint Ex. 3.) Lot CC was allegedly[16] conveyed

---

[15] The deed describes Lot 12 as follows:

> Beginning at the northwesterly corner of Lot AA, running thence south 13 degrees 45 minutes east 165.3 feet along the westerly boundary line of Lot AA to the Sea Wall, thence in the same course to the Sea; thence westerly about 299 feet by the Sea to a point in a line which is 249 feet westerly from and parallel with the westerly boundary line of said Lot AA, thence north 13 degrees 45 minutes

14

to Frances N. Parsons prior to 1916. (*Id.*) Thus, the deed purports to be a confirmatory grant with respect to Lot CC,[17] just as the deed to Carl Parsons had been a confirmatory deed to him with respect to Lot B. (*Id.* at 6.) These deeds contained all of the common provisions with respect to the roads and easements referenced above.

As noted below, on the 1915 Plan the name "Edwin Parsons" is written below the reference to "Lot CC." Edwin Parsons was one of the executors and trustees of the Charles Parsons estate. (Joint Ex. 1 at 1.) He previously owned some of lots in this subdivision but confirmed the transfer of them to other family members as part of the division of lands in the 1915 Plan.

Llewellyn Swayne Parsons held fee title to Lot F, Lot 21, and Lot CC by 1943. (Joint Ex. 23 at 3, 5.) In 1948 she conveyed Lot F as well as part of Lot CC and Lot W to Mary Parsons Liversidge. (Joint Ex. 9 at 1.) In 1950, she also conveyed the part of Lot 21 adjoining Road A and the remainder of Lot CC to Mary Parsons Liversidge. (Joint Ex. 10 at 1.) Neither deed expressly reserved an easement across said lots for the benefit of the Farm Lot, nor, however, did they expressly release those easements.

---

west by said line to the Sea Wall, thence in the same course 167.2 feet along the easterly boundary line of Road A to the southwesterly corner of Lot L thence north 75 degrees 20 minutes east 299 feet along the southerly boundary line of Lot L to the point of beginning, containing about 49,644 feet to the Sea Wall. (Joint Ex. 3)

[16] There was no deed offered or admitted at trial to reflect any prior conveyance to Frances N. Parsons. The parties did not challenge or question the capacity of the trustee/grantors to encumber Lot CC with easements in the 1916 deeds.

[17] The deed's language with regard to conveying Lot CC:

[A]ll rights, titles, interest, easements and restrictions which the parties of the first-part, or any of them, have or have power to convey or release . . . in Lot CC, as shown on said map, together with the beach and all other land between said Lot CC and the Sea included by extending the easterly and southwesterly boundary lines of Lot CC to the Sea. (It is believed that title in fee simple to . . . Lot CC is already in Frances N. Parsons, and the foregoing provisions is for the purpose of continuing her title and of releasing to her any and all easements and restrictions which the parties of the first-part may have in respect of . . . Lot CC.) (Joint Ex. 3.)

15

(Joint Exs. 9-10.) However, both deeds make express references to Road A in the lot descriptions, and the 1950 deed conveying the eastern portion of Lot CC and part of Lot 21 states that a "conveyance to the boundary line of a road shall convey the fee to the middle of the road subject to any easements now existing." (Joint Ex. 10 at 2.)

## G. Use of the Property from 1915 to 1977

From 1915 through the mid-1960s, the heirs and descendants of Charles Parsons used the property primarily during the summers. They stayed in one of four houses: The "Big House," located on the point and shown on Lot A of the Plan; "Seven Gables," located and shown on Lot E; the "Play House," located and shown on Lot F; and "Pine Knot," located on Lot 12 but not shown on the Plan.[18] (Stipulation ¶ 10; *see also* Joint Exs. 35, 47.) All four houses had access to the ocean. (Stipulations ¶ 11.) Typically the family that owned or stayed in each of the four houses would use the beach area in front of that house. (Stipulation at Tr. Trans., Day 2 at 60.)

In the early years there was another building on the property known as the "Pool House," an L-shaped structure located on Lot CC. Its footprint is depicted on the 1915 Plan. (Joint. Ex. 47.) The structure housed an in-ground, salt-water pool (fed by a windmill-powered pump) and a bowling alley. The pool was in the vertical (north/south) part of the "L"-shaped figure shown on Lot CC on the Plan. According to the Plan scale, the top of the "L" was approximately 100 feet (8/16") from the second segment of Road A; and the horizontal or bottom (east/west) part of the "L" shape appears to have been approximately 40 feet (3/16") from the third segment of Road A as depicted on the Plan. (*Id.*) Thomas K. ("Kin") Liversidge testified that the horizontal part of the Pool House may have been expanded at some point, bringing it

---

[18] Although not depicted in the Plan, testimony at trial indicated that "Pine Knot" was the house on Lot 12 east of the Pool House as pictured on page 1 of Joint Exhibit 35.

16

even closer to Road A where it approaches the sea wall.

The Pool House was torn down in the 1930s. At some point after it was torn down, a white fence or gate was erected across Road A, in the vicinity of its intersection with Road B. The hole where the pool had been remained open and unfilled for many years. Road A was not used for vehicular access to the area where the Pool House previously stood after that point. Over time, Road A from the gate south and east became overgrown with vegetation.

Helen Rivas Rose was born in 1942. As a child, she visited the Parsons Beach property with her family every summer for two to three weeks during the month of June and sometimes again during September. As a child, she and her immediate family would stay at Seven Gables, located on Lot E. Her family was part of a group that owned Seven Gables on Lot E. They would use the beach in front of on Lots C and D, which were directly south of Lot E.

She testified that during her childhood visits to Parsons Beach she often spent time with the caretaker's twin daughters, who lived on the Farm Lot. They would traverse the land and sometimes idle away the hours at a white gate across Road A southeast of the triangle at the intersection of Roads A, B, and C. She also testified that they would walk along Road A behind and to the south of the white gate and would spend time at the two pillars at the southwest and southeast corners of Lot W.

Helen Rivas Rose did not visit the Parsons Beach area from 1964 to 1971. It was only after her father conveyed the property to her and her brother in 1978 that she moved to Maine permanently.

Plaintiff Nathaniel P. Merrill's use of the property is unclear. He resides in Colombia, South America and did not appear at trial.

17

### H. Use of the Property and Road A Since 1977

Upon moving to Maine in 1978, Helen Rivas Rose took up permanent residence in the house on the Farm Lot. She testified that she went to Parsons Beach via a route she believed to be Road A across Lot CC up to four or five times during that first summer. At the time, her cousin, Kin Liversidge, was also living at the property. According to her testimony, Kin Liversidge asked her to take a different route to the beach to afford him privacy while he was recovering from a long-term illness. She obliged and used a different path—further to the east across Lot 21 and Lot 12—to access Parsons Beach. (*See* Joint Ex. 42 (enlarged map with push-pins).)

Kin Liversidge and his wife, Sandra, currently own most of the land underlying the southern three segments of Road A. (Joint Ex. 50.) His mother, Mary C. Parsons Liversidge, deeded him the land in 1980. (Joint Ex. 16.) The deed granted him in relevant part the "[w]esterly portion of Lot 21, [e]asterly portion of Lot CC, portion of Road A (not open), all used in common, and adjoining beach of the Atlantic Ocean, 1915 Parsons division plan . . . ." (Joint Ex. 16 at 1.)

According to his testimony, Kin Liversidge began clearing vegetation to open a road in this area as early as 1976. He testified that it took him three days to clear the growth to re-create a road extending from behind the white gate at the intersection of Roads A and B on the 1915 Plan to the western end of the segment of Road A located between Lots F and 21, and to the point where Road A takes a 90 degree turn to the east between Lots 21 and CC. When the new road was installed there was no trace of an old gravel road, and the only indication of Road A's prior existence was elevated ground between Lots CC and 21 and Lots CC and 12. He replaced the old white gate with a new gate, but eventually replaced it with a chain. The gates and chain were intended to keep out vehicles, not family members on foot. Kin Liversidge testified he

18

and his family, including two of his siblings, Horace Liversidge and Mary Elizabeth Fluke, and their families, are the only ones who have used the road that he opened.

Over the years, Kin and Sandra Liversidge have done considerable landscaping and other work to their property on the land underlying parts of Road A. They planted trees on the eastern boundary of the segment of Road A between Lots 12 and CC on the 1915 Plan. They planted a rose garden on or near a section of Road A, and planted a vegetable garden near or on the southwestern portion of Lot 21. They placed granite blocks on their property, one of which was placed in the location just below the letters "OA" in the word "Road" labeling the segment of Road A between Lots CC and 21 on the Plan. (Joint Ex. 47.) They planted an arbor in a location that appears on the Plan just above the same word. They built a shed near, but not on, Road A. Kin and Sandra Liversidge also built an addition to their house, the corner of which extended up to and perhaps just barely over the southern boundary of the second segment of Road A. (Joint Ex. 51.) They did not see evidence of a path or evidence of use of that area as a pathway. None of the improvements would act as physical barrier preventing foot passage over where Road A is depicted; although, to follow that course today puts one squarely on the Liversidge property.

Plaintiff Rose was aware of these improvements as they were being made, including the addition. In November 2009 she sent an email Kin Liversidge, her cousin, to ensure that the addition would not impede or block Road A. The next day he responded, "[T]he addition will not effect Road A." (Joint Ex. 31.) She also visited Kin Liversidge's property as the foundation for the addition was being laid to see where it was located.

Plaintiff Nathaniel Merrill emailed Kin Liversidge in May 2010 regarding Road A: "I have used Road A very little over the years to get to the beach. However must

19

now think about my six children and six grandchildren! Helen and I will be surveying this Road sometime during the summer." (Joint Ex. 32.) Kin Liversidge responded a few days later expressing his concerns regarding Plaintiffs' desire "to pursue the use of a road that has not existed for many, many years." (Joint Ex. 32.)

This was not the first time Plaintiffs, as owners of the Farm Lot, had asserted a right of way over Road A. In 1984, they sent written notice to Kin and Sandra Liversidge as well as owners of other servient lots on the 1915 Plan, to give notice of their intent to "contest the extinguishment of all easements and rights of way." (Joint Ex. 27.) Plaintiffs did not receive a response from any of the recipients of the notice. Plaintiff Rose also wrote to Kin Liversidge in 1989 to inform him that she might have people staying at her house that summer who would use Road A to access Parsons' Beach. (Joint Ex. 28.) He responded that it was his belief that Road A was his and his siblings' exclusive property, but offered to allow Plaintiff Rose to walk down his driveway to the beach. (Def.'s Ex. 3.) That offer was later rescinded upon learning that his sister and neighbor, Ms. Fluke, was planning to have renters at her house for the summer. (Joint Ex. 29.)

### III. Conclusions

Prior to trial the parties agreed that the legal issues in dispute were as follows: (A) Whether the easement rights in Road H appurtenant to the Farm Lot[19] have been extinguished by operation of the doctrine of merger? (B) Whether the easement rights in Road A appurtenant to the Farm Lot have been extinguished by abandonment? (C) If easement rights in Road H and Road A have not been extinguished, then (1) What is the scope of the easements? (2) Where is Road A's intended and actual location, and in

---

[19] Defendants are not claiming that the doctrine of merger terminated any easement in Road H appurtenant to Party-in-Interest Fluke's property. (*See* Stipulation ¶ 26.)

20

particular, does Road A extend beyond the sea wall and if so to what extent? (3) What is the scope of the easements in the roads and does this include a general right of recreation on the beaches? By the conclusion of trial, another disputed issue had arisen: Whether the easement rights in Road A as appurtenant to the Farm Lot have also been extinguished by operation of the doctrine of merger?[20]

For the reasons set out below, the court concludes: (A) The easements in Road H and Road A appurtenant to the Farm Lot have not been extinguished by the doctrine of merger; (B) The easement in Road A appurtenant to the Farm Lot has not been extinguished by abandonment; and (C)(1) The scope of said easement rights in the roads consists only of a right-of-way over the roads and a right to maintain certain utilities along the roads; (C)(2) One purpose of the rights-of-way in the roads is to provide access to the beaches; (C)(3) Both roads extend from the sea wall to the Atlantic Ocean and thus to the intertidal zone of the beach; and (C)(4) By virtue of these rights-of-way, the easements imply general use rights, including recreational rights, within the intertidal zone of said Crescent Surf Beach and Parsons Beach, but only as acquiesced in or permitted by the title owner of the intertidal land(s) as well as any and all public use rights in the intertidal zone of said beaches recognized under Maine law, including the so-called Colonial Ordinance of rights of fishing, fowling and navigation.

---

[20] In the first appeal of this matter to the Law Court, Plaintiffs challenged this court's grant of summary judgment to Defendants based upon an initial conclusion that merger had extinguished the easements in both roads appurtenant to the Farm Lot. See *Rose v. Parsons*, 2013 ME 77, ¶¶ 1, 6, 76 A.3d 343. The Law Court's reversal of that ruling was predicated, in part, on facts that trial revealed to be erroneous. Neither the parties nor the Law Court were aware at the time of this gap in the record. Thus, the question of merger as it pertains to Road A appears to now be revived. The court addresses the issue of merger with regard to Road A and the doctrine of law of the case below in Section III (A)(2).

## A. Easements in Road H and Road A Not Extinguished by Merger

### 1. Road H

The doctrine of merger operates to extinguish an easement when there is "unity of title and possession of the dominant and servient estates in the same person by the same right." *Dority v. Dunning*, 78 Me. 381, 387, 6 A. 6, 9 (Me. 1886). Defendants contend that the easements appurtenant to the Farm Lot comprising part of Road H were extinguished in 1956 by operation of law under the doctrine of merger when Helen Parsons Merrill acquired the dominant estate, the Farm Lot, and the two servient estates, Lot 1 and Lot B.

The Law Court made clear, however, that the rule it was enunciating in *Dority v. Dunning* "is subject to qualifications." *Id.* Thus, for merger to operate, "unity of title" requires ownership of the estates to be "coextensive, equal in validity, quality, and all other circumstances of right."[21] *Id.* If one estate is "held in severalty and the other only as to a fractional part thereof by the same person, there will be no extinguishment of such easement." *Id.; see* Restatement (First) of Property § 497 cmt. b (1944) ("'unity of ownership of estates' as used in this Section applies to the unity in one person of estates in a dominant and servient tenement . . . . [and] does not extend to estates held in co-ownership, but only to estates held in severalty."); 28A C.J.S. *Easements* § 123 (1996) ("[A]n easement is not extinguished under the doctrine of merger by the

---

[21] *Dority v. Dunning* still appears to be sound precedent. It followed Massachusetts case authority dating back to *Ritger v. Parker*, 62 Mass. (8 Cush.) 145 (1851) ("[I]n order to extinguish an easement, by the unity of title and possession, both of the dominant and servient tenements, in the same person, he should have a permanent and enduring estate, an estate in fee in both."). *Ritger v. Parker* is still prevailing law in Massachusetts, *see Busalacchi v. McCabe*, 71 Mass. App. Ct. 493 (Mass. App.Ct. 2008); *Mills v. Mason*, 120 Mass. 244, 251 (1876), and has been cited with approval on other grounds by the Maine Law Court. *See Lemay v. Anderson*, 397 A. 2d 984, 988 n.3 (Me. 1979); *see generally* Knud E. Hermansen & Donald R. Richards, *Maine Roads and Easements*, 48 Me. L. Rev. 197, 268 (1996) ("ownership of dominant estate and a half interest in the servient estate will not result in unity of title.").

22

acquisition by the owner of the dominant or servient estate of title to only a fractional part of the other estate.").

Helen Parsons Merrill did not have the requisite unity of title in the lots in question in order for the doctrine of merger to operate to extinguish the easements in Road H. She owned one of the servient estates—Lot 1—as a tenant in common with four others. Since her ownership in all estates was not "coextensive, equal in validity, quality, and all other circumstances of right," she did not have unity of title to support extinguishment of her easement in Road H by merger. *Dority*, 78 Me. at 387, 6 A. at 9.

Defendants urge, in the alternative, that the court should bring the merger issue into sharper focus and determine that partial extinguishment of the easement in Road H has occurred as to particular burdened lots. For example, since the boundary of both servient estates extends to the middle of Road H and since Helen Parsons Merrill held both the Farm Lot and one of the two servient lots—Lot B—in severalty, Defendants argue that easement rights in the half of Road H that falls on Lot B should be extinguished.

The court is not inclined to accept this argument. Partial extinguishment here would only apply to one segment of Road H—the lower portion of Road H between Lot 1 and Lot B—and not the full length or width of the road. In these circumstances, such a ruling would have little practical effect or value. The upper portion of Road H, which runs along the eastern boundary of Lot 1 between Lot 1 and the small, unidentified island of land on the Plan between Road H and Road G, would not be affected because Helen Parsons Merrill held only a fractional interest in Lot 1. And with respect to the portion of Road H running between Lot 1 and Lot B, only the eastern half of the easement would be extinguished; the western half would be unaffected. The Farm Lot's owner(s) would still have an intact easement and a right of way over the

23

Lot 1-side of the road. This outcome would be both confusing and difficult to enforce. Moreover, the principal case Defendants cite in support of partial extinguishment is distinguishable. *See Chase v. Eastman*, 563 A.2d 1099 (Me. 1989) (affirming there was an easement over defendant's property allowing plaintiff, in common with others, to access the waterfront, even though part of the easement was abandoned by plaintiff's failure to object to defendant's construction of cottage).

There is another basis for concluding that the easements in Road H have not been, or should not be, extinguished by merger in these circumstances. The doctrine of merger is given more limited application with respect to easements that are part of a recorded subdivision plan or common plan of development. In that instance, complete unity of title to all dominant and servient estates in the plan is required to extinguish the easements by merger. The Restatement (Third) of Property: Servitudes § 7.5 (2000)[22] states a "servitude is terminated when all the benefits and burdens come into a single ownership." Comment c to section 7.5, titled "Application to property subject to general plan of development," provides as follows:

> Because merger takes place only when all the benefits and burdens of the servitude come into a single ownership, subdivision covenants and servitudes in other developments with reciprocal servitudes are rarely terminated by merger. Since each lot, unit, or parcel enjoys the benefit of the servitudes imposed on every other property in the development, see § 2.14(a), the occasion for merger can arise only when the entire development is acquired by a single owner.

Restatement (Third) of Property, § 7.5 cmt. c (2000); *see also id.* § 2.14(a) (conveyance of land pursuant to a general plan of development implies creation of servitudes

---

[22] The Law Court cited with approval other language in section 7.5 of Restatement (Third) of Property when holding that the easements in this case had been re-established. *See Rose v. Parsons*, 2013 ME 77, ¶ 10, 76 A.3d 343 ("Transfer of a previously benefited or burdened parcel into separate ownership does not revive a servitude terminated under the rule of this section. Revival requires re-creation under the rules stated in Chapter 2.")

24

benefitting and burdening all lots).

The 1915 Plan is a common development plan or subdivision and merits different treatment with respect to applying the merger doctrine. "Existence of a general plan is a question of fact to be determined from the circumstances." Restatement (Third) of Property: Servitudes § 2.14 cmt. f (2000); *see, e.g., Murch v. Nash,* 2004 ME 139, ¶¶ 5-8, 861 A.2d 645 (discussing the creation and details of a subdivision plan and the conveyance of the lots to the wife and heirs of the decedent landowner). Pursuant to and at the direction of the will of Charles Parsons, his property was subdivided for distribution among heirs according to a detailed, intricate plan and implementing deeds. The Plan was drawn with due consideration not only for the property distribution itself, but also the configuration and purposes of roads, and easements therein. Each deed granted "as appurtenant to the ... land and every part thereof, a right of way over all roads shown on said map" and the right was granted "in common with others in and to the roads shown on the 1915 Plan." (Joint Ex. 2 at 3-4; Joint Ex. 3 at 6; Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) This is consistent with the intent of the trustee/grantors to assure each lot owner had not only rights of way over the roads, but also the right to use the roads as utility corridors. This latter concern was explicitly raised in connection with the creation of the roads so as to avoid the need to run pipes or wires over any of the lots. Extinguishing these rights-of-way on a piecemeal basis is contrary to the overall intent and design of the common plan of development.

The Law Court has not addressed whether the rule articulated in comment c to section 7.5 of the Restatement (Third) Property applies in Maine. However, the Court has held private easement rights in roads are created by implication based on estoppel when grantees acquire property by reference to a plan providing for such roads. *See*

25

*Murch*, 2004 ME 139, ¶¶ 12-17, 861 A.2d 645 (grantee who acquired property by reference to a plan received a private right-of-way in proposed streets delineated in the plan); *Callahan v. Ganneston Park Dev. Corp.*, 245 A.2d 274, 278 (Me. 1968) (grantee who purchased land by reference to plan had easement in the roads "by implication based on estoppel"); *Arnold v. Boulay*, 147 Me. 116, 120, 83 A.2d 574, 576 (1951) (person who received a deed with a description of land recited as a lot number according to a recorded plan received all rights contained within the plan, including use of roads on the plan.); *Bartlett v. Bangor*, 67 Me. 460 (1878) (rights-of-way in streets annexed to subdivision lots cannot be afterwards interrupted or destroyed).[23]

In the unique context of this case, and in light of the principles stated in the Restatement (Third) Property and consistent with the principles articulated in the Law Court's decisions cited above, the court finds that something more than mere inaction or silence is required for merger to extinguish easements passively through operation of law and on a piecemeal basis with respect to properties that are, and have been, transferred only among family members and are part of a subdivision/common development plan. All of the parties to this action are descendants of Charles Parsons, whose appointed trustees acted to create a thoughtful, integrated plan of development for his descendants and heirs in which the roads, and the easements therein, were considered with much care and attention. The original 1916 deeds effectuating the

---

[23] Two cases cited by Defendants for a contrary position, the Maine case of *Warren v. Blake*, 54 Me. 276 (1866) and the Massachusetts case of *Cheever v. Graves*, 592 N.E.2d 758 (Mass App. 1992) appear distinguishable and/or not controlling. The Law Court expressly noted in *Warren v. Blake* that it was "not called upon to discuss or decide the question [of] how far individuals holding deeds of lots on other streets, laid down on this plan of 12 acres, can claim a right to have this distant street always kept open." *Blake*, 54 Me. at 281. Although *Cheever v. Graves* held that merger could extinguish individual easements in a subdivision, not all of the deeds contained the express easement grants. *Cheever*, 592 N.E.2d 758. All of the 1916 deeds contain such grants. Moreover, *Cheever v. Graves* was a decision by a Massachusetts intermediate appellate court.

26

1915 Plan granted as appurtenant to each lot a "right of way over all roads shown on the map [the Plan]." (Joint Ex. 2 at 3; Joint Ex. 3 at 6; Joint Ex. 4 (Page 304 missing) Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) Plaintiffs acquired the Farm Lot in 1978 together with all right, title and interest "in common with others, in and to the roads shown on the 1915 division plan." *Rose*, 2013 ME 77, ¶ 4, 76 A.3d 343.

The court concludes that the easements in Road H appurtenant to the Farm Lot have not been extinguished by operation of law through the doctrine of merger.

### 2. Road A

The issue of merger with respect to Road A was resurrected on the last day of trial when it became clear from the evidence that the factual predicate for the Law Court's holding in *Rose v. Parsons I* no longer proved accurate.[24] During her lifetime, Llewellyn Swayne Parsons acquired a number of lots that were initially granted to her siblings or nephew pursuant to the 1915 Plan. By 1948 she acquired the Farm Lot, a dominant estate with respect to the easements in Road A, and Lots F, 21 and CC, the servient estates burdened by two of Road A's three segments at issue. (*See* Joint Exs. 9, 10; Def. Exs. 2(a)-3(d).) Defendants contend that the doctrine of merger extinguished the easements in Road A that benefitted the Farm Lot because there was unity of title and possession in Llewellyn Swayne Parsons at that time.

The Law Court's 2013 decision in *Rose v. Parsons I* held that, as with Road H, the easements in Road A were recreated when Llewellyn Swayne Parsons' properties were devised or conveyed out under her will and codicils upon her death in 1956. *Rose*, 2013 ME 77, ¶ 6, 76 A.3d 343. However, unlike the lots that constitute the servient estates with respect to Road H, Llewellyn Swayne Parsons did not own the servient

---

[24] *See supra* note 20.

27

estates with respect to Road A at the time of her death. In 1949 she conveyed Lot F and in 1950 she conveyed parts of Lots 21 and CC, all to Mary Parsons Liversidge. The deeds that conveyed the lots to Mary Parsons Liversidge did not reserve or grant a new easement. (Joint Exs. 9, 10.) One cannot convey—or as in this case devise or convey by codicil—that which one does not own. And an easement can only be created if the grantor owns in fee the land under the road. *See Warchalowski v. Brown*, 417 A.2d 425, 428 (Me. 1980).

Plaintiffs object to the court entertaining this issue. They contend it is settled law of the case and even if the Law Court was operating on an record that was subsequently discovered to be inaccurate, this court cannot revisit the merger issue with respect to Road A. The law of the case doctrine does not preclude, as is the case here, reconsideration of an issue that was decided on "essentially different facts." *Blance v. Alley*, 404 A.2d 587, 589 (Me. 1979) (holding "absent a showing of essentially different facts, the decision by an appellate court on a given issue is to be followed in the trial court once the case is remanded."); *Raymond v. Raymond*, 480 A.2d 718, 720 (Me. 1984).

Even though Llewellyn Swayne Parsons had unity of title and possession in these estates, the court concludes that that the easements in Road A appurtenant to the Farm Lot were not extinguished by merger because, as concluded above, the 1915 Plan constituted a common development plan and in order for merger to extinguish the easements there would need to be unity of title in all lots of the subdivision.[25]

---

[25] This conclusion also may be consistent with what Llewellyn Swayne Parsons might have intended, as inferred from the record evidence. It is true, as Defendants have noted, that she did not expressly recreate or reserve the easements in Road A in the deeds of conveyance to Mary Parsons Liversidge with respect to Lots F, 21, and CC. At the same time, however, the property descriptions in these deeds made a number of references to Road A on the Plan in delineating the boundaries of the properties conveyed. Nowhere in the deeds did it appear she intended to extinguish the easements in Road A. In any event, the third segment of Road

28

The court concludes that merger did not extinguish the easements in Road A appurtenant to the Farm Lot.

## B. Abandonment of Road A Not Proven by Clear and Convincing Evidence

Nonuse alone cannot extinguish an easement. *Rutland v. Mullen*, 2002 ME 98, ¶ 10, 798 A.2d 1104. "To prove abandonment a party must show 1) a history of nonuse coupled with an act or omission evincing a clear intent to abandon, or 2) adverse possession by the servient estate." *Canadian N. Ry. v. Sprague*, 609 A.2d 1175, 1179 (Me. 1992); *Stickney v. City of Saco*, 2001 ME 69, ¶ 51, 770 A.2d 592. The party seeking to demonstrate abandonment must prove the above "elements by clear and convincing evidence, establishing each fact to a high degree of probability." *Gravison v. Fisher*, 2016 ME 35, ¶ 52, 134 A.3d 857. An intent to abandon requires evidence of "unequivocal acts inconsistent with the further assertion of rights associated with the existence of the easement." *Chase v.* Eastman, 563 A.2d 1099, 1102-03 (Me. 1989)). Such unequivocal acts must be "decisive and conclusive." *Canadian N. Ry.*, 609 A.2d at 1179.

The three segments of Road A at issue in this case were unused for a long period of time. Llewellyn Swayne Parsons and Helen Parsons Merrill, previous owners of the Farm Lot, were never seen using these portions of Road A. There was no evidence that the original devisees of the Farm Lot used these parts of Road A. In the 1930s, after the Pool House was razed, a fence or a gate was erected across Road A near its intersection with Road B.[26]

---

A would have been unaffected—or at least the portion of Road A that was on Lot 12, the lot abutting Lot CC to the east.

[26] Read together, the Plan and the Dane Letter suggest that Road A previously continued southwest over what became Lots W, H and I and thus was the primary means of access to the Big House. It appears that the trustees and drafters of the Plan may have intended to close off

29

As noted above, Llewellyn Swayne Parsons conveyed Lot F, Lot 21, and Lot CC, the Road A servient estates, to Mary Parsons Liversidge in 1949 and 1950. Road A was referenced as part of the property descriptions, even though there was not an express reservation of the easements. (Joint Exs. 9, 10.) Several later deeds also referenced the fact that Road A "was not open." None of these deeds involved the Farm Lot.

In later years, after Kin and Sandra Liversidge acquired their property on Lot CC, they cleared some of the land, built a driveway, and put in some gardens in the vicinity of where part of Road A appears on the Plan. As time went on, parts of Road A became overgrown with vegetation. Kin Liversidge testified that the vegetation he cleared to build his driveway was thick and consistent with years of growth. The driveway is in close proximity to, but not coextensive with, the first segment of Road A. Kin and Sandra Liversidge have created gardens and arbors on or near portions of Road A. They planted a hedge of bushes along the third segment of Road A. The built an addition to their home which approaches, but does not infringe upon or obstruct the third segment of Road A.

For an extended period of time, this road was not used. During some of this time the servient estate owner undertook actions that appeared inconsistent with its continued use. However, in order to establish abandonment there must be clear and convincing evidence of "decisive and conclusive" intent *on the part of the dominant estate owners* to abandon the easement. *Chase*, 563 A.2d at 1102. Defendants have not made this showing. *See Stickney*, 2001 ME 69, ¶ 52, 770 A.2d 592 ("Although the . . .

---

this portion of Road A, use the smaller lots established in the footprint of the former Road A as buffer lots, and redirect "traffic" around onto Road B as the primary means of access to the Big House, Seven Gables, and other houses on the lots fronting Crescent Surf Beach. When the Pool House was torn down, there would have been no reason to keep this portion of Road A open to vehicles. The fact that the road was no longer used for vehicles, however, does not establish intent to abandon it altogether.

30

driveway is arguably a permanent structure, it is not a decisive act that *permanently* obstructs the right-of-way, compelling an objection for the purposes of abandonment." (emphasis in original)); *Rutland*, 2002 ME 98, ¶ 10, 798 A.2d. 1104 ("Neither the building of a fence across an easement and using it for pasturage, nor a right-of-way overgrown with trees, blocked by rocks, and inaccessible by car for many years is sufficiently adverse to constitute abandonment." (internal citations omitted)).

The evidence regarding intent, if any, of the former owners of the Farm Lot, Llewellyn Swayne Parsons and Helen Parsons Merrill, to abandon the easement in Road A is indirect, circumstantial, and far from clear and decisive. The testimony of the current owner of the Farm Lot, Helen Rivas Rose, established the contrary—that she had no intention of abandoning this easement. Beginning shortly after Kin and Sandra Liversidge took up permanent residence at Parsons Beach around 1980, Plaintiffs gave express, written notice on more than one occasion of their intent not to abandon Road A.

Further, for the same reasons the evidence does not clearly establish adverse possession. To prove adverse possession, Defendants must demonstrate that their use of the property was actual, open, visible, notorious, hostile, under claim of right, continuous and exclusive for a period of over 20 years. *Harvey v. Furrow*, 2014 ME 149, ¶ 11, 107 A.3d 604. Defendants have not so proven.

C. Scope, Purpose, and Location of Easements in the Roads

1. Scope of Easements

The scope of rights granted in an easement is to be determined from the language of the deed. *Sleeper v. Loring*, 2013 ME 112, ¶ 18, 83 A.3d 769; *Matteson v. Batchelder*, 2011 ME 134, ¶ 16, 32 A.3d 1059. In construing a deed, the court must "give words their general and ordinary meaning to determine if they create any ambiguity."

31

*Sleeper*, 2013 ME 112, ¶ 12, 83 A.3d at 773. The language of the 1916 deeds was clear and unambiguous as to the scope of easement rights.

Each of the 1916 deeds granted "as appurtenant to the . . . land and every part thereof, *a right of way over all roads shown on said map and a right to maintain along all roads shown on said map water pipes, electric light wires, and telephone wires.*" (Joint Ex. 2 at 3; Joint Ex. 3 at 6; Joint Ex. 4 (Page 304 missing) Joint Ex. 5 at 4; Joint Ex. 6 at 3; Joint Ex. 7 at 2; Joint Ex. 8 at 5.) (emphasis added). A "right-of-way" is a "legal right to pass through property owned by another." *Sleeper*, 2013 ME 112, ¶ 13 n.5, 83 A.3d 769 (*quoting* BLACK'S LAW DICTIONARY 1326 (7th ed. 1999)). Thus, the "right of way over all roads" means the right to pass and re-pass over the roads as they cross another's property, nothing more. Similarly, the "right to maintain along all roads" pipes for water and wires for electricity and telephone is plain and unambiguous.

Based upon the unambiguous language of the deeds, the court concludes that the scope of the easements is limited to the right to pass over the roads shown on the map; and the right to maintain water pipes, electric lines, and telephone wires along the roads depicted on the map. The court rejects the argument Plaintiffs and Party-in-Interest Fluke put forward that any additional easement rights, specifically the right of use for general recreational purposes, exist within the boundaries of the roads themselves. Any rights or activities beyond those expressly specified would exceed and conflict with the plain, unambiguous language of the deeds.

### 2. Purpose of Easements

Even though the scope of rights within an easement is clearly set forth in the deeds, the question of the easements' purpose is not fully answered. *See Flaherty v. Muther*, 2011 ME 32, ¶ 55, 17 A.3d 640; *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979). One of the purposes of the easements in the roads can be determined from the express

32

language of the deeds—that is, to delineate specific corridors for laying certain utilities to avoid crossing over individual lots. However, the purpose of the easement's second component—the "right of way over all roads"—is not clear from the deeds alone. A right of way over all roads to where? And, for what purpose(s)? When the "purposes of an express easement are not specifically stated," the court may turn to extrinsic evidence to "ascertain the objectively manifested intention of the parties [to the original conveyance]," including facts and circumstances in existence prior to conveyance. *Flaherty*, 2011 ME 32, ¶ 55, 17 A.3d 640; *Fine Line v. Blake*, 677 A.2d 1061, 1064 (Me. 1996); *Badger*, 404 A. 2d at 225; *Englishmans Bay Co. v. Jackson*, 340 A.2d 198, 200 (Me. 1975).

The Dane Letter is persuasive extrinsic evidence from which the court infers that one of the intended purposes of the rights of way in the roads was to access the beaches. It is clear from the Letter, and in particular from the statements of George C. Parsons quoted therein, that Roads A and H had historically been used to access the beach. Road H is referred to as "the road leading to the beach between lot B and lot one." (Joint Ex. 23 at 11.) Further, it stated "People now to get on the western beach . . . go along the road shown on the map running between . . . lot one and . . . [lot] B." (Joint Ex. 23 at 11.) The Letter also makes explicit reference to the road "between lot 12 and lot F.N.P. from E.P.," the third segment of Road A running between Lot CC and Lot 12 on the 1915 Plan, as "the road to the beach." (Joint Ex. 23 at 11.) There is nothing in the deeds or the Plan evincing an intent to alter this historic usage of the roads, at least insofar as private access for family lot owners was concerned. Moreover, the Plan itself, which depicts openings in the sea wall at the intersection with Road H and Road A, suggests the roads were not intended to terminate abruptly at the sea wall (see below).

33

The court therefore finds that one purpose of the right-of-way easements in Road H and Road A was for access to the beaches.

With respect to Road A, the court has considered, but ultimately finds unpersuasive, Defendants' contention that Road A was not intended to go to the beach but rather only to the Pool House. Their argument cites a 1908 letter from Henry Parsons to Edwin Parsons discussing the property and referring to "the road from the swimming pool to Kennebunk." (Joint Ex. 24 at 2.) Defendants also point to the fact that the Pool House may have been later extended to be closer to the third segment of Road A and that once the Pool House was torn down a gate was erected across a section of Road A and Road A was little used thereafter.[27]

The reference to the "road from the swimming pool to Kennebunk" was most likely a reference to Road A. Even if Road A went to the swimming pool, it does not preclude the fact that the road also was used to access the beach. The Dane Letter has a clearer, more direct identification of both the particular segment of Road A being referenced as well as one of its established purposes. Moreover, Road A appears to have been the major access road to the entire property at that time. The Pool House was also proximately located to other parts of Road A, to which Henry Parsons could just as likely have been referring.

Further the fact that Road A fell into disuse after the Pool House was torn down likewise does not persuade the court that the intent of the drafters of the deeds and the Plan was to limit the purpose of Road A's third segment to accessing the Pool House, especially given its historic use as referenced in the Dane Letter and the manner in which it is depicted in the Plan.

---

[27] Defendants' argument that the physical existence of sea wall indicated that Road A was intended to terminate at the wall is addressed below in Section III(C)(3)(b).

34

### 3. Location of Road H and Road A

Determining the intended location of an easement is a question of law to be based upon the language of the deed and any recorded plan referenced therein if clear and unambiguous on their face; and if not, then the court looks to ascertain the intent of the parties. *See French v. Estate of Gutzan*, 2015 ME 152, ¶ 7, 128 A.3d 657; *Anchors v. Manter*, 1998 ME 152, ¶ 16, 714 A.2d 134. When the precise location of a right of way is ambiguous on the face of the deeds then location becomes a question of fact. *Anchors*, 1998 ME 152, ¶ 16, 714 A.2d 134. Moreover, "where a boundary is on the face of the earth is a question of fact." *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d 41. The party asserting easement rights has the burden of proving its precise location when there is a dispute as to its location. *See French*, 2015 ME 152, ¶ 19, 128 A.3d 657.

### a. Road H

The parties have stipulated to the intended location of Road H. They stipulated that Road H runs between Lot 1 and Lot B as shown, and continues beyond the "line of sea wall" as shown on the Plan and across the beach to the Atlantic Ocean, terminating at the low water mark. (Stipulations ¶ 20.) In other words, the stipulation effectively provides that Plaintiffs and Party-in-Interest Fluke have access to the intertidal zone of Crescent Surf Beach via Road H.

Likewise, there seems to be no disagreement as to Road H's location on the face of the earth. During the September 27ᵗʰ view, parties, counsel, and the court traversed the relevant part of Road H, which runs between Lot 1 and Lot B as depicted in the Plan. The road began at a sign erected a number of years ago, ran along a pathway that was somewhat overgrown but passable and that was distinctly raised in elevation. The pathway terminated at the sea wall where a set of wooden stairs had been recently erected. The court so finds that this is the location of Road H on the face of the earth.

35

### b. Road A

The location of Road A, in particular its southernmost point of termination and the location on the face of the earth of its third segment between Lot CC and Lot 12 as shown on the Plan, remains in dispute.

As to the former issue, Defendants contend that Road A terminates at, and goes no further than, the "line of sea wall" as depicted on the Plan. Plaintiffs take the general position that if Road A was intended to provide access to the beach then it must pass beyond the sea wall. The parties also contest—or did at one point—the dimensions of Road A south of the line of the sea wall.

The court finds that Road A was intended to extend beyond the sea wall to the water, thus providing access to the intertidal zone of Parsons Beach.

The 1916 deeds alone are not determinative, one way or the other, of this question. As discussed above, the deeds expressly provide a right-of-way easement in the roads, but beyond that do not make reference to the beaches. The court concluded above, in light of relevant extrinsic evidence, that one intended purpose of the rights-of-way was to provide access to the beaches. The deeds do not support the conclusion that that Road A was intended to terminate at the sea wall. Contrary to Defendants' reading of the deed conveying Lot 12, the servient estate underlying the southeastern most portion of Road A, the description of its western boundary does not support the conclusion that Road A terminates at the sea wall. It is true that the relevant deed describes the western boundary of Lot 12 by reference to Road A only from the sea wall north, and does not refer to Road A in the description of the boundary line extending from the ocean to the sea wall.[28] However, the deed's description of the eastern

---

[28] *See supra* note 15.

boundary of Lot 12 also makes the same distinction in describing the portion of the boundary north of the sea wall, which expressly references the adjoining Lot AA, and the portion from the sea wall south to the ocean, which does not include such a reference. The boundary south of the sea wall is similarly depicted on the Plan as a dotted line extending from the sea wall to the ocean.

On the other hand, the deeds may support an inference that Road A was intended to extend to the ocean. Lot 12's deed description vis-à-vis Road A is nearly identical to the description of Lot 1's western boundary that borders Road H.[29] The deed descriptions of the other two lots adjacent to both of these roads—Lot CC to the west of the third segment of Road A and Lot B to the east of Road H—are also identical. In other words, the manner in which the relevant deeds describe the properties adjacent to Road A and to Road H is strikingly similar.[30] Thus, based on the language of the deeds, there is little difference between the two roads in terms of where their seaward terminus is located.[31]

The 1915 Plan indicates an intention that Road A extend beyond the sea wall to the beach. The Plan depicts both Road H and Road A at the "line of sea wall" with an opening in the line, as if to indicate that the roads continue on and do not terminate there. This stands in contrast with the Plan's depiction of road termination points in other locations. For example, where Road A meets Lot W there is a solid black line indicating that Road A terminates its southerly course and turns east. Where Road A meets Lot L there is a solid black line, indicating that Road A terminates its easterly

---

[29] *See supra* note 10.

[30] The deeds differ in the limited respect that the description of the eastern boundary of Lot 1 is from north to south and the description of the western boundary of lot 12 is from south to north.

[31] *Compare* Joint Ex. 2 at 2 *with* Joint Ex. 3 at 2.

course and turns south. There is a solid black line across the Road G where it meets and terminates at Lot K. (*See* Joint Ex. 47.)

However, despite those details, the Plan is not unambiguous with regard to the southern terminus of Road A. The omission of a second, parallel dotted line extending across the beach to the water from the intersection of Road A and the "line of sea wall" at the southeast corner of Lot CC does not provide a clear, visual impression of a road crossing the beach (as is the case with Road H) and thus raises at least a question as to whether Road A was intended to extend past the sea wall. The court considers relevant extrinsic evidence to answer this question.

In support of their position that Road A terminates at the sea wall, Defendants rely primarily on extrinsic evidence concerning the physical feature of the sea wall at the time as well as evidence suggesting that the third segment of Road A was only used and intended to be used for access to the Pool House.[32] While photographs in evidence show an "unbroken" sea wall along the oceanfront lots in the area, the wall was not so high or formidable so as to prevent one from easily stepping down from the upland onto the sand. (*See* Joint Ex. 35.) The court has considered, and for the reasons noted previously, rejected the proposition that the third segment of Road A existed only to access the Pool House.

The Dane Letter offers more persuasive evidence of an intent to extend Road A beyond the sea wall. It provides a clear indication that the family at the time

_____

[32] Defendants cite the following evidence in support of their position that Road A was only intended to access the Pool House, not the beach: (i) the proximity of the former Pool House to the third segment of Road A, as evidenced by the Plan's depiction of the Pool House footprint on Lot CC, the view taken on September 27ᵗʰ which demonstrated the approximate location of the in-ground pool, and testimony of Kin Liversidge regarding the addition to the Pool House that brought its eastern side closer to Road A; and (ii) the 1908 letter from Henry Parsons discussed above. For the reasons discussed, the court does not find this evidence as persuasive as other record evidence with regard to the intended purpose of Road A.

considered Road A as a means of access to Parsons Beach, as the court has previously concluded. The provision in the deeds for "a right of way over all roads," the Plan's depiction of the opening in the "line of sea wall" at the intersection with Road A, and Road H, and the absence of any contrary provisions in either the deeds or the Plan, read in the light of the historic uses of the roads as made clear in the Dane Letter, lead the court to find the intent of the trustee/grantors was to continue the historic use of these rights of way to the beaches requiring the conclusion that the right of way in Road A extends beyond the sea wall to the low water mark.

As noted above, the Plan's omission of a second, parallel, dotted line running from the southeastern corner of Lot CC not only created an ambiguity as to Road A's southern terminus but also as to its dimension once it extended past the sea wall. Plaintiffs initially took the position in this litigation that this feature of the Plan indicated an intent that Road A, as it extended past the sea wall, widened out to the south and west, encompassing the entire beach area seaward of Lots CC, D and C.

Plaintiffs seemed to abandon this position at trial. If the position was not fully abandoned, Plaintiffs failed to carry their burden of proof on this point.

The Plan does not depict dotted lines extending from each boundary of the three lots to the west of Road A—Lots CC, Lot D, and Lot C. This stands in marked contrast with the fact that in every other instance the Plan depicts the boundaries of oceanfront lots as extending via dotted lines from the sea wall to the water. While this is a curious omission in an otherwise meticulously drawn plan, it does not evidence an intention to widen the dimension of Road A as it extends from the sea wall to the water.

First, the Plan itself does not label this area as "Road A." All other segments of Road A are expressly labeled as such. It would seem particularly important to include that label here because it would have been an unusual and counterintuitive notion to

39

consider a wide stretch of beach to be the extension of a 12 ½ foot road.

Second, the deeds conveying Lots C, D, and CC clearly and unequivocally conveyed title to the beach seaward of these lots, down to the ocean. None of the relevant deeds mention any reservation of a right of way or other encumbrance specific to this situation. Moreover, the 1916 deeds provide that the servient estates extend to the mid-point of any road. This construct would be difficult to apply in this instance if the beach in front of these three lots was considered a "road."

Third, other record evidence does not support the notion that the beach on Lots C, D, and CC was an extension of Road A. Plaintiffs point to evidence that this particular stretch of the Parsons Beach was the part of the beach historically used by the families. They contend this demonstrates the trustee/grantors' intent to designate an area of the beach for general use as part of the right-of-way in Road A. However, the parties stipulated at trial that all of the families used the beach in front of their own houses. (Stipulation at Tr. Trans. Day 2 at 60.) Moreover, as concluded above, the roads served limited purposes as rights of way for passing over land and as utility corridors. Neither of those purposes provides support to find this stretch of beach as an extension of Road A.

The court concludes that Plaintiffs have not shown it more likely than not that Road A encompassed the entire beach area in front of Lots C, D, and CC.

Even if Plaintiffs had met their burden of showing that Road A was intended to encompass this entire beach area, such a ruling by the court would have little practical effect or value. The 1916 deeds expressly granted servient estate owners the right to alter the precise location of a road across his or her property so long as a "reasonably convenient route is maintained for the use of the other parties entitled to a right-of-way over such road." (Joint Ex. 3 at 7.) Even if Road A widened out to encompass the

40

entire beach, Plaintiffs' sole rights therein, as owners of the Farm Lot, would be to cross over the beach for access to the intertidal zone. Pursuant to the controlling deeds, the servient estate owners, presently the Liversidges, are entitled to alter the path of the right-of-way. Thus, the Liversidges could, consistent with their deeds, relocate, redirect, or limit the right-of-way easement in Road A to a particular route or location.[33]

Therefore, the court concludes that the Road A easement appurtenant to the Farm Lot assures a right to pass from the sea wall to the water, and hence to access the intertidal zone, and that this is a 12 ½ foot wide extension of the third segment of the road. And, use of this easement is subject to the right of the servient oceanfront lot owners to dictate another, specific path that constitutes a "reasonably convenient route" to the intertidal zone of the beach.

Finally, with regard to the location of the upland portion of the third segment of Road A between Lot CC and Lot 12 on the face of the earth, the court finds and concludes that it runs along the raised ground where the Liversidges have planted shrubbery along their eastward boundary with Lot 12. The 2002 revised site plan of Kin and Sandra Liversidge's property provides an accurate depiction of the road as it lays on the face of the earth relevant to his driveway and property boundaries. (Joint Ex. 50.) This part of the road is approximately 12 ½ feet wide according to the scale of the Plan. Of course, as noted, the precise location of the easement right-of-way in the road can be altered consistent with the deeds so long as a "reasonably convenient route" is maintained.

4. **Extent of Use Rights in the Beaches**

By virtue of the easements in the roads appurtenant to the Farm Lot, Plaintiffs

---

[33] The servient estate may not alter the route in such a way that makes it less convenient than the 12 ½ foot right of way that was depicted in the 1915 plan.

claim an unfettered right to use the beaches, including a right of general recreational use. In asserting this claim, Plaintiffs rely primarily on language found in certain deeds and Law Court cases discussed below. For the following reasons, the court rejects their claim.

The 1916 deeds themselves do not convey any general rights of use in the beaches as part of the easement rights or otherwise. As noted, the 1916 deeds expressly limit the scope of easement rights to rights-of-way over the roads and for certain utilities. The rights-of-way in Road H and Road A to the water thus assure the right to pass over the land to reach the water and hence the intertidal land. Beyond that, the 1916 deeds are silent with respect to any further use rights, recreational or otherwise.

Significantly, the oceanfront lots conveyed by the 1916 deeds expressly extended to the Atlantic Ocean. The lots, therefore, included all land from the sea wall to the water, encompassing any dry sand portion of the beach (from the upland portion of the lot to the mean high water line) and the intertidal zone (from the mean high water line to the mean low water line). The clear intent and result was that each beachfront lot owner holds title in fee to the beach seaward of the upland portion of the lot conveyed and down to the water.

Plaintiffs point to more recent deeds in the chain of title of the current servient owners as a basis for their claim of rights to use the beaches. In 1973, several deeds conveying some of the properties in question began using the phrase, "adjoining beach of Atlantic Ocean, all used in common." (Joint Ex. 12 at 2; Joint Ex. 13 at 2; Joint Ex. 14 at 2; Joint Ex. 15 at 2; Joint Ex. 16 at 1; Joint Ex. 17 at 1; Joint Ex. 18 at 2; Joint Ex. 19 at 1; Joint Ex. 20 at 3.) For multiple reasons these deeds are not relevant to this issue.

First, the above-quoted language did not appear in any Parsons Beach deeds

42

until 1973 when Helen Parsons Merrill, Plaintiffs' mother and predecessor in title to the Farm Lot, conveyed her fee interests in Lots B and B-2 and her one-third interest in Lot B-1 to William Parsons. (Ex. 13 at 2.) The deed grants: "all our respective rights, titles and interests in and to the following properties . . . Entire int [sic] (title in HPM) of combined area of Lots B, B-2, *and adjoining beach of Atlantic Ocean, all used in common, 1915 division plan.*" (Ex. 13 at 1-2.) (underscore in original; italics added).

Second, when read in context this language appears to have a different meaning from that suggested by Plaintiffs. Lot B-2 is a very small carve-out from Lot B. It does not have ocean frontage, and likely was never used as a stand-alone lot due to its small size. The same may be said of Lot B-1, also is a very small carve-out from the larger Lot B that lacks ocean frontage. It is far more likely that the phrase, "all used in common, 1915 division plan," was intended to mean that both lots were conveyed to be "used in common" with one another as well as with the "adjoining beach of Atlantic Ocean," which previously would have been only part of Lot B and not part of Lot B-2 or Lot B-1.

All but one[34] of the later deeds using this same phrase involved transactions that (i) were conveying two or more lots, at least one of which did not have ocean frontage, and (ii) were transferring and/or consolidating the lots among the children of Mary C. Parsons Liversidge. (Joint Exs. 15, 16, 17, 19, 20.) Again, in this specific context it

---

[34] The 1973 deed from Llewellyn Parsons Hogan Hall to Matthew and Deborah Head Burns conveying "Lot 2 and adjoining beach of Atlantic Ocean, used in common, 1915 plan[,]" (Ex. 14 at 2.), is the only one of the seven deeds using this phrase that did not convey multiple lots, including a lot that did not have ocean frontage. However, even in this instance, given the absence of any express authority in the prior deeds, it would make more sense to construe this phrase to mean that Lot 2 and its adjoining beach were all one parcel, as is made clear from the 1916 deeds. Moreover, this deed, dated July 14, 1973, appears to have been prepared by the same attorney who drafted the May 4, 1973 deed conveying Lots B, B-1 and B-2, in which this phrase was used, likely for the reasons noted above.

would make sense that the intent of the grantor(s) was to provide that all lots conveyed be "used in common" and that the beach adjoining any ocean front lot be "used in common" for all of the lots, as the 1915 Plan had intended for the ocean front lot.

Third, none of the deeds using this phrase involve the dominant estate in this case, the Farm Lot. Even if the court were to construe the phrase to have broader intent and purpose with respect to conveying general rights to use the beach, these conveyances do not benefit Plaintiffs as owners of the Farm Lot. Therefore, when considered in context this language does not establish general recreational rights in the beach through the easements in the roads, or otherwise. The later deeds using this phrase have gone beyond the plain language of the 1916 deeds and, therefore, do not reflect the intent of the grantors of the original deeds.

Plaintiffs rely on several Law Court decisions to support their claim of a right to use the beaches. *See Badger*, 404 A.2d 222; *Flaherty*, 2011 ME 32, 17 A.3d 640; *Sleeper*, 2013 ME 112, 83 A.3d 769. These cases do not hold that a right of way via an easement to the water overrides the private property rights of ownership in the beach.

*Badger v. Hill* and *Sleeper v. Loring* both addressed the question of whether a deeded right-of-way to an inland body of water included a right for the owners of the dominant lot to construct a dock at the end of the easement. *Badger*, 404 A.2d 222; *Sleeper*, 2013 ME 112, 83 A.3d 769. The Court held that the easements in both cases provided access to the water and that the right to construct a dock at the easements' water-ward terminus fell within the scope of the easements' purpose. However, those cases are distinguishable in an important respect. The area over which the plaintiffs sought to construct a dock—the river in *Badger* and the lake in *Sleeper*--was not owned by the defendants in either case. Thus, the imputation of the right to construct a dock based on the easements' implied purpose and the exercise of that right by the easement

44

holders would not infringe upon any rights of others nor overburden the servient estates. *See Sleeper*, 2013 ME 112, ¶ 21, 83 A.3d 769. That is not the case here. The servient estates include the beach. An unfettered right to use Crescent Surf Beach or Parsons Beach would directly impact the rights of the fee owners of the land.

Likewise, the Law Court in *Flaherty v. Muther* did not hold that an easement right-of-way to access a beach established a general right to recreate inconsistent with private ownership rights. *Flaherty*, 2011 ME 32, ¶¶ 57-58, 17 A.3d 640. *Flaherty* involved a "20 foot drainage and walkway easement" over an oceanfront lot in a subdivision. *Id.* ¶ 5. The easement extended to the high water mark, thus providing the holder of the easement with access to the intertidal zone. *Id.* ¶¶ 57-58. Because the easement, though unambiguous on its face, was "silent as to [its] purpose," the Law Court affirmed the trial court's reliance upon extrinsic evidence of recent use to conclude that the "the purpose of the easement was to allow access to Secret Beach for general recreational purposes." *Id.* ¶ 56. Even then, because the grantor of the servient estate and easement did not own the intertidal land, the Court expressly recognized that the general recreational rights created could only be "properly used . . . if the title owner of the intertidal land, who is neither a party to this litigation nor identified by the record, permits or acquiesces to those uses." *Id.* ¶ 58.

In *Flaherty*, there was sufficient evidence in the record to establish that at the time the subdivision and easement were created there was regular use of the beach for general recreational purposes. *Id.* ¶ 57. Here, that is not the case. At the time of the original conveyances, each heir inherited at least one ocean front lot. Over the years the families tended to gather on and use the beach in front of their own houses and lots. While there was also evidence that the portion of Parsons Beach in front of Lot C and Lot D was commonly and regularly used, it is also true that the families using that part

45

of the beach owned houses and lots landward of that part of the beach.

Moreover, as noted the 1916 deeds made unequivocal grants in fee to the beaches down to the Atlantic Ocean. Although those grants were subject to easements created, there is little evidence that around the time the Plan was devised and deeds were executed to suggest that families regularly used the beaches outside of their own property. All of the lot owners were family members.

The court finds and concludes that it is more likely than not, given the record evidence as a whole read in light of the language of the 1916 deeds and the incorporated 1915 Plan, that the intent of the trustee/grantors was for each heir to have separate, private ownership of the beach area immediately seaward of their upland lot(s), and that the roads could provide a means of access for family members to go to and use each other's beach area; however, each owner would nonetheless have the ultimate right to exclude anyone, including other family members or others, from using his or her privately owned part of the beach.

This conclusion is buttressed by the silence of the deeds and Plan with respect to the public's use of the beaches. The Dane Letter posed direct questions to be addressed regarding the public right of access to the beaches. The Letter suggested, at least, that the family believed it might have some latitude in determining whether to change or restrict the public's historic access. The final 1916 deeds are silent in this regard, and do not recognize any rights in the public, either to use the roads or the beaches. While the public's use rights are distinct from the family's private use rights, it is reasonable to infer from this silence and from the structure of the ultimate plan of distribution, that the trustee/grantors intended, and the deeds reflected an intent, to limit access to and use of the beaches from what it had been prior to that time, and to give greater weight to the rights of private property ownership in and to the beaches.

46

That is not to say that the rights-of-way to the beaches via Road H and Road A are without purpose or meaning. Consistent with *Flaherty* and with this judgment, there are implied rights of use within the intertidal lands of these beaches, and those rights include general recreational rights if acquiesced in or permitted by the fee owner(s) of the land. Over and above these rights, there are the limited, common law rights in Maine to use the intertidal zones of the beaches, including rights of fishing, fowling, and navigation. *See McGarvey v. Whittredge*, 2011 ME 97, ¶ 28, 28 A.3d 620; *Bell v. Town of Wells*, 557 A.2d 168, 173 (Me. 1989); *Marshall v. Walker*, 93 Me. 532, 536-37, 45 A. 497, 498 (1900). The court concludes that the 1915 Plan as implemented by the 1916 deeds reflected an intent on the part of the trustee/grantors to strike a balance between access to and use of the beaches and the private property interests granted to the heirs and descendants of Charles Parsons.

Therefore, the court concludes as follows with respect to Plaintiffs' and Party-in-Interest Mary Elizabeth Fluke's rights of use of the beaches. As owners of the dominant estates benefited by easements appurtenant to those estates, they have (i) the right to pass over the roads on the 1915 Plan, including the right to pass over Road H to reach the intertidal lands of Crescent Surf Beach and the right to pass over Road A to reach the intertidal lands of Parsons Beach; (ii) rights of use including general recreational rights within the intertidal zone of the beaches so long as the fee owner(s) of said intertidal lands acquiesce or permit the use; and (iii) any and all public use rights in the intertidal zone of said beaches recognized under Maine law, including the so-called Colonial Ordinance rights of fishing, fowling and navigation.

## IV. Order and Judgment

In accordance with the foregoing, it is hereby ordered and the entry will be:

1. Partial judgment for Plaintiffs on Count I of their Complaint, to the extent

47

that the easements in the roads depicted in the 1915 Plan which are appurtenant to the Farm Lot, including without limitation the easements in Road A and Road H, are not extinguished; and that said easements include the right to utilize said roads, and in particular and without limitation the right to access the intertidal zones of Parsons Beach via Road A and Crescent Surf Beach via Road H, and the right to use the intertidal zones of said beaches subject to and consistent with the terms of this Final Judgment.

2.    Partial judgment for Party-in-Interest Mary Elizabeth Fluke on her Cross-Claim, to the extent that the easements in the roads depicted in the 1915 Plan which are appurtenant to her property as identified in her Cross-Claim, including without limitation the easements in Road H, include the right to utilize said roads, and in particular and without limitation the right to access the intertidal zone of Crescent Surf Beach via Road H, and the right to use the intertidal zone of said beach subject to and consistent with the terms of this Final Judgment.

3.    Partial judgment for Defendants on Count I of Plaintiffs' Complaint and Party-in-Interest Mary Elizabeth Fluke's Cross-Claim to the extent that the right to use the intertidal zones of said beaches by virtue of the easements appurtenant to said respective dominant estates as set forth in paragraphs 1 and 2, above, are subject to a servient estate fee titleholder's acquiescence or permission unless otherwise provided by Maine law.

4.    Partial judgment for Plaintiffs on Count I of the Counterclaim of Defendants William Parsons, Jr., et als. to the extent set forth in and consistent with paragraph 1 above.

5.    Partial judgment for Defendants on Count I of the Counterclaim of Defendants William Parsons, Jr., et als. to the extent that the right to use the intertidal zones of said beaches by virtue of the easements appurtenant to the Farm Lot is subject to a servient estate fee titleholder's acquiescence or permission unless otherwise provided by Maine law.

The clerk may incorporate this Memorandum of Decision and Final Judgment on the docket by reference pursuant to M.R. Civ. P. 79(a).

DATED:   January 12, 2017

Wayne R. Douglas
Justice/Maine Superior Court

48

RE-11-56

ATTORNEY FOR PLAINTIFF:
ALAN SHEPARD
SHEPARD & READ
93 MAIN ST
KENNEBUNK ME  04043


ATTORNEYS FOR DEFENDANTS:  MULTIPLE DEFENDANTS:
KELLY MCDONALD
MURRAY PLUMB & MURRAY
P O BOX 9785
PORTLAND ME  04104

ATTORNEY FOR PARTY-IN-INTEREST MARY ELIZABETH FLUKE
RICHARD A HULL
HULL LAW OFFICE LLC
409 ALFRED STREET
BIDDEFORD ME  04005

STATE OF MAINE                          SUPERIOR COURT
                                         CIVIL ACTION
YORK, ss.                          DOCKET NO.   RE-11-056

                                   *pAF — YOR — 9/27/2012*

HELEN RIVAS ROSE, et al.,

         Plaintiffs


    v.                            **ORDER AND JUDGMENT**
                             (TITLE TO REAL ESTATE AFFECTED)


WILLIAM PARSONS, JR., et al.,

         Defendants


1.    <u>THE PARTIES</u> — The plaintiffs are Helen Rivas Rose of Kennebunk, Maine, and Nathaniel P. Merrill of Medellin, Columbia.  They were represented by Alan E. Shepard of Shepard & Read of Kennebunk, Maine.

The defendants are William Parsons, Jr. of Locust Valley, New York, William C. Parsons, Charles B. Parsons, Louise P. Parry, Louise Parsons Smith, David L. Weld, Jr., Christopher P. Weld, and Ashley Taylor all of whom own property in Kennebunk, Maine, Rudolph Hutz of Kennett Square, Pennsylvania, Elizabeth Hutz of Kennett Square, Pennsylvania, Thomas K. Liversidge, Jr. as Trustee of Beach Property Realty Trust of Kennebunk, Maine, Katherine A. Burns of Boston, Massacusetts, Michael A. Greely of Boston, Massachusetts, Jackayla, LLC of Boston, Massachusetts, Ann Ferguson of Yardley, Pennsylvania, Matthew Miller of Scarsdale, New York, along with Stacey Miller, Ben Miller and Ali Giacomin , Llewellyn Parsons Smith of Manchester-by-the-Sea, Massachusetts along with Sarah S. Gerritz, Abigail A.S. Davis and G. Putnam Smith, Jr. and Bonnie Curry of Stamford, Connecticut.   They were represented by Peter S. Plumb and Kelly W. McDonald of Murray, Plumb & Murray of Portland, Maine.

Additional defendants were Matthew J. Burns and Debbie P. Burns of Kennebunk, Maine. They were represented by Theodore A. Small of Bernstein Shur of Portland, Maine.

Among the parties in interest was Llewellyn P.H. Alden of Wolfeville, Nova Scotia, Canada, who was represented by Jens-Peter W. Bergen of Kennebunk, Maine.

The United States of America was represented by the United States Attorney for the District of Maine Thomas E. Delahanty, II, of Portland, Maine. It disclaimed any right, title or interest in the disputed land.

Elizabeth W. McMaster and Philip R.B. McMaster of Providence, Rhode Island and Charles Bach McMaster and Joseph P. McMaster of Pepperell, Massachusetts were represented by Thomas Danylik of Woodman Edmands Danylik Austin Smith & Jacques, P.A. of Biddeford, Maine.

Abigail M. Alling of Kennebunk, Maine represented herself.

Julia Read Burns of Kennebunk, Maine was also represented by Mr. Small.

Mary Elizabeth Fluke of Philadelphia, Pennsylvania was represented by Richard Hull and Reid Hayton-Hull of Hull Law Office of Biddeford, Maine.

Horace Liversidge, II, of Kennebunk, Maine was also represented by Mr. Plumb and Mr. McDonald.

2. DOCKET NUMBER - The docket number is RE-11-56.

3. NOTICE - All parties have received notice of the proceedings in accordance with the applicable provisions of the Maine Rules of Civil procedure.

4. DESCRIPTION OF THE REAL ESTATE INVOLVED - The plaintiffs are the owners of an approximately 17-acre parcel of land located in an area between the Atlantic Ocean and Route 9 in the Parsons Beach area of Kennebunk, Maine. Their

property is described in a deed from Frederic Arnold Merrill of March 15, 1978 recorded at Book 2325, Page 83.

The defendants and parties-in-interest all own or potentially had an interest in nearby properties which were part of the larger property owned by Charles Parsons and shown in the Plan of Division of a Part of the Estate of Cha's Parsons of August 10, 1915, Plan Book 8, Page 9. This intra-family dispute involves the question of whether the plaintiffs still have the right to use the areas depicted as Roads "A" and "H" on the 1915 Plan to access the Atlantic Ocean from their larger back lot, formerly described as the Farm Lot.

The plaintiffs maintain that they have the deeded right to use the areas depicted as Roads "A" and "H" and that right has never been lost or, if lost, was reacquired through adverse possession. The defendants' claim that whatever rights once existed have been lost through the doctrines of merger or abandonment or the effects of Maine's "paper street" statute. The dispute has been well briefed and ably argued.

THE PLEADINGS

The plaintiffs have filed a three count third amended complaint. In Count I they have sought a declaratory judgment establishing their continued rights to use the interior roadways, particularly Roads "A" and "H", from the 1915 plan. In Count II they seek similar relief under the alternative theory of adverse possession or prescriptive easement. Their final count is for slander of title based on a letter from Mr. Plumb to plaintiffs' counsel of July 29, 2010, which argued that the plaintiffs no longer had rights of access over Roads "A" and "H".

The defendants have filed a single count counterclaim seeking a declaratory judgment that the plaintiffs "... have no right to utilize 'Road A' or 'Road H' or the beach depicted on the Parsons Plan."

3

Mary Elizabeth Fluke has also filed a cross-claim seeking a declaration that she has the right to use the roadways and pathways and that she has access to the beach within the bounds of Road H.

The plaintiffs have filed a motion for partial summary judgment on Count I of their complaint. The defendants along with party-in-interest Horace P. Liversidge, II have opposed the plaintiffs' motion and filed their own cross-motion for summary judgment on all counts in both the complaint and counterclaim.

THE ISSUES

The primary argument of the plaintiffs is direct. They argue that their predecessors acquired deeded rights based on the 1915 Plan and that nothing has occurred to terminate those rights. They argue that they and anyone that they rent or sell to has the right to use the interior ways to reach the ocean and to use at least a portion of the beach. They fundamentally disagree with the defendants' arguments that they can use the ways and beach only with the continued permission of the defendants who have granted that alleged privilege only to family members.

The defendants have argued that whatever rights the plaintiffs once had have been lost through the application of either the doctrines of merger or abandonment or by the application of Maine's statute governing public and private ways in proposed, unaccepted ways in subdivisions found at 23 M.R.S.A. §3031. The defendants have also argued that the plaintiffs have not re-acquired any lost rights by adverse possession or through any more recent deeds. Finally the defendants argue that there can be no slander of title since the letter was correct and, at the very least, not malicious.

MERGER

The plaintiffs are correct that Charles Parsons owned a large area at what is now quite properly called Parsons Beach in Kennebunk. He died in 1904 and his property

4

went into a trust, which created the 1915 plan, which both divided the property and outlined a series of interior roads. Both Roads "A" and "H" provided access from what was called the "Farm Lot" to the Atlantic Ocean. Through a series of deeds it is clear that the earlier owners of the plaintiffs' property had deeded rights. The first question is whether a proper application of the doctrine of merger in the context of easements has extinguished the plaintiffs' right to use all of Road "H" and much of the disputed portion of Road "A".

The doctrine of merger in the context of an easement is succinctly stated in the Restatement (Third) of Property (Servitudes) §7.5 as, "A servitude is terminated when all the benefits and burdens come into a single ownership. Transfer of a previously benefited or burdened parcel into separate ownership does not revive a servitude terminated under the rule of this section...." The rationale for the rule is, at comment a, "A servitude benefit is the right to use the land of another or the right to receive the performance of an obligation on the part of another. A servitude burden is the obligation not to interfere with another's use of the burdened party's land, or the obligation not to use land in the burdened party's possession in particular ways, or the obligation to render a specified performance to another. When the burdens and benefits are united in a single person, or group of persons, the servitude ceases to serve any function. Because no one else has an interest in enforcing the servitude, the servitude terminates. The previously burdened property is free of the servitude...."

These principles are consistent with Maine Law starting with *Dority v. Dunning*, 78 Me. 381,7 (1886) where the Law Court initially made the sweeping and apparently then unremarkable statement, "That an easement will become extinguished by unity of title and possession of the dominant and servient estates in the same person by the same right, is a principle of law too general and elementary to be questioned." The

5

Law Court continued, "But this principle, like many others, is subject to qualifications. In order that unity of title to the two estates should operate to extinguish an existing easement, the ownership of the two estates should be coextensive, equal in validity, quality, and all other circumstances of right." In *Dority* the easement was not extinguished as the one interest was in fee while the other "was but a chattel interest, not only fractional in quantity, but limited in its duration to the term of nine hundred and ninety-nine years". *Dority* at 388.

In *Smith v. Dickson*, 225 A.2d 631,6 (Me. 1967) the Law Court stated, "Any private right of way which may have existed across the Smith lot ended with merger of lots into one ownership."

In *Fitanides v. Holman*, 310 A.2d 65, 67 (Me. 1973) the Law Court noted that since both the dominant and servient estate came into common ownership and "... since the ownership of both parcels was in fee, we find that whatever claim to a right of way which might have existed ended with merger of the subject lots in one owner." The Law Court also stated, at 67, "Once extinguished as here by merger, the easement does not come again into existence upon a separation of the former servient and dominant estates unless a proper new grant or reservation is made. 28 *C.J.S. Easements* §57c."

Lastly in *LeMay v. Anderson*, 397 A.2d 984, 5, n. 3 the Law Court briefly stated, "Unity of title to the dominant and servient estate, of course, extinguishes an easement."

After a review of the written submissions including the initial and second affidavits of Robert Yaroumian and after oral argument I have concluded that there are no material facts in dispute concerning the merger issue and the defendants are correct as a matter of law.

By February 12, 1943 Llewellyn Parsons had obtained ownership of a substantial number of lots such that with one minor exception the easements in Roads "A" and "H" were terminated by merger as to the property she owned. The plaintiffs do not have the right to cross the sections of Road "A" between Lots F and 21 or Lot CC and 21. The easement across Lot 12 is not terminated by merger. The easement involving Road "H" has been terminated in its entirety.

No later deeds revived the easements for the plaintiffs. Llewellyn Parsons did not need to own all of the land referenced in the 1915 plan in order for the doctrine of merger to terminate the easements solely across the land that she owned. See *Cheever v. Graves*, 32 Mass. App. Ct. 601; 592 N.E. 2d 758 (1992). This order and judgment does not resolve any claims to Roads "A" or "H" by people or entities other than the two named plaintiffs.

## ABANDONMENT

This issue arises only if the easements were not terminated through merger or through the application of 23 M.R.S.A. §3031 and in fact existed. It is not necessary to reach this issue.

## ADVERSE POSSESSION

The plaintiffs have failed to establish that any rights, once lost through merger or through the application of 23 M.R.S.A. §3031, were re-created through adverse possession. See *Androkites v. White*, 2010 ME 133, ¶14, 10 A.3d 677, 681.

## PAPER STREETS STATUTE

The Maine statute governing private rights in proposed, unaccepted ways in subdivisions has two paragraphs which are relevant. 23 M.R.S.A. §3031(2). Each side is correct in their interpretation of the paragraph of the sub-section that they emphasized.

7

The defendants are correct in their assertion pursuant to the first paragraph that since Roads "A" and "H" were not constructed and used as private rights-of-way, any easements in them have been terminated. The plaintiffs are correct that by deed and by the second paragraph of the sub-section the abutting owners own to the centerline of the way. The questions of ownership of the fee interest and the question of the continuing existence of a right-of-way are separate.

SLANDER OF TITLE

Since plaintiffs have failed to establish that there was a false statement made with malice or with reckless disregard of its falsity, their claim for slander of title in Count III of the third amended complaint fails. *Colquhoun v. Webber*, 684 A.2d 405, 9 (Me. 1996).

> The entry is:
>
> Judgment for the defendants and party-in-interest Liversidge on Counts I, II and III of the third amended complaint.
>
> Judgment for the defendants and party-in-interest Liversidge on the counterclaim. The plaintiffs' rights in Road "A", except at Lot 12, and Road "H" as depicted in the August 10, 1915 Plan of Division of a Part of the Estate of Cha's Parsons no longer exist and have been terminated as a matter of law.
>
> The defendants are responsible for recording an attested copy of the judgment and paying the appropriate recording fees.

Dated: _September 27, 2012_

Paul A. Fritzsche
Justice, Superior Court


The applicable appeal period has expired without action or the final judgment has been entered after remand following appeal.


Dated: _____           _____
                                                    Clerk


8

ATTORNEY FOR PLAINTIFFS:
ALAN SHEPARD ESQ
SHEPARD & READ
93 MAIN STREET
KENNEBUNK ME 04043

ATTORNEY FOR DEFENDANT S:
PETER PLUMB ESQ
KELLY MCDONALD ESQ
MURRAY PLUMB & MURRAY
PO BOX 9785
PORTLAND ME 04104
 FOR: WILLIAM PARSONS, JR., WILLIAM C. PARSONS, CHARLES B.
       PARSONS, LOUISE P. PARRY, LOUISE PARSONS SMITH,
       DAVID L. WELD, JR., CHRISTOPHER P. WELD, ASHLEY TAYLOR,
       RUDOLPH HUTZ, ELIZABETH HUTZ, THOMAS K. LIVERSIDGE, JR
       KATHERINE A. BURNS, MICHAEL A. GREELY, ANN FERGUSON,
       MATTHEW MILLER, STACEY MILLER, BEN MILLER, ALI GIACOMIN,
       LLEWELLYN PARSONS SMITH, SARAH S. GERRITZ, ABIGAIL A.S.
       DAVIS, G. PUTNAM SMITH, JR. AND BONNIE CURRY

ATTORNEY FOR DEFENDANTS:
THEODORE SMALL ESQ
BERNSTEIN SHUR
PO BOX 9729
PORTLAND ME 04101
 FOR: MATTHEW J. BURNS, DEBBIE P. BURNS,
       AND PARTY-IN-INTEREST: JULIA READ BURNS


ATTORNEY FOR PARTY-IN-INTEREST: UNITED STATES OF AMERICA
THOMAS DELAHANTY ESQ
US ATTORNEYS OFFICE
100 MIDDLE STREET 6TH FLOOR
PORTLAND ME 07101

ATTORNEY FOR PARTY-IN-INTEREST: LLEWELLYN P.H. ALDEN
JENS-PETER BERGEN ESQ
LAW OFFICE OF JENS-PETER W BERGEN
79 PORTLAND ROAD
KENNEBUNK ME 04043

ATTORNEY FOR PARTY-IN-INTEREST: MARY ELIZABETH FLUKE
REID HAYTON HULL III, ESQ
RICHARD HULL ESQ
HULL LAW OFFICE LLC
409 ALFRED STREET
BIDDEFORD ME 04005

ATTORNEY FOR PARTY-IN-INTEREST:
THOMAS DANYLIK ESQ
WOODMAN EDMANDS DANYLIK & AUSTIN
PO BOX 468
BIDDEFORD ME 04005
  FOR: ELIZABETH W. MCMASTER, PHILIP R.B. MCMASTER, CHARLES BACH
      MCMASTER AND JOSEPH P. MCMASTER

PRO SE PARTY-IN-INTEREST:
ABIGAIL M ALLING
41 PARSONS BEACH
KENNEBUNK ME 04043